CASE NO. 23-1462

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

### *DOUGLAS MILCZAK*

**Plaintiff-Appellant**

**v.**

### *GENERAL MOTORS LLC*

**Defendant-Appellee**

**On Appeal from the United States District Court**
**For the Eastern District of Michigan**
**Case No. 2:21-cv-11484**
**Honorable George Caram Steeh**

**DEFENDANT-APPELLEE GENERAL MOTORS LLC'S**
**BRIEF ON APPEAL**

**Donald C. Bulea (Mich. P84895)**
**Mami Kato (Mich. P74237)**
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PLLC**
*Attorneys for Defendant-Appellee*
**34977 Woodward Avenue, Suite 300**
**Birmingham, Michigan 48009**
**(248) 593-6400**

# <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and 6th Cir. R. 26.1, Defendant-Appellee makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

**YES.**

**Parent Corporation/Affiliate Name: General Motors Company**
**Relationship with Named Party: Indirect Subsidiary**

2. Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

**NO.**

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PLLC

s/ Donald C. Bulea
Donald C. Bulea (Mich. P84895)
Mami Kato (Mich. P74237)
*Attorneys for Defendant-Appellee*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
(248) 593-6400
daniel.cohen@ogletree.com
Dated: October 23, 2023            mami.kato@ogletree.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ....................................... ix

STATEMENT OF THE CASE ............................................................... 1

    A.    Plaintiff's Employment History ............................................. 1

    B.    The "Unallocation" of the DHAM and the Resulting Job
        Transfers for All Salaried Employees ...................................... 4

        1.    The Immediate Impact of the "Unallocation"
                Announcement in November 2018 ............................................ 4

        2.    Plaintiff's Transfer to General Assembly (GA)
                Maintenance in January 2019 ............................................... 6

        3.    Plaintiff's Transfer to the Body Shop in July 2019 ................. 7

        4.    Plaintiff's Temporary Transfer to Second Shift ...................... 8

        5.    Plaintiff's Transfer to the Installation Group in February
                2020 ....................................................................... 10

    C.    Workplace Incidents Unrelated to Plaintiff's Age ........................... 11

        1.    The Mousetrap Drawing Found in May 2019 ....................... 12

        2.    GM Issued Plaintiff Written Counseling for His Poor
                Attendance ................................................................ 14

        3.    Photo of an "Old Man" and Michael Jackson CD Found in
                August 2020 ............................................................... 14

    D.    Minimal and Isolated Age-Related Comments by Lazaroff
        Between December 2018 and July 2019 ...................................... 16

    E.    Plaintiff's EEOC Charge of Discrimination ................................ 18

F.    Suggestion Plan Bonuses and Plaintiff's Vague Allegations of Mistreatment by Brent Cuthbert and Guy Mitchell ........................... 18

SUMMARY OF THE ARGUMENT ................................................... 21

STATEMENT OF THE STANDARD OF REVIEW .......................... 22

ARGUMENT ...................................................................................... 23

I.     THE DISTRICT COURT PROPERLY EXCLUDED PLAINTIFF'S UNSWORN DECLARATION AND "SUMMARY OF EVENTS" ......... 23

II.    PLAINTIFF HAS FAILED TO MEET HIS EVIDENTIARY BURDEN ON THE AGE-BASED HOSTILE WORK ENVIRONMENT CLAIM ................................................................. 27

    A.    Plaintiff Failed to Exhaust His Administrative Remedy ................... 27

    B.    The Evidence Does Not Show Age-Based Harassment That Was Sufficiently Severe or Pervasive ...................................................... 28

        1.    Nearly All of the Events Plaintiff Takes Issues With Are Not Based on His Age ............................................................. 29

        2.    As a Matter of Law, None of the Alleged Incidents Based on Plaintiff's Age Was Severe, Pervasive, Abusive, or Hostile ...................................................................................... 31

III.   PLAINTIFF CANNOT MAINTAIN HIS AGE DISCRIMINATION CLAIM UNDER THE ADEA ...................................................................... 34

    A.    Plaintiff's Evidentiary Burden Under the *McDonnell-Douglas* Burden Shifting Framework .............................................................. 34

    B.    Plaintiff Cannot Establish a *Prima Facie* Case of Age Discrimination ................................................................................. 36

        1.    There Is No Legally Cognizable Adverse Employment Action ................................................................................... 36

            a.    Plaintiff Was Not Entitled to Higher Raises, Bonuses, or the Suggestion Bonuses ........................... 37

        b.     Transfers Within DHAM and Temporary Shift Change Were Not Adverse Actions ............................ 39

     2.     There Is No Evidence Similarly Situated Younger Employees Received Better Treatment.................................. 44

C.    GM Has Articulated Legitimate, Non-Discriminatory Reasons for Plaintiff's Job Transfers and Reassignment to Second Shift ...... 45

D.    Plaintiff Cannot Establish Pretext ...................................... 47

IV.    PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM UNDER THE ADEA................................................................. 48

A.    Plaintiff Cannot Establish A *Prima Facie* Case of Retaliation......... 49

     1.     Plaintiff's Limited Protected Activity..................................... 49

     2     Plaintiff Cannot Establish a Causal Connection .................... 51

B.    Plaintiff Cannot Establish Pretext to Maintain His Retaliation Claim ................................................................................. 53

CONCLUSION.................................................................................... 55

CERTIFICATE OF COMPLIANCE....................................................... 56

CERTIFICATE OF SERVICE ............................................................... 57

ADDENDUM 1: DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS................................................................................... 58

ADDENDUM 2: UNPUBLISHED OPINIONS CITED IN THE BRIEF ............ 60

<u>**CASES**</u>

*Alexander v. CareSource*,
    576 F.3d 551 (6th Cir. 2009) .......................................................................23, 25

*Amini v. Rite Aide Corp.*,
    819 Fed. Appx. 344 (6th Cir. Jul. 7, 2020)...................................................30, 32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................................24, 35

*Arendale v. City of Memphis*,
    519 F.3d 587 (6th Cir. 2008) .......................................................................23, 52

*Barrett v. Lucent Technologies, Inc.*,
    36 Fed. Appx. 835 (6th Cir. Jun. 6, 2002)...................................................38, 51

*Beans v. City of Massillon*,
    2016 WL 7492503 (N.D. Ohio Dec. 30, 2016), *aff'd*, 706 Fed. Appx. 295
    (6th Cir. Aug. 29, 2017).....................................................................................24

*Binay v. Bettendorf*,
    601 F.3d 640 (6th Cir. 2010) ..............................................................................23

*Blount v. Stanley Engineering Fastening*,
    55 F.4th 504 (6th Cir. 2022) .......................................................................26, 27

*Brown v. Metropolitan Government of Nashville and Davidson County*,
    722 Fed. Appx. 520 (6th Cir. Feb. 1, 2018) .......................................................29

*Chattman v. Toho Tenax America, Inc.*,
    686 F.3d 339 (6th Cir. 2012) ..............................................................................54

*Cosby v. Purdue Univ.*,
    2010 WL 2838377 (N.D. Ind. July 16, 2010)....................................................24

*Crawford v. Medina General Hosp.*,
    96 F.3d 830 (6th Cir.1996) .............................................................29, 30, 32, 33

*Davis v. McCourt*,
   226 F.3d 506 (6th Cir. 2000) ..............................................................23

*Fox v. Eagle Distribution Co.*,
   510 F.3d 587 (6th Cir. 2007) ..............................................................49

*France v. Lucas*,
   836 F.3d 612 (6th Cir. 2016) ..............................................................26

*Gross v. FBL Fin. Services, Inc.*,
   557 U.S. 167 (2009)............................................................................35

*Harper v. Elder*,
   803 Fed. Appx. 853 (6th Cir. Mar. 4, 2020)..................................42, 43

*Harris v. American Postal Workers Union*,
   198 F.3d 245 (6th Cir. Oct. 19, 1999)(table) ................................35, 44

*Harris v. Forklift Systems, Inc.*,
   510 U.S. 17 (1993)..............................................................................31

*King v. Steward Trumbull Memorial Hospital, Inc.*,
   30 F.4th 551 (6th Cir. 2022) ..............................................................22

*Kocsis v. Multi-Care Management, Inc.*,
   97 F.3d 876 (6th Cir. 1996) ....................................................37, 40, 41

*Laster v. City of Kalamazoo*,
   746 F.3d 714 (6th Cir. 2014) ..............................................................36

*Lewis v. City of Chicago*,
   496 F.3d 645 (7th Cir. 2007) ....................................................38, 39, 43

*Lujan v. Nat'l Wildlife Federation*,
   497 U.S. 871 (1990)............................................................................27

*McMillian v. Potter*,
   130 Fed. Appx. 793 (6th Cir. May 11, 2005) ....................................36

*Mickey v. Zeidler Tool and Die Co.*,
   516 F.3d 516 (6th Cir. 2008) ....................................................48, 51

*Miles v. South Central Human Resources Agency, Inc.*,
    946 F.3d 883 (6th Cir. 2020) ...............................................................35

*Pack v. Damon Corp.*,
    434 F.3d 810 (6th Cir. 2006) ...............................................................27

*Peecook v. Northwestern Nat'l Ins. Group*,
    156 F.3d 1231 (6th Cir. Aug. 3, 1998) ...............................................29

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) ...............................................34, 35, 48

*Phillips v. UAW, Int'l*,
    854 F.3d 323 (6th Cir. 2017) ...............................................................34

*Pines v. Bd. of Regents of the Univ. of Michigan*,
    2012 WL 380242 (E.D. Mich. Feb. 6, 2012)......................................53

*Policastro v. Northwest Airlines, Inc.*,
    297 F.3d 535 (6th Cir. 2002) .........................................................34, 44

*Primes v. Reno*,
    190 F.3d 765 (6th Cir. 1999) ...............................................................36

*Rose v. State Farm Fire & Cas. Co.*,
    766 F.3d 532 (6th Cir. 2014) ...............................................................47

*Scola v. Publix Supermarkets, Inc.*,
    557 Fed. Appx. 458 (6th Cir. Feb. 27, 2014) .....................................32

*Sfakianos v. Shelby County Government*,
    481 Fed. Appx. 244 (6th Cir. Jun. 6, 2012).......................................26

*Shrivastava v. RBS Citizens Bank, N.A.*,
    227 F.Supp.3d 824 (E.D. Mich. 2017) ...............................................31

*Spees v. James Marine, Inc.*,
    617 F.3d 380 (6th Cir. 2010) ...............................................................41

*Spengler v. Worthington Cylinders*,
    615 F.3d 481 (6th Cir. 2010) ...............................................................49

*Tenneco Auto. Operating Co. v. Kingdom Auto Parts*,
  410 Fed. Appx. 841 (6th Cir. Oct. 28, 2010)......................................24

*Thornton v. Fed. Express Corp.*,
  530 F.3d 451 (6th Cir. 2008) ................................................................32

*Threat v. City of Cleveland*,
  6 F.4th 672 (6th Cir. 2021) ......................................................39, 40, 41

*United States v. Penaloza*,
  648 Fed. Appx. 508 (6th Cir. May 12, 2016) ...................................47

*White v. Baxter Healthcare Corp.*,
  533 F.3d 381 (6th Cir. 2008) ......................................................37, 42

*White v. Burlington Northern & Santa Fe R. Co.*,
  364 F.3d 789 (6th Cir. 2004) ..............................................................40

*Whitfield v. Tennessee*,
  639 F.3d 253 (6th Cir. 2011) ..............................................................22

*Willard v. Huntington Ford, Inc.*,
  952 F.3d 795 (6th Cir. 2020) ..............................................................47

*Yazdian v. ConMed Endoscopic Technologies, Inc.*,
  793 F.3d 634 (6th Cir. 2015) ......................................................49, 50

*Younis v. Pinnacle Airlines, Inc.*,
  610 F.3d 359 (6th Cir. 2010) ..............................................................27


**STATUTES**

28 U.S.C. §1746......................................................................11, 25, 26


**OTHER AUTHORITIES**

6th Cir. R. 26.1............................................................................................2

6th Cir. R. 30(g)(1) ................................................................................58

Cir. R. 32.1(a)(1)..................................................................60

Fed. R. App. P. 26.1..............................................................2

Fed. R. App. P. 28(b)............................................................1

Fed. R. App. P. 32(a)............................................................56

Fed. R. App. P. 32(g)(1)........................................................56

Fed. R. App. P. 32.1(b)..........................................................60

Fed. R. Civ. P. 56(a)............................................................22

Fed. R. Civ. P. 56(c)(1)(A)......................................................25

Fed. R. Civ. P. 56(c)(4)........................................................25

Fed. R. Evid. 1006..............................................................25

# STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Rule 34 of the Federal Rules of Appellate Procedure and the Rules of the Sixth Circuit Court of Appeals, Defendant-Appellee General Motors LLC ("GM") hereby requests oral argument. Each of Plaintiff's arguments on appeal (1) misconstrues the record and relies on a number of factual statements that are either not supported by the record or based on inadmissible evidence, (2) misstates applicable legal framework for each of the claims asserted and/or fails to meet Plaintiff's evidentiary burdens, and (3) is otherwise vague and confusing as to the evidence and arguments in support of each distinct cause of action. Therefore, oral argument may assist the Court in clarifying the underlying material facts and legal principles that are applicable to this appeal.

<u>**STATEMENT OF THE CASE**</u>[1]

**A.     Plaintiff's Employment History.**

Plaintiff-Appellant Douglas Milczak ("Plaintiff") is a 59-year old Caucasian male[2] who began working for Defendant-Appellee General Motors LLC ("GM") in 1994 as a Senior Manufacturing Engineer. (Milczak, 20:9-23 and 22:4-21 [RE 26-2, PageID #130-131]). From 1994 through 2015, Plaintiff was a Senior Manufacturing Engineer overseeing the installation and launch of conveyor systems at various GM plants around the country. (Milczak, 26:19-27:10 [RE 26-2, PageID #132-133)]). In 2015, in response to Plaintiff's request to stop traveling, GM transferred Plaintiff to the engineering department at GM's Detroit-Hamtramck Assembly Plant ("DHAM") with the same Senior Manufacturing Engineer title. (*Id*.; Milczak, 140:19-141:14 [RE 26-2, PageID #173-174]).

In May 2016, Michael Lazaroff ("Lazaroff"), born in 1949 and over 13 years older than Plaintiff, became Plaintiff's supervisor. (Milczak, 27:11-15 and 61:7-10 [RE 26-2, PageID #133 and RE 40-2, PageID # 588]). According to Plaintiff, Lazaroff referred to Plaintiff and other employees as "motherfucker" and "my bitch"

---

[1] Except for the incorrect date of the Charge of Discrimination contained in Issue B (should be "12/11/**19**," not "12/11/**29**"), GM is in agreement with Plaintiff's jurisdictional statement and Statement of Issues. Fed. R. App. P. 28(b).

[2] The record cited by Plaintiff does not support that Plaintiff is "59 yrs old," but GM does not dispute Plaintiff's assertion regarding his age or the District Court's reliance on Plaintiff's representation. (Opinion and Order, 2 [RE 42, PageID #751]).

multiple times between August/September 2016 and December 2018. (Milczak, 44:23-48:17 [RE 40-2, PageID # 575-578 and RE 26-2, PageID # 146]). While Plaintiff purportedly asked Lazaroff to stop using vulgar language "a couple of times" (to which Lazaroff was receptive), Plaintiff unequivocally admitted that he never reported Lazaroff's alleged name-calling to Lazaroff's superiors or to GM's human resources. (Milczak, 47:18-48:4 [RE 40-2, PageID # 578 and RE 26-2, PageID # 146]). Plaintiff also admitted that prior to December 2018, neither Lazaroff nor anyone else at GM made any comments that, in any way, referenced Plaintiff's age.[3] (Milczak, 45:7-46:14 [RE 40-2, PageID #576-577]).

From 1994 through the present, Plaintiff has been, and remains to this day, a salaried employee of GM. (Milczak, 22:12-21 [RE 26-2, PageID #131]). GM has consistently provided Plaintiff annual raises and bonuses (plus benefits) with the following compensation scheme for the years 2019, 2020, and 2021:

---

[3] The record, inclusive of the citation provided in its brief, does not support the EEOC's claim that Plaintiff claimed these vulgarities "were due to his age." (Document: 23, Page: 9).

**Annual Base Salary**

|      | Previous Salary | New Salary   | Increase ($) | Increase (%) |
|------|-----------------|--------------|--------------|--------------|
| 2019 | $122,233.00     | $125,289.00  | $3,055.00    | 2.50%        |
| 2020 | $125,289.00     | $128,421.00  | $3,132.00    | 2.50%        |
| 2021 | $128,421.00     | $132,274.00  | $3,853.00    | 3.00%        |

(Compensation History [RE 26-14, PageID # 347-349]).

**Annual Bonus (teamGM Bonus)[4]:**

|      | 100% Payout Opportunity | Company Performance Opportunity | Actual Payout |
|------|-------------------------|---------------------------------|---------------|
| 2019 | $15,890.00              | $15,095.00                      | $15,095.00    |
| 2020 | $16,287.00              | $18,567.00                      | $18,567.00    |
| 2021 | $16,695.00              | $15,860.00                      | $15,860.00    |

(*Id.*)

Plaintiff acknowledged that his total annual compensation from GM in March 2022 was in the range of $165,000 to $170,000, plus benefits. (Milczak, 1 and 89:8-13 [RE 26-2, PageID # 129 and 163]). The record reflects that GM indisputably

---

[4] For teamGM Bonus, "100% Payout Opportunity" is based on each employee's eligibility whereas "Company Performance Opportunity" accounts for both the employee's eligibility and corporate performance. "Actual Payout" is based on the employee's eligibility, corporate performance, and the employee's individual performance. (Compensation History [RE 26-14, PageID # 347-349]). Plaintiff received 100% of the bonus that was available to him.

provided Plaintiff with steady increases in his base annual salary and 100% of the annual bonus to which he was entitled for each of the years that form the basis of his age-related claims. (Milczak, 89:8-91:7 [RE 26-2, PageID # 163-164 and RE 40-2, PageID # 602]; Compensation History [RE 26-14, PageID # 347-349]).

**B.    The "Unallocation" of the DHAM and the Resulting Job Transfers for All Salaried Employees.**

**1.    The Immediate Impact of the "Unallocation" Announcement in November 2018.**

In late November 2018, GM announced that DHAM would be "unallocated," meaning that GM would wind down and eventually cease the production of vehicles being manufactured at DHAM; thereafter, DHAM would either be closed or retooled for electric vehicle production. (Milczak, 37:24-38:2 and 131:19-22 [RE 26-2, PageID # 140-141, 170]; Declaration of Sean Tackett, ¶2 [RE 26-8, PageID # 250]). Plaintiff acknowledged that DHAM's salaried workforce was told they were all "going to get jobs in other plants," or be terminated. (Milczak, 37:24-38:2 [RE 26-2, PageID # 140-141]). Unsurprisingly, the unallocation announcement caused considerable anxiety among the salaried workforce at DHAM, with some worrying that they might lose their jobs. (Milczak, 131:24-132:5 [RE 26-2, PageID # 170-171]). Consistent with Plaintiff's recollection, James Donlin, part of DHAM management, testified: "[with production] shutting down [,] [t]here was no one advancing anywhere, except for trying to survive, get out, and get a job. The truth is

everybody that was there was worried about losing their job and getting their next placement." (Donlin, 19:23-20:2 [RE 26-12, PageID # 341]).

Due to unallocation, many of Plaintiff's co-workers sought and accepted positions at other plants, which required them to transfer to new locations. For example, Plaintiff's co-worker Ronnie Perez, who was five years younger than Plaintiff, left DHAM and accepted a position at the Propulsion Center in Toledo, Ohio because "the [DHAM] plant was closing." (Perez, 4:20-21, 5:18-6:3, and 8:11-16 [RE 26-4, PageID # 217-218, 221]). Pat Quigley, who was working in the General Assembly (GA) Maintenance at DHAM, also left for a job in Flint, Michigan in January 2019. (Milczak, 37:16-38:5 [RE 26-2, PageID # 140-141]).

In November 2018, GM extended Voluntary Severance Program Opportunity for eligible employees in an effort to reduce the salaried workforce; Plaintiff did not apply for the opportunity. (Milczak, 63:10-16 [RE 26-2, PageID # 156]; VSP Opportunity Communication [RE 40-4, PageID # 654-656]). GM began implementing a series of involuntary layoffs in January 2019 but Plaintiff was not selected; he instead remained employed at DHAM, unaffected by GM's need to reduce the DHAM's salaried workforce due to unallocation. (Milczak, 63:17-21 [RE 26-2, PageID # 156]).

### 2. Plaintiff's Transfer to General Assembly (GA) Maintenance in January 2019.

Instead of transferring to a new location or being laid off, Plaintiff took advantage of the vacancy created by Pat Quigley's departure from DHAM in January 2019. As directed by Mike Lazaroff, Plaintiff assumed the job duties left open by Quigley and began working in GA Maintenance in January 2019, maintaining his title as a Senior Manufacturing Engineer. (Milczak, 38:6-20 [RE 26-2, PageID # 141]). While Plaintiff now claims that GA Maintenance was "a very stressful job" because he had to supervise a team of UAW-represented skilled trade employees performing maintenance work instead of overseeing engineering work for conveyors and equipment,[5] there is no dispute that Plaintiff's compensation was unaffected by his January 2019 transfer necessitated by unallocation. (Milczak, 113:14-114:10 [RE 26-2, PageID # 167-168]; Compensation History [RE 26-14, PageID # 347-349]).

Due to unallocation, Plaintiff's pre-unallocation job duties at DHAM had become obsolete by January 2019, and neither Plaintiff nor the record suggests otherwise. The record is also devoid of any evidence that Plaintiff desired or sought

---

[5] Plaintiff later testified that being transferred to the Body Shop was an adverse action despite being advised that the Body Shop "needed some help on conveyors" because he did not want to be moved out of his GA Maintenance position. (Milczak, 97:17-98:8 [RE 40-3, PageID # 608-609]).

out any other positions, either within or outside of DHAM.[6] Thus, there is no question that Lazaroff's decision to assign Plaintiff to the vacancy in GA Maintenance enabled Plaintiff to remain at DHAM while his co-workers took the voluntary buyout, were involuntarily laid-off, or accepted transfers to other GM plants.[7]

### 3.   Plaintiff's Transfer to the Body Shop in July 2019.

Lazaroff remained Plaintiff's supervisor until July 15, 2019 when Plaintiff was transferred to the Body Shop at DHAM. (Milczak, 41:13-19 [RE 26-2, PageID # 142]; Lazaroff, 21:10-21 [RE 26-3, PageID # 209]; Ferraiuolo Decl. ¶5 [RE 26-10, PageID # 330]). In summer 2019, as manufacturing operations at DHAM were winding down, Siarhei Tsahelnik, an employee with significant experience as a GA Maintenance Group Leader, transferred to DHAM from GM's Spring Hill, Tennessee plant for family-related reasons on a temporary basis.[8] (Lazaroff, 21:14-23 [RE 26-3, PageID # 209]; Tackett Decl. ¶8, [RE 26-8, PageID # 251]). Because

---

[6] According to Donlin, Plaintiff rejected offers from GM plants in Romulus, Michigan and Toledo, Ohio stating, "I'm staying here or I'm not staying [with GM]." (Donlin, 16:21-17:19 [RE 26-12, PageID #340]).

[7] Plaintiff also credits Lazaroff with securing him a position at DHAM in 2016 so he could stop traveling. (Milczak, 48:2-4 [RE 26-2, PageID # 146]).

[8] Tsahelnik worked at DHAM for approximately six months and in February 2020, transferred to a position in GM's Global Technical Center in Warren, Michigan. [Tackett Decl. ¶9-10 [RE 26-8, PageID # 252]).

the Body Shop at DHAM needed Plaintiff's skillset based on his conveyance engineering background at the same time, and to capitalize on Tsahelnik's extensive experience in GA Maintenance, Lazaroff transferred Plaintiff to the Body Shop managed by Damon Ferraiuolo (who is approximately seven years older than Plaintiff), and placed Tsahelnik in GA. (Lazaroff, 21:18-22:2 [RE 26-3, PageID # 209-2010]; Tackett Decl. ¶7-8 [RE 26-28, PageID # 251-252]; Ferraiuolo Decl. ¶5 [RE 26-10, PageID # 330]).

The transfer from GA to the Body Shop did not materially alter Plaintiff's job duties; Plaintiff performed the same job duties in the Body Shop as he did in GA, *i.e.*, supervising the maintenance and repair work performed by the UAW-represented skilled trade employees. (Ferraiuolo Decl. ¶6 [RE 26-10, PageID # 331]). Plaintiff's reassignment to the Body Shop also did not affect his title, salary, or benefits. (*Id.*)

### 4. Plaintiff's Temporary Transfer to Second Shift.

In August 2019, Plaintiff was temporarily transferred from first shift to second shift due to a staffing shortage. Specifically, GM terminated Tom Chonjnowski's contract assignment in August 2019 as a cost saving measure due to unallocation and winding down of the manufacturing operations. (Ferraiuolo Decl. ¶7 [RE 26-10, PageID # 331]). Chonjnowski, like Plaintiff, supervised the UAW-represented skilled trade employees who performed maintenance and repair work in the Body

Shop. (*Id*.) Effective August 26, 2019, Ferraiuolo and the Body Shop Area Manager Jason McKelvey temporarily assigned Plaintiff to fill the immediate void left on the second shift by Chonjnowski's departure. (Milczak, 57:15-21 [RE 26-2, PageID # 153]; Ferraiuolo Decl. ¶7-9 [RE 26-10, PageID # 331]). In early January 2020, GM assigned Plaintiff back to the first shift. (Milczak, 57:22-58:3 [RE 26-2, PageID # 153-154]; Ferraiuolo Decl. ¶10 [RE 26-10, PageID #331]).

While Plaintiff expressed a *preference* that he not be assigned to second shift due to a purported strain on his marriage and asked McKelvey to reconsider the decision, Plaintiff's contemporaneous communication does not reference his age in any way.[9] (8/13/2019 Email [RE 26-10, PageID #335]). While Plaintiff subjectively asserts his skills were underutilized on second shift (Milczak, 59:4-16 [RE 26-2, PageID # 155]), Plaintiff's compensation, title, essential job duties, and responsibilities were not impacted in any way by his temporary assignment to the second shift.[10] (Milczak, 101:5-17 [RE 26-2, PageID # 166]; Ferraiuolo Decl. ¶10 [RE 26-10, PageID # 331]).

[9] There is no evidence that Ferraiuolo and McKelvy's decision to assign Plaintiff to the second shift on a temporary basis was motivated by or related to Plaintiff's age. While Plaintiff claims that Ferraiuolo, on one occasion, agreed with Plaintiff's subjective perception that GM promoted the hiring of younger workers (Milczak, 56:7-57:8 [RE 26-2, PageID # 152-153]), the alleged acknowledgment does not suggest any age bias by Ferraiuolo.

[10] While Plaintiff claims he lost overtime opportunities due to these transfers, Plaintiff conceded that as an exempt, salaried employee, his manager had complete

**5. Plaintiff's Transfer to the Installation Group in February 2020.**

GM transferred Plaintiff back to the first shift during the first week of January 2020. (Milczak, 57:22-58:3 [RE 26-2, PageID # 153-154]; Ferraiuolo Decl. ¶10 [RE 26-10, PageID #331]). Plaintiff reported to Ferraiuolo until February 15, 2020 when he accepted a position as a Senior Manufacturing Engineer with the installation group at DHAM as a part of the retooling project, reporting to Brent Cuthbert. (Milczak, 41:20-42:15 [RE 26-2, PageID # 142-143]; Ferraiuolo Decl. ¶11 [RE 26-2, PageID # 332]).

According to Plaintiff, Dave Wilke, Cuthbert's superior, offered Plaintiff the position in the installation group without requiring Plaintiff to formally apply through GM's established application portal or interview for the position, and despite Plaintiff's claimed inability to travel, which Plaintiff understood to be a requirement for the position. (Milczak, 139:1-141:25 [RE 26-2, PageID # 172-174]). While the installation group is based out of the central office in Warren, Michigan, Plaintiff has continuously worked at DHAM, which has always been his preferred location. (*Id*.; Plaintiff's 9/17/2019 GM Mobility Interest Form [RE 26-8, PageID # 261]). Today, Plaintiff works in the installation group for DHAM's retooling project, now Factory ZERO, a dedicated electric vehicle assembly plant. (Milczak, 41:20-

---

discretion on whether or not to approve any overtime pay for him. (Milczak, 22:12-21 and 101:5-17 [RE 26-2, PageID # 131 and 166]).

41:13 [RE 26-2, PageID # 142-143]). The record is thus unequivocal: Plaintiff has been continuously employed at DHAM (now Factory ZERO) while the rest of the DHAM salaried workforce relocated, accepted a buyout, or were involuntarily laid off.

### C. Workplace Incidents Unrelated to Plaintiff's Age.

Plaintiff struggled to manage the GA Maintenance workforce, which consisted of UAW-represented skilled trade employees who, according to Plaintiff, often refused to follow his directions and/or failed to complete the work that Plaintiff assigned them.[11] (Milczak, 69:2-72:21 [RE 40-2, PageID # 591-594]). While Plaintiff claims Lazaroff and Donlin failed to adequately support him in dealing with the UAW-represented employees except to acknowledge that they were "a bitch to work with," (Milczak, 70:20-24 [RE 40-2, PageID # 592]), the record is devoid of any admissible evidence that even remotely suggests that Lazaroff and Donlin's alleged *laissez-fair* approach with respect to managing the UAW-represented workforce was in any way related to Plaintiff's age.

---

[11] Plaintiff relies on his 40-page "summary of events" to support his narrative regarding the UAW-represented employees. (Milczak, 203:12-204:4 [RE 40-3, PageID # 650-651]; Plaintiff's summary [RE 40-6, PageID # 682-721]). As the District Court correctly found, Plaintiff's "summary" is neither a notarized affidavit nor an unsworn declaration that complies with 28 U.S.C. §1746 and thus cannot be considered in reviewing a motion for summary judgment. (Opinion and Order, 8 [RE 42, PageID # 757]). The summary should similarly be excluded on appeal.

# 1. The Mousetrap Drawing Found in May 2019.

On May 22, 2019, Plaintiff found a drawing of a mousetrap, with his name written on the mouse that was trapped, and names of the trades, "Pipefitter," "Millwright," "Tool Maker," and "Electricians," written on the surrounding mice. (Milczak, 72:22-73:1 [RE 26-2, PageID # 157-158]; Drawing [RE 26-5, PageID # 226]). The drawing also contained the text: "when you're down and out[,] everyone wants to screw you." (*Id.*) While unprofessional and highly inappropriate, the drawing contains no reference to Plaintiff's (or anyone's) age. Importantly, Plaintiff admitted that he never told anyone at GM that he believed the mousetrap drawing was in any way related to his age, and that he didn't know what the drawing meant.[12] (Milczak, 81:18-23 [RE 26-2, PageID # 162]; Firek, 12:2-10 [RE 26-6, PageID # 239]).

Plaintiff reported this drawing to Lazaroff, who turned it over to Human Resources, who, in turn, immediately launched an investigation. (Milczak, 72:22-73:21 [RE 26-2, PageID # 158]). While HR representatives Kimberlee Russell and Kelsey Firek interviewed Plaintiff twice, interviewed more than 15 UAW-represented skilled trade employees and outside contractors, and reviewed logs from

---

[12] While Plaintiff testified that he *personally* viewed the drawing as ageist because it (inexplicably) reminded him of older dogs getting pushed around dog parks, Plaintiff conceded that he never shared this view with HR or anyone else at GM. (Milczak, 159:17-160:11 [RE 40-3, PageID # 648-649]).

nearby printers, the investigation was unable to identify the culprit. (Milczak, 75:19-76:19 [RE 26-2, PageID # 159-160]; Firek, 7:3-11:17 [RE 26-6, PageID # 234-238]; 7/10/2019 Email from Sean Tackett to Plaintiff [RE 26-7, PageID # 242-248]; Tackett Decl. ¶4 [RE 26-8, PageID # 251]; Investigation Summary [RE 26-9, PageID # 314-328]). Nevertheless, and as a remedial measure, GM implemented anti-harassment training and required all skilled trade employees to attend the training. (Tackett 7/10/2019 Email [RE 26-7, PageID # 242]; Tackett Decl. ¶4 [RE 26-8, PageID # 251]).

On July 10, 2019, Sean Tackett, HR/LR Director for DHAM, advised Plaintiff that GM was unable to identify the individual who distributed the drawing, and would be closing the investigation after implementing the mandatory anti-harassment training for all UAW-represented skilled trade employees at DHAM. (Tackett 7/10/2019 Email [RE 26-7, PageID # 242]). Plaintiff conceded that GM advised him of the general nature of the investigation and the outcome, but continues to complain that GM should have engaged a handwriting expert and offered a substantial monetary reward as a part of its investigation. (Milczak, 155:16-157:11 [RE 26-2, PageID # 182-183 and RE 40-3, PageID # 646]; Milczak 6/27/2019 Email to Russell [RE 26-7, PageID # 242-243]).

## 2. GM Issued Plaintiff Written Counseling for His Poor Attendance.

On August 8, 2019, GM issued Plaintiff a Letter to File for Absenteeism. (Letter to File [RE 26-16, Page ID # 353]). Plaintiff admitted that during the summer of 2019, he did not "show up to work" due to "stress headaches" that he could not predict and as a result, accrued an unacceptable number of unexcused absences. (Milczak, 99:1-20 [RE 26-2, PageID # 165]; Tackett Decl. ¶12-14 [RE 26-8, PageID # 252-253]). Despite his acknowledged serial absenteeism, Plaintiff now claims that the Letter to File was a "total crap" because he is personally unaware of any attendance policy for GM's salaried workforce, and because there was "no reason for [him]" to "come in on second shift by [myself]."[13] (*Id.*) Neither the Letter nor the counseling affected Plaintiff's compensation or benefits, and Plaintiff does not claim otherwise.

## 3. Photo of an "Old Man" and Michael Jackson CD Found in August 2020.

On August 18, 2020, nearly 15 months after Plaintiff found the mousetrap drawing and nearly six months after Plaintiff transferred to the installation group working out of DHAM, Plaintiff claims to have found "a picture of an old man, long hair, with eyes poked out" on a desk in a cubicle area where he worked. (Milczak,

---

[13] Plaintiff's deposition reference to "second shift" while addressing his attendance issue is inconsistent with the record. The Letter to File was issued on August 8, 2019. Plaintiff was not transferred to second shift until August 26, 2019.

148:13-154:5 [RE 26-2, PageID # 175-181]; Photo [RE 26-13, PageID # 344 and RE 40-10, PageID # 730]). At the time, Plaintiff was working in an open cubicle area at the front of the DHAM plant, shared between four or five employees. (Milczak, 149:10-24 [RE 26-2, PageID # 176]). According to Plaintiff, he asked his co-workers who worked in the same area about the photo, but received no response. (Milczak, 148:21-149:6 [RE 26-2, PageID # 175-176]). Plaintiff did not report this incident to GM, and instead, left the photo out in the open for two weeks "to see if somebody would own up to putting" the photo on his desk. (Milczak, 152:21-154:5 [RE 26-2, PageID # 179-181]).

Two weeks later on August 30, 2020, Plaintiff returned from vacation to find a CD with a handwritten label "Michael Jackson Number Ones." (Milczak, 150:11-153:21 [RE 26-2, PageID # 177-180]; Photo [RE 26-13, PageID # 344]). According to Plaintiff, the CD was mixed in with other papers scattered on his desk, and none of his co-workers who worked nearby had any knowledge of the CD. (Milczak, 151:2-9 [RE 26-2, PageID # 178]). Plaintiff claims that the CD is age-related because it suggests his supposed preference for music from the "early '80's" as opposed to "hip-hop or anything like that." (Milczak, 151:21-152:22 [RE 26-2, PageID # 178-179]). Again, Plaintiff did not report this CD incident to GM. (Milczak, 153:22-154:5 [RE 26-2, PageID # 180-181]).

### D. Minimal and Isolated Age-Related Comments by Lazaroff Between December 2018 and July 2019.

Plaintiff claims Lazaroff began making comments that referenced Plaintiff's age in December 2018. (Milczak, 45:7-14 [RE 26-2, PageID # 145]). Plaintiff's testimony, however, is that in the seven (7) months between December 2018 and June 2019, Lazaroff made only three (3) discrete age-related comments to Plaintiff. (Milczak, 56:1-10 [RE 26-2, PageID # 152]).

First, Plaintiff claims that in December 2018, Lazaroff referred to Plaintiff as an "old fart" while discussing the skillet system during a morning meeting in the GA office. (Milczak, 47:21-48:14 [RE 26-2, PageID # 146-147]). According to Plaintiff, Lazaroff proceeded to discuss their plans ("We're going to do this and that") and nothing more was said. (*Id.*) There was no witness to Lazaroff's alleged remark in December 2018. (*Id.*)

Plaintiff next claims that Lazaroff referred to Plaintiff as an "old fucker" in January 2019 when discussing a site visit to a GM plant in Toledo in connection with Plaintiff's possible transfer to another plant. (Milczak, 49:15-50:12 [RE 26-2, PageID # 147-148]). According to Plaintiff, Lazaroff advised Plaintiff not to waste any time reaching out to a contact for a potential job at GM's Toledo plant because "they might not want an old fucker like you." (*Id.*)

The third and final remark by Lazaroff was allegedly uttered towards the end of June 2019. (Milczak, 54:22-55:25 [RE 26-2, PageID # 150-151]). According to

Plaintiff, Lazaroff was unsupportive of Plaintiff's suggestion for stopping the skillet conveyor carts from tipping over and when Plaintiff brought up his prototype again, Lazaroff became upset and responded by stating, "just drop it, you old motherfucker. You'll never get paid for this." (*Id*.) Again, there was no witness to this supposed exchange. (*Id*.) Notably, Plaintiff unequivocally testified in his deposition that these were the **only** age-related comments that Lazaroff made to Plaintiff, and that **no other GM employee made any age-related comments towards him**. (Milczak, 56:1-10 [RE 26-2, PageID # 152]).

Plaintiff claims that he reported Lazaroff's "name-calling" to Donlin in July 2019 **after** he learned that he was being transferred to the Body Shop. (Milczak, 86:24-87:25 [RE 40-2, PageID # 599-600]). When Donlin advised Plaintiff that it was a classic case of "he said, she said" because Lazaroff denied the name-calling accusation, Plaintiff made no further effort to escalate his alleged concerns regarding Lazaroff.[14] (*Id*.)

---

[14] While Plaintiff also claims to have informed McKelvey (Body Shop Area Manager) and Tackett (HR/LR Director) of Lazaroff's alleged name-calling during a meeting on August 8, 2019 to address his attendance, Plaintiff admitted that he refused to respond to Tackett's request for specific information relating to his claims against Lazaroff that otherwise would have enabled Tackett to investigate them. (Milczak, 86:2-23 [RE 40-2, PageID # 599]).

### E.     Plaintiff's EEOC Charge of Discrimination.

On December 11, 2019, while on temporary assignment to the second shift, Plaintiff filed a charge of discrimination. (Charge of Discrimination [RE 26-15, PageID # 351]). The charge, which identified "retaliation, age" as the basis of discrimination, described five discrete events that Plaintiff claimed were discriminatory based on his age or otherwise retaliatory: (1) May 2019 report of the mousetrap drawing; (2) August 8, 2019 Letter to File; (3) July 15, 2019 transfer to the Body Shop; (4) August 26, 2019 transfer to second shift; and (5) November 18, 2019 denial of a "suggestion bonus." (*Id.*)

The Charge also alleged that GM failed to address his complaints that "this conduct" and "transfers" were "based on his age and protected activities." (*Id.*) Notably, nothing in the Charge actually describes any purported "harassment" based on his age, or any conduct that could reasonably be inferred as severe or pervasive enough to have substantially interfered with Plaintiff's employment at GM. (*Id.*)

The EEOC issued a Right to Sue letter on or about April 21, 2021; Plaintiff commenced this lawsuit on June 24, 2021. (Complaint [RE 1, PageID # 1-14]).

### F.     Suggestion Plan Bonuses and Plaintiff's Vague Allegations of Mistreatment by Brent Cuthbert and Guy Mitchell.

Plaintiff also asserts that GM further subjected him to adverse action by denying him suggestion bonus awards under GM's Suggestion Plan (Charge [RE

26-15, PageID # 351]) and providing him negative performance reviews. (Document: 20, Page: 18-19).

GM maintains a Suggestion Plan, which provides certain GM employees, including Plaintiff, an opportunity to earn monetary awards for suggestions that meet the Plan's specific requirements. (Declaration of Michelle Antczak-Healey, ¶2-3 [RE 26-17, PageID #356-357]; Suggestion Plan [RE 26-18, PageID # 366-375]). The Plan outlines the specific rules for participation and eligibility for an award, and the final decisions on the award are made by a centralized team of GM employees. (Milczak, 189:6-11 [RE 26-2, PageID # 200]). To receive a monetary award, an employee's suggestion must, among other things, be implemented, submitted prior to or within 60 days of implementation, and present an idea that falls outside the employee's normal job duties. (Milczak, 187:4-188:3 [RE 26-2, PageID # 198-199]; Antczak-Healey Decl. ¶ 3 [RE 26-17, PageID # 356-357]; Suggestion Plan, p. 2-3 [RE 26-18, PageID # 367-368]).

Plaintiff submitted four suggestions and GM paid him an award for one of them. (Milczak, 181:5-18 [RE 26-2, PageID # 193]; Antczak-Healey Decl. ¶ 10 [RE 26-17, PageID #358]). Of the three suggestions that did not receive an award, one was denied because Plaintiff did not submit the suggestion until two years after implementation. (Milczak, 176:9-177:20 [RE 26-2, PageID # 188-189]; Antczak-Healey Decl. ¶ 7 [RE 26-17, PageID # 357-368]; 9/4/2019 Email [RE 26-19, PageID

# 377-378]). Another suggestion was "not-adopted" and thus ineligible for the award under the Plan. (Milczak, 183:9-24 [RE 26-2, PageID # 195]; Antczak-Healey Decl. ¶9 [RE 26-17, PageID # 358]). The last suggestion was denied because it fell within Plaintiff's normal job duties, and because GM already had a plan in place for reusing equipment, which was the subject of Plaintiff's suggestion. (Milczak, 183:25-184:6 [RE 26-2, PageID # 195-196]; Antczak-Healey Decl. ¶ 10 [RE 26-17, PageID #358]). Plaintiff does not know the identities of the individuals who ultimately denied him monetary awards for these three suggestions, and has no evidence to suggest that their decisions were in any way related to Plaintiff's age. (Milczak, 189:6-17 [RE 26-2, PageID # 200]).

Finally, Plaintiff claims that DHAM Site Supervisor Guy Mitchell fed false information to Plaintiff's supervisor, Cuthbert, for his 2020 Year-End Review delivered in March 2021 (while Cuthbert was working from home due to the pandemic), and otherwise made Plaintiff's work environment difficult because Plaintiff "**think[s]**" Mitchell "found out about either the MDCR, Michigan Department of Civil Rights, and/or the court case," and "the only thing I could think of is he thinks he's going to be a hero to try to get me to quit." (Milczak, 122:11-125:17 [RE 40-3, PageID # 622-625]). Plaintiff provides nothing but pure speculation that Mitchell has any knowledge of his Charge or the instant lawsuit.

# SUMMARY OF THE ARGUMENT

Having failed to develop probative, admissible evidence to properly support his age discrimination, ADEA retaliation, and age-based hostile work environment claims, Plaintiff seeks to save his case on appeal by relying almost entirely on an unsworn 40-page "Summary" containing various allegations, none of which was made under the penalty of perjury, and an improper declaration that contradicts his prior sworn deposition testimony. The District Court correctly held neither document could be considered in reviewing GM's motion for summary judgment.

Even when liberally construed, Plaintiff's Charge did not contain sufficient factual allegations that reasonably put the EEOC on notice that he was alleging an age-related hostile work environment claim. On appeal, Plaintiff throws 19 separate incidents (with little to no age-related context) against the wall in hopes that something might stick. Ultimately, Plaintiff identified only three, isolated age-related comments over the course of seven months that had no impact whatsoever on his work environment or performance.

Plaintiff has not identified any legally cognizable adverse employment action, and he offers nothing but speculation and conclusory assertions to support a *prima facie* case of age discrimination. Moreover, Plaintiff has abandoned his ultimate burden to show pretext by failing to address it in his initial appeal brief.

Finally, Plaintiff's everything-but-the-kitchen-sink approach to his ADEA retaliation claim fails where Plaintiff cannot establish the requisite causal nexus between the legally cognizable protected activity and any alleged adverse employment action. Plaintiff's retaliation claim also fails at the pretext stage because Plaintiff makes no argument whatsoever that GM's legitimate, non-retaliatory reasons for its employment actions were pretexual.

For all of the foregoing reasons, the summary judgment should be affirmed in its entirety.

## STATEMENT OF THE STANDARD OF REVIEW

Fed. R. Civ. P. 56(a) empowers the district court to render summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011). On appeal, the district court's grant of summary judgment is reviewed *de novo*. *King v. Steward Trumbull Memorial Hospital, Inc.*, 30 F.4th 551, 559 (6th Cir. 2022).

To defeat summary judgment, the record evidence must be sufficient to demonstrate a *genuine* dispute of *material* fact from which a reasonable jury could return a verdict for the nonmoving party. *Id.* "The plaintiff must present more than a mere scintilla of the evidence. To support [his] position, [he] must present evidence

on which the trier of fact could find for the plaintiff," *Davis v. McCourt*, 226 F.3d 506, 611 (6th Cir. 2000)(internal citations omitted), and the evidence must be capable of presentation in a form that would be admissible at trial. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010); *Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009). Thus, "mere speculation, conjecture, or fantasy" is insufficient to defeat a properly supported motion for summary judgment. *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008). The District Court did not err in finding no genuine dispute on any of Plaintiff's claims and granting summary judgment to GM.

## **ARGUMENT**

### I. THE DISTRICT COURT PROPERLY EXCLUDED PLAINTIFF'S UNSWORN DECLARATION AND "SUMMARY OF EVENTS."

Much of Plaintiff's evidence on appeal is grounded on his 40-page "Summary of Events" that he created post-hoc [RE 40-6, PageID # 682-721] and his extensive declaration [RE 40-5, PageID # 658-677], both of which the District Court properly excluded. (Opinion and Order, 7-9 [RE 42, PageID # 756-758]). On appeal, Plaintiff's sole argument on the admissibility of his 40-page "Summary" (and every document referenced therein) is that it was introduced as Exhibit A to his deposition, which Plaintiff testified was "true and accurate to the best of his knowledge and

belief" in response to a question from his own counsel.[15] (Milczak, 203:1-205:16 [RE 40-3, PageID # 650-652]). Plaintiff's argument misses the mark. This Court has affirmed that an unsworn statement does not become admissible evidence simply because it is produced during discovery. *Beans v. City of Massillon*, 2016 WL 7492503, *7 (N.D. Ohio Dec. 30, 2016), *aff'd*, 706 Fed. Appx. 295 (6th Cir. Aug. 29, 2017)(internal citations omitted). Moreover, a Plaintiff "may not rely on [his] own unsworn statements" to defeat summary judgment. *Cosby v. Purdue Univ.*, 2010 WL 2838377, *12 (N.D. Ind. July 16, 2010)(excluding "Timeline of Events" that was nothing more than plaintiff's recitation of the events that occurred leading up to her termination). *See also, Tenneco Auto. Operating Co. v. Kingdom Auto Parts*, 410 Fed. Appx. 841, 848 (6th Cir. Oct. 28, 2010) ("the hearsay affidavit" and "the unsworn statements must be disregarded because a court may not consider unsworn statements when ruling on a motion for summary judgment" (internal citation omitted)).

Plaintiff's summary would also be inadmissible at trial where Plaintiff cannot establish personal knowledge of the statements contained therein, and because it falls

---

[15] Plaintiff's argument leads to an absurd result that mere allegations in an unverified complaint could defeat a summary judgment if a plaintiff testifies at deposition that the allegations were true and accurate to the best of his/her knowledge and belief. It has long been held that mere allegations in a complaint are insufficient to get to a jury without significant probative evidence tending to support the allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

outside the scope of Fed. R. Evid. 1006 that permits a use of "a summary" only "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. While the evidence relied on by a party opposing a motion for summary judgment need not itself be in a form that is admissible at trial, "the party opposing summary judgment must show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact be admissible." *Alexander*, 576 F.3d at 558. There is no question that Plaintiff's Summary would be inadmissible at trial under Fed. R. Evid. 1006. Plaintiff, therefore, was required to separately demonstrate that any and all allegations contained in his Summary that purport to support his opposition to GM's motion for summary judgment would be admissible at trial, whether through an affidavit, declaration, or other documentary evidence, which Plaintiff failed to do.

Plaintiff argues that his unsworn declaration should be considered in support of his opposition to summary judgment because it was "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" as required under Fed. R. Civ. P. 56(c)(4). (Document: 20, Page: 22-23). Plaintiff fatally glosses over the preliminary and fundamental requirement of an affidavit and/or declaration. Under Fed. R. Civ. P. 56(c)(1)(A) and 28 U.S.C. §1746, an unsworn declaration has

the same force and effect as a sworn declaration or affidavit *only if* it is declared "as true under penalty of perjury" with a declaration that substantially reads, "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct," together with the execution date and signature of the declarant. 28 U.S.C. §1746. Plaintiff's "declaration" and the "Summary" are neither a sworn affidavit nor unsworn declaration made under penalty of perjury, and the District Court correctly held these documents failed to meet the statutory requirements. They should likewise be excluded on appeal. *See, e.g.*, *Sfakianos v. Shelby County Government*, 481 Fed. Appx. 244, 245 (6th Cir. Jun. 6, 2012)(affirming decision not to consider plaintiff's unsigned affidavit that lacked the proper attestation, which also failed to comply with the requirements of 28 U.S.C. §1746); *Blount v. Stanley Engineering Fastening*, 55 F.4th 504, 515-516 (6th Cir. 2022)(finding that the district court did not abuse its discretion in excluding plaintiff's affidavit that was not a proper declaration under 28 U.S.C. §1746).

Plaintiff's declaration and Summary are also improper and should be rejected on that basis. It is well established that a plaintiff is foreclosed from filing an affidavit or a declaration that contradicts his earlier sworn testimony. *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016); *Blount*, 55 F.4th at 516. In addition, an affidavit or a declaration based on inadmissible hearsay, mere allegations, opinions, and/or conclusory assertions may not be considered on a motion for summary

judgment. *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006); *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Blount*, 55 F.4th at 516. Plaintiff's declaration and Summary should be excluded from this Court's consideration on appeal to the extent they contain assertions that either contradict his deposition testimony, are not made on personal knowledge, and fail to set out *facts* that would be admissible as evidence.

## II. PLAINTIFF HAS FAILED TO MEET HIS EVIDENTIARY BURDEN ON THE AGE-BASED HOSTILE WORK ENVIRONMENT CLAIM.

### A. Plaintiff Failed to Exhaust His Administrative Remedy.

It is well established that a plaintiff generally cannot bring claims in a lawsuit that were not included in his EEOC charge. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). Accordingly, an ADEA plaintiff may only pursue claims that are reasonably related to or grow out of the factual allegations in his Charge, and is foreclosed from pursuing a claim that falls outside the reach of his EEOC Charge. *Younis*, 610 F.3d at 362.

To preserve a hostile work environment claim, a plaintiff must allege harassment that unreasonably interfered with his work performance and created an objectively intimidating, hostile, or offensive work environment. *Id.* In *Younis*, this Court found that discrete acts of alleged discrimination, limited to three or four isolated comments by the plaintiff's peers, were insufficient to allege a claim of hostile work environment. *Id.*

Plaintiff's Charge suffers from the same defect. While Plaintiff and the *amicus* EEOC argue that Plaintiff properly exhausted his administrative remedies because the narrative portion of the charge contains the word "harassment" and the November 18, 2019 Incident bears a heading "Harassment/Not Sexual," (Charge [RE 26-15, PageID # 351]), the narrative itself provides no allegation of age-related "harassment" that interfered with Plaintiff's work environment.

Plaintiff's Charge only identified five discrete incidents, only one of which referenced an alleged age-related incident. The lone and vague assertion that Plaintiff's manager called him "old and directed profanities at" him "as recently as June 2019"—nearly six months before he filed the Charge on December 11, 2019—hardly suggests any type of an on-going or reasonably frequent discriminatory conduct suggestive of a hostile work environment.

Plaintiff failed to exhaust his administrative remedies as to his hostile work environment claim under the controlling authority in the Sixth Circuit. The District Court's grant of summary judgment should be affirmed.

## B.     The Evidence Does Not Show Age-Based Harassment That Was Sufficiently Severe or Pervasive.

To state a claim for hostile work environment under the ADEA, Plaintiff must show that (1) he was over 40 years old; (2) he was subjected to harassment, either through words or action, ***based on age***; (3) the harassment unreasonably interfered with his work performance and created an objectively intimidating, hostile, or

offensive work environment; and (4) some basis for liability exists on the part of GM. *Crawford v. Medina General Hosp.*, 96 F.3d 830, 834 (6th Cir.1996). On appeal, Plaintiff failed to meet his evidentiary burden on his age-based hostile work environment claim.

1. **Nearly All of the Events Plaintiff Takes Issues With Are Not Based on His Age.**

To satisfy the second prong, the alleged harassment must be based on Plaintiff's age, and a theory based on false syllogism that "A) my coworkers hate me; B) I'm old; C) My coworkers hate me because I'm old" does not create a jury issue on an age-based hostile work environment claim. *Crawford*, 96 F.3d at 836. This Court has routinely affirmed summary judgment where a plaintiff failed to demonstrate that the alleged hostile behavior was based on plaintiff's age. *Brown v. Metropolitan Government of Nashville and Davidson County*, 722 Fed. Appx. 520, 525 (6th Cir. Feb. 1, 2018)(collecting cases); *Peecook v. Northwestern Nat'l Ins. Group*, 156 F.3d 1231, *3 (6th Cir. Aug. 3, 1998)(a comment "perhaps you are too old to change" was too amorphous to constitute age-based harassment.)

On appeal, Plaintiff lists 19 alleged incidents that purport to support his hostile work environment claim based on his age (Document: 20, Page: 28-30). Of the 19 alleged incidents, only three are related to Plaintiff's age: (1) Lazaroff calling Plaintiff "old fart" in December 2018 (alleged incident #3); (2) Lazaroff telling Plaintiff "they might not want an old fucker like you" at the Toledo plant (alleged

incident #4); and (3) Lazaroff telling Plaintiff "just drop it you old motherfucker, you'll never get paid for this" in June 2019 (alleged incident #10). The picture Plaintiff claimed to have found on his desk in August 2020 and described as a picture of an "old man with long hair and his eyes poked out" (alleged incident #15) does not objectively show an "old man;" the distorted black and white photo only shows a male with what appears to be a light-colored long hair and a mustache. (Photo [RE 40-10, PageID # 730]). Even assuming *arguendo* that the photo was meant for Plaintiff, no reasonable jury could view the photo as supporting Plaintiff's age-based hostile work environment claim.

The remaining allegations bear no connection to Plaintiff's age. Plaintiff admitted that none of Lazaroff's alleged vulgarities prior to December 2018 were based on his age (alleged incident #1). Plaintiff also admitted that he never informed GM of his subjective view that the mousetrap drawing that he found on May 22, 2019 related to his age (alleged incidents #8 and #9). Plaintiff simply speculates that some of the alleged incidents were based on his age (alleged statement that "knowledge does not matter" and the Michael Jackson CD), which is the precise type of syllogism proscribed by *Crawford* (alleged incidents #2 and #16). *See also, Amini v. Rite Aide Corp.*, 819 Fed. Appx. 344, 347 (6th Cir. Jul. 7, 2020)(declining to make a string of tenuous inferences between the plaintiff's poor evaluation and the evaluator asking about his age). As a matter of law, personnel actions cannot

support a hostile work environment claim because by their nature, they do not invoke the kind of "acute intimidation, ridicules, abuse, or insult contemplated by a hostile work environment claim." *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F.Supp.3d 824, 847 (E.D. Mich. 2017). Accordingly, Plaintiff is foreclosed from pursuing his hostile work environment claim based on transfers and reassignments necessitated by the unallocation of DHAM, none of which is objectively based on Plaintiff's age (alleged incidents #5, #6, #11, #12, and #14). Finally, there is no admissible evidence from which a reasonable jury could infer that the remaining alleged incidents, *i.e.,* Plaintiff's subjective gripes about working with the UAW-represented skilled trade employees, as well as his disagreement with the attendance-related counseling and performance reviews, are in any way related to Plaintiff's age and more importantly, Plaintiff provides no evidence that establishes any connection between these incidents and his age (alleged incidents #7, #13, #17 through 19).

Accordingly, the three discrete comments by Lazaroff between December 2018 and June 2019 (and *arguably* a photo of an "old man with long hair" that Plaintiff found in August 2020) are the only age-based incidents that could conceivably support Plaintiff's claim of age-based hostile work environment.

### 2. As a Matter of Law, None of the Alleged Incidents Based on Plaintiff's Age Was Severe, Pervasive, Abusive, or Hostile.

To satisfy the third prong, the conduct alleged must be so severe or pervasive that a reasonable person would find it abusive or hostile. *Harris v. Forklift Systems,*

*Inc.*, 510 U.S. 17, 21-22 (1993); *Amini v. Rite Aid Corp.*, 819 Fed. Appx. 344, 347 (6th Cir. Jul. 7, 2020). Plaintiff must show that the alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment and created an abusive working environment. *Scola v. Publix Supermarkets, Inc.*, 557 Fed. Appx. 458, 472 (6th Cir. Feb. 27, 2014)(an assistant manager referring to plaintiff as an "old lady" on a few occasions did not create an objectively intimidating, hostile, or offensive work environment.) In assessing the severity or pervasiveness of the alleged harassment, Courts consider the totality of the circumstances. *Crawford*, 95 F.3d at 835; *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).

The record is simply devoid of any evidence that Lazaroff's three age-related comments between December 2018 and June 2019 collectively had any material impact on Plaintiff's work environment. There is certainly no evidence or testimony that these discrete comments created a hostile or abusive environment for Plaintiff.[16]

---

[16] Plaintiff argues that Lazaroff's age-related comments somehow created a hostile work environment because they were made in the context of Plaintiff's refusal to accept the voluntary severance package, the unallocation of DHAM, various reassignments, the mousetrap drawing, and Plaintiff's subjective dissatisfaction with GM's investigation of the drawing. (Document: 20, Page: 34). Setting aside the lack of evidentiary support, Plaintiff simply expects this Court to draw an inference that Lazaroff's discrete comments somehow created a hostile work environment *based on Plaintiff's age* in the midst of GM's need to eliminate or transfer the entire salaried workforce at DHAM, which rendered his previous position and job duties obsolete since no more vehicles would be manufactured at DHAM. As this Court

Plaintiff's testimony, on the contrary, is that his transfer to GA Maintenance in January 2019 and working with the UAW-represented skilled trade employees caused the stress in his work environment; Lazaroff's three comments did not cause his inability to manage the union-represented workforce in GA Maintenance. Under these facts, Plaintiff cannot maintain his hostile work environment claim based on Lazaroff's alleged age-related comments, which, at best, were "mere offensive utterances." *Crawford*, 95 F.3d at 835-836 (a supervisor's alleged comments that "[o]ld people should be seen and not heard," "I don't think women over 55 should be working" and coworkers generally equating "old with being stupid, useless, dumb" and referring to plaintiff's side of the office as "the old side, the dumb side, worthless side" in the supervisor's presence did not support a claim of hostile work environment based on age).

The photo of an "old man with long hair" (or Michael Jackson CD) fairs no better. Even if the Court assumes the photo to be that of an "old man," there is simply no evidence that it created an abusive or hostile work environment. By August 2020, Plaintiff had accepted a position with the installation group supporting the retooling of DHAM to Factory ZERO, continued to work out of DHAM per his desire, and more than a year had passed since Lazaroff's last alleged age-related comment to

---

recognized, the courts will not make a string of tenuous inferences to find a hostile work environment. *Amini*, 819 Fed. Appx. at 347.

Plaintiff. Plaintiff left the photo up on his cubicle wall for two weeks in hopes that someone might own up to it. No reasonable jury would view the photo as creating a hostile work environment that was so severe or pervasive as to unreasonably interfere with his work performance.

The District Court correctly found that the alleged age-based incidents did not create a workplace permeating with discrimination, and as such, Plaintiff failed to clear the "relatively high bar for what amounts to [actionable] discriminatory conduct under a hostile work environment theory." (Opinion and Order, 16 [RE 42, PageID # 765] (citing *Phillips v. UAW, Int'l*, 854 F.3d 323, 328 (6th Cir. 2017)).

## III. PLAINTIFF CANNOT MAINTAIN HIS AGE DISCRIMINATION CLAIM UNDER THE ADEA.

### A. Plaintiff's Evidentiary Burden Under the *McDonnell-Douglas* Burden Shifting Framework.

To maintain his age discrimination claim under the ADEA based on circumstantial evidence,[17] Plaintiff must first establish a *prima facie* case by showing he (1) is over 40 years old; (2) is qualified for his position; (3) suffered an adverse employment action; and (4) was treated differently than, or replaced by, a

---

[17] Plaintiff presents no direct evidence to support his age discrimination or ADEA retaliation claims, and must therefore establish his claims with circumstantial evidence using the *McDonnel-Douglas* burden-shifting framework. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324-325 (6th Cir. 2021).

significantly younger person. *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538-539 (6th Cir. 2002).

If Plaintiff establishes a *prima facie* case, the burden of production shifts to GM to identify a legitimate, non-discriminatory reason for the challenged action. *Pelcha*, 988 F.3d at 325. Once GM articulates a reason, the burden shifts back to Plaintiff to prove that GM's stated reason is a mere pretext for age discrimination. *Id.* Pretext is generally established by showing that the proffered reasons either (1) had no basis in fact; (2) did not actually motive GM's challenged actions; or (3) were insufficient to motivate GM's action. *Miles v. South Central Human Resources Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

At the summary judgment stage, Plaintiff cannot rely on mere allegations to defeat summary judgment; he must present significant probative evidence tending to support the allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). While the court will draw all inferences in light most favorable to the non-moving party, the non-moving party must still present significant probative evidence in support of their claims; mere allegations, suppositions or conclusory statements are insufficient to defeat a properly supported motion for summary judgment. *Harris v. American Postal Workers Union*, 198 F.3d 245, *2 (6th Cir. Oct. 19, 1999)(table). In addition, the age discrimination claim requires "but-for" causation, that is, a

showing that "but for" Plaintiff's age, GM would not have taken the challenged adverse action. *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 177-78 (2009).

Plaintiff has failed to establish a *prima facie* case of age discrimination, and to his material detriment, failed to address his ultimate evidentiary burden on pretext, therefore abandoning his claim. Moreover, there is not a shred of evidence to suggest GM's legitimate reasons for its employment decisions were pretexual.

**B.    Plaintiff Cannot Establish a *Prima Facie* Case of Age Discrimination.**

**1.    There Is No Legally Cognizable Adverse Employment Action.**

Plaintiff is foreclosed from pursuing his discrimination claim because he has not identified any legally cognizable adverse employment action that supports a *prima facie* case of age discrimination. Notably, "[n]ot every act affecting an individual's employment can be considered an adverse employment action." *McMillian v. Potter*, 130 Fed. Appx. 793, 796 (6th Cir. May 11, 2005). Simply because an employee expresses discontent with the employment action does not mean that he has identified a legally cognizable adverse action. *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999). To be actionable, an adverse employment action must be accompanied by a materially adverse change in the terms and conditions of employment that inflicts direct economic harm on a plaintiff. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). Reassignment and/or transfer is not

an adverse employment action unless it comes with a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Similarly, a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).

In support of his age discrimination claim, Plaintiff argues that GM subjected him to adverse employment action by (1) failing to pay him raises and bonuses commensurate with his experience; (2) failing to pay compensation for Plaintiff's suggestions under GM's Suggestion Plan; and (3) transferring him within DHAM and reassigning him to different shifts. (Document: 20, Page: 37-42). None of these actions constitutes a legally cognizable adverse employment action.

> **a.      Plaintiff Was Not Entitled to Higher Raises, Bonuses, or the Suggestion Bonuses.**

Plaintiff provides nothing but his purely subjective belief that his unspecified "experience and performance" somehow entitled him to "a higher than normal" raise for his annual base salary and teamGM bonus for 2018 (and presumably through the present).[18] The amount and the percentage of Plaintiff's annual raise and teamGM

---

[18] Plaintiff's argument cites only to his 40-page Summary and unsworn Declaration, both of which should be excluded from the Court's consideration for the reasons

bonus, however, is at the full discretion of GM and determined based on the nine-box rating system applied to all GM salaried employees. (Tackett Decl. ¶18 [RE 26-8, PageID # 254]). Notably, Plaintiff does not identify any evidence, let alone "significant probative evidence," capable of supporting his allegation that GM deprived him of additional raises and bonuses to which he was actually entitled. *Barrett v. Lucent Technologies, Inc.*, 36 Fed. Appx. 835, 843-844 (6th Cir. Jun. 6, 2002)(denial of bonuses, awards, and stock options did not constitute adverse action where plaintiff could not show entitlement to these payments). Significantly, a denial of transient, discretionary payments are not an adverse action as a matter of law. *Lewis v. City of Chicago*, 496 F.3d 645, 653-654 (7th Cir. 2007)(denial of remunerations that are "wholly discretionary on the part of the employer" do not constitute an adverse employment action). There is no dispute that GM provided Plaintiff with steady and consistent raises in his annual base salary and awarded him 100% of his teamGM bonus throughout his employment at GM; Plaintiff's purely conclusory assertion, unsupported by any record evidence, that he was somehow entitled to additional compensation falls far short of the evidentiary standard needed to create a fact question on whether Plaintiff suffered an adverse employment action.

---

addressed above. Plaintiff's claim that he had been receiving a 4% increase in the annual base salary up to 2018 also conflicts with the record evidence that Plaintiff received a 2.1% raise in 2016, 3.45% raise in 2017, and 3.0% raise in 2018. (Tackett Decl. ¶20 [RE 26-8, PageID # 255]).

Plaintiff's claim that GM denied him suggestion bonuses suffers from the same, fatal defect. GM's Suggestion Plan provides monetary awards for suggestions that meet the Plan's award criteria, *i.e.,* that the suggestion be submitted timely and implemented, and presents an idea that falls outside of the employee's normal job duties. Of the four suggestions Plaintiff submitted, three were ineligible for an award because they did not meet the Plan's criteria; and GM provided Plaintiff with a monetary award for his remaining suggestion, which Plaintiff claims, in a purely conclusory fashion, should have been more. Here again, Plaintiff fails to identify any evidence, let alone probative evidence, that demonstrates that he was actually entitled to receive the suggestion bonuses, such that deprivation of the award would constitute an adverse action. In addition, the suggestion bonus is a transient remuneration that is sporadic, irregular, unpredictable, and within the employer's discretion. Denial of such a bonus, even if true, does not constitute adverse action as a matter of law.[19] *Lewis*, 496 F.3d at 653-654.

### b. Transfers Within DHAM and Temporary Shift Change Were Not Adverse Actions.

Relying primarily on this Court's decision in *Threat v. City of Cleveland*, 6 F.4th 672 (6th Cir. 2021), Plaintiff and the EEOC argue that Plaintiff's transfer to

---

[19] Plaintiff's claims are nothing more than "'trivial personnel action[s]' brought by [an] 'irritable, chip-on-the-shoulder employee'" that should be distinguished from meritorious cases. *Lewis*, 496 F.3d at 653.

GA Maintenance in January 2019, subsequent transfer to the Body Shop in July 2019, and temporary assignment to the second shift for four months constitute adverse employment actions.[20] Plaintiff and the EEOC's reliance on *Threat*, however, is materially misplaced. *Threat* was a direct evidence case where the defendant admittedly switched out a black captain for a white captain "to adjust the shift's racial makeup," thereby leaving no question that "the race-based shift changes controlled when and with whom the black captain worked, prohibited him from exercising his seniority rights, and diminished his supervisory responsibilities when the city imposed the night shift on him." *Id.* at 678. Acknowledging that "not all shift changes are the same" and "some shift changes and reassignments may constitute…race-based discrimination in 'terms,' 'privilege' and other aspects of employment," this Court concluded "that is just what happened here." *Id.* at 679-

---

[20] The EEOC urges this Court to adopt a broad, sweeping definition of adverse employment action whereby "*all* forced job transfers, denials of job transfers, and reassignments" be categorically considered an adverse employment action. (Document: 23, Page: 21, n.6). This Court has previously rejected the EEOC's attempt to broaden the definition of adverse employment action within the context of Title VII retaliation claim, choosing to remain with more fact-specific inquiry that appropriately balances the purpose of Title VII's anti-retaliation provision with "the need to prevent lawsuits based upon trivialities." *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 799 (6th Cir. 2004). This Court should reject the EEOC's attempt to dispense with more fact-specific, nuanced approach in the ADEA context that could open the floodgate to lawsuits based on mere trivialities, especially where, as here, the transfer and reassignments were made at a time where dozens of employees were being relocated, taking voluntary buyouts, or being involuntarily laid off due to the unallocation of DHAM.

680. The analysis in *Threat* is consistent with the approach articulated in *Kocsis* emphasizing the contextual nature of the inquiry into whether a shift change or reassignment constitutes an adverse action or mere inconvenience that does not support a discrimination claim. *Id.* at 679 (citing *Kocsis,* 97 F.3d at 886).

Under *Kocsis* and its progeny, reassignments and transfers can be an adverse employment action where they are accompanied by salary or work hour changes. *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). For reassignments and transfers without salary or work-hour changes to be actionable, they must be accompanied by the evidence of a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Id.* Subjective perceptions such as a bruised ego and mere inconvenience, or mere alteration of job responsibilities are not sufficient to constitute an adverse employment action. *Id.*

Under the controlling legal authorities, neither Plaintiff's transfer to GA Maintenance in January 2019 nor to the Body Shop in July 2019 constitutes adverse employment action. Plaintiff maintained the same title; his salary, bonus, and benefits were unaffected; he maintained the same hours working the first shift; and his responsibilities did not materially change. While Plaintiff claims that working with the UAW-represented skilled trade employees was stressful, Plaintiff's personal and subjective reaction to the job transfer does not give rise to a cognizable

adverse employment action any more than a bruised ego or mere inconvenience, which this Court has already found were not enough to constitute an adverse employment action. *White*, 365 F.3d at 789.

This is especially true given the context of Plaintiff's transfers. There is no dispute that all salaried employees were "trying to survive, get out, and get a job" due to unallocation, and "everybody that was [at DHAM] was worried about losing their job and getting their next placement." (Donlin, 19:23-20:2 [RE 26-12, PageID # 341]). Plaintiff, on the other hand, was adamant that he did not want to travel, would not relocate, and sought to remain at DHAM. In the context of this case, Plaintiff's two job transfers within DHAM unaccompanied by any change in primary job responsibilities, title, salary, or benefit simply are not legally cognizable adverse employment actions.

Similarly, a shift change is not materially adverse without some reduction in pay, prestige, or responsibility. *Harper v. Elder*, 803 Fed. Appx. 853, 857 (6th Cir. Mar. 4, 2020)(a shift change without any change in pay that only deprived plaintiff of opportunities to attend her son's baseball games and being at home in the evening was not adverse employment action). Plaintiff's temporary shift change in late August 2019 did not result in any reduction in pay or benefits, and did not affect his title, job functions, or responsibilities. Plaintiff's personal gripes that he had less time to spend at home with his wife during the four months that he was on second

shift, and his personal and subjective perception that his talent was underutilized on the second shift do not render the temporary shift change an adverse employment action. *Id*.

In addition, Plaintiff and the EEOC argue that Plaintiff's position transfers and temporary assignment to the second shift were adverse employment actions because Plaintiff purportedly lost opportunities to earn overtime. Plaintiff presents no evidence to demonstrate that he actually lost overtime opportunity when he transferred to GA or the Body Shop, or when he was temporarily assigned to the second shift. Plaintiff also conceded that he was an exempt employee at all times, and whether or not he received overtime was completely discretionary. (Milczak, 22:12-21 and 101:5-17 [RE 26-2, PageID # 131 and 166]). Simply put, there is no *admissible* evidence in the record that Plaintiff ever received overtime or that he lost the opportunity to earn overtime due to his transfers within DHAM. There is no dispute that whatever "overtime" opportunity Plaintiff had was purely discretionary, and thus a sporadic, irregular, and unpredictable form of compensation at the complete discretion of GM. Under these facts, Plaintiff's alleged loss of overtime, even if proven, does not turn Plaintiff's temporary shift change into an adverse employment action. *Lewis*, 496 F.3d at 653-654.

## 2. There Is No Evidence Similarly Situated Younger Employees Received Better Treatment.

Even if this Court finds that Plaintiff established a fact question on whether GM subjected him to an adverse employment action, Plaintiff's *prima facie* case still fails on the last prong because there is no evidence Plaintiff was treated differently than, or replaced by, a significantly younger person. *Policastro*, 297 F.3d at 538-539.

While Plaintiff testified that Andrea Hellen, whom Plaintiff suspects to be in her early to mid-30's, received a 10% raise in 2017 or 2018 (Milczak, 93:23-95:21 [RE 40-3, PageID # 605-607]), he provides no documentary evidence or admissible, probative evidence to demonstrate Hellen was younger than Plaintiff, similarly situated, or that she actually received a 10% increase in her annual base salary. Similarly, Plaintiff provides no evidence to support his analogous claim that an unnamed female control engineer, who he believes is also in her early 30's, received a higher percentage increase for her annual base salary for 2017 or 2018. (*Id.*) At the summary judgment stage, Plaintiff's allegations must be supported by probative evidence, mere allegations and conclusory assertions are wholly insufficient. *Harris,* 198 F.3d 245 at *2. Plaintiff has failed to meet his evidentiary burden on the *prima facie* case of age discrimination.[21]

---

[21] Plaintiff's claim that younger employees received positions without the need for a resume or interview is irrelevant since Plaintiff also did not submit a resume or

## C. GM Has Articulated Legitimate, Non-Discriminatory Reasons for Plaintiff's Job Transfers and Reassignment to Second Shift.

Assuming, *arguendo*, that Plaintiff could establish a *prima facie* case, GM has articulated legitimate, non-discriminatory reasons for its employment decisions including Plaintiff's transfers and reassignment.

Consistent with the unallocation announcement in November 2018, DHAM began winding down the manufacturing operations at DHAM. (Tackett Decl. ¶2 [RE 26-8, PageID # 250]). While Plaintiff did not apply for any positions at other GM plants because he wanted to remain at DHAM, other salaried employees at DHAM understood that they would need to locate jobs at other GM facilities or lose their employment with GM. (*Id.*) Lazaroff transferred Plaintiff to GA Maintenance because Quigley, who held the position, left DHAM for another position in Flint, Michigan.

In July 2019, Siarhei Tsahelnik, who had significant experience as a GA Maintenance Group Leader relocated to Michigan due to family hardship, and GM assigned him to DHAM on a temporary basis. When Tsahelinik arrived, GM transferred Plaintiff to the Body Shop because the Body Shop needed Plaintiff's skillset in conveyance engineering background. These assignments enabled GM to maximize the limited personnel and resources available while continuing to run

---

interview before GM transferred him to GA Maintenance, the Body Shop, and eventually to the installation group working out of DHAM.

DHAM's manufacturing operations for its final months. (Tackett Decl. ¶8-9 [RE 26-8, PageID # 251-252]). GM transferred Plaintiff to the Body Shop for legitimate business reasons.

GM temporarily assigned Plaintiff to the second shift in late August 2019 to fill the vacancy created by the termination of Tom Chonjnowski's contract assignment as a cost saving measure associated with DHAM's unallocation. (Ferraiuolo Decl. ¶7 [RE 26-10, PageID # 331]). McKelvey, the Body Shop Area Manager, explained at the time that Plaintiff's temporary assignment to the second shift was a part of his efforts to address the DHAM's then current needs to support the production and off-shift maintenance activities. (McKelvey August 13, 2019 Email [RE 26-10, PageID # 333]).

Thus, to the extent that Plaintiff could be deemed to have met his *prima facie* burden, GM met its burden to articulate legitimate, non-discriminatory reasons for Plaintiff's position transfers and shift change.[22]

---

[22] Plaintiff's age discrimination claim based on denial of suggestion bonuses fails at the *prima facie* stage due to lack of any evidence showing that a similarly situated younger employee was treated better than Plaintiff under GM's Suggestion Plan. As addressed above, GM has articulated legitimate, non-discriminatory and non-retaliatory reasons for denying Plaintiff Suggestion Bonuses for the three suggestions that were ineligible for an award under the express language of the Plan.

### D. Plaintiff Cannot Establish Pretext.

Under the *McDonnell-Douglas* burden-shifting framework, Plaintiff has the "ultimate burden of persuasion" to show that GM's legitimate, non-discriminatory reasons for its employment decisions, including the two position transfers and the shift change, were a pretext, and that his age was the "but-for" cause of GM's alleged adverse employment action. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020). Significantly, Plaintiff's appeal brief is utterly silent on his burden to show pretext. Plaintiff, therefore, has abandoned any argument that he has satisfied his ultimate burden on pretext, and is now foreclosed from submitting his case to a jury. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014)(an appellant generally abandons all issues not raised and argued in its initial brief on appeal. (citing *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006))). *See also, United States v. Penaloza*, 648 Fed. Appx. 508, 521 n.6 (6th Cir. May 12, 2016)(argument raised for the first time in reply brief on appeal, even if made before the district court, is "forfeited when [party] did not raise it in his opening brief.")

Even if the Court were to consider pretext, the record is insufficient to create a jury question. Plaintiff cannot demonstrate that GM's legitimate, non-discriminatory reasons, *i.e.,* DHAM's unallocation that necessitated certain personnel decisions as the plant wound down its manufacturing operations, was not

based in fact, did not motivate GM's decisions, or were insufficient to justify GM's decisions. Plaintiff admitted that all salaried employees at DHAM were concerned about the job security because of the unallocation, and understood that they had to find a position at another GM plant or risk involuntary layoff. There is no dispute many employees left DHAM, either through voluntary buyout, relocation, or involuntary layoff. GM also had to continue providing maintenance to support manufacturing operations while DHAM wound down. Two additional, undisputed facts dispel any inference of pretext: (1) a comparable younger employee, Ronnie Perez, transferred to Toledo, Ohio while Plaintiff remained at DHAM; and (2) GM transferred Plaintiff to the position with the installation group (without requiring him to submit a resume or be interviewed) allowing him to remain employed at DHAM (now Factory ZERO) to this day. In the context of this case and the record, Plaintiff cannot show that GM's employment decisions relative to Plaintiff were in any way motivated by Plaintiff's age, and certainly cannot show that but for his age, GM would not have made these personnel changes.

## IV. PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM UNDER THE ADEA.

To establish an ADEA retaliation claim, Plaintiff must demonstrate that (1) he engaged in protected activity; (2) GM had knowledge of his protected activity; (3) GM took an adverse action; and (4) there exists a causal connection between the protected activity and the adverse action. *Mickey v. Zeidler Tool and Die Co.*, 516

F.3d 516, 523 (6th Cir. 2008). The retaliation claim also requires a showing that GM would not have taken the challenged adverse action "but for" Plaintiff's legally cognizable protected activity. *Pelcha*, 988 F.3d at 323-324. If Plaintiff establishes a *prima facie* case, GM has the burden to articulate a legitimate, non-retaliatory reason for the alleged adverse employment action, which Plaintiff ultimately must demonstrate is a pretext for unlawful retaliation.

### A.  Plaintiff Cannot Establish A *Prima Facie* Case of Retaliation.

### 1.  Plaintiff's Limited Protected Activity.

To be a "protected activity" under the ADEA, Plaintiff must have made an age discrimination complaint, or opposed a violation of the ADEA. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010); *Fox v. Eagle Distribution Co.*, 510 F.3d 587, 591 (6th Cir. 2007). Ambiguous complaints of discrimination or harassment that do not reference age are "too vague to 'amount to opposition to an unlawful employment practice'" that sufficiently alert the employer that the plaintiff was opposing an unlawful employment practice under the ADEA. *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 643 (6th Cir. 2015).

Relying on a strained reading of *Yazdian*, Plaintiff argues that his various complaints of alleged mistreatment constitute protected activity under the ADEA. (Document: 20, Page: 44-47). In *Yazdian*, the plaintiff made repeated reference to "hostile work environment" and threatened to commence legal action through

counsel on multiple occasions. The Court found these repeated threats constituted protected activity because "hostile work environment" is a term of art that explicitly refers to an unlawful employment practice under Title VII, and based on the particular context of the case, "a reasonable jury could conclude that [the plaintiff] used and intended the phrase 'hostile work environment' to reference discriminatory treatment" based on his national-origin or religious discrimination. *Yazdian*, 793 F.3d at 646. *Yazdian* is factually distinguishable from this case in that Plaintiff never once used the term "hostile work environment" or threatened legal action, and nothing in the record objectively suggests a context in which a reasonable jury could construe Plaintiff's actions as complaining of age discrimination.

Of the litany of activities that Plaintiff claims are protected under the ADEA, most of which are supported only by Plaintiff's inadmissible Summary, only three incidents arguably rise to the level of protected activity: Plaintiff's alleged complaint to Donlin on July 16, 2019 that Lazaroff referred to Plaintiff as an "old fucker;" Plaintiff's December 11, 2019 Charge, and Plaintiff's Complaint filed on June 24, 2021. The remaining communications and activities contain no reference to Plaintiff's age, including Plaintiff's May 2019 complaint about the mousetrap drawing.[23] Accordingly, Plaintiff must demonstrate that (1) the decision-makers had

---

[23] While Plaintiff now claims via his "declaration" that he notified his managers that he "believed the mousetrap picture was made because of his age," he unequivocally testified in his deposition that he never told anyone at GM that he believed the

knowledge of his protected activities, and (2) there exists a causal nexus between the alleged protected activity and GM's alleged adverse employment action.

### 2    Plaintiff Cannot Establish a Causal Connection.

As discussed, the *prima facie* case of retaliation requires Plaintiff to establish a causal nexus between the protected activity and the adverse action, including that the decision-maker had knowledge of the protected activity. *Mickey*, 516 F.3d at 523. Plaintiff must also proffer evidence from which a reasonable jury could infer that GM would not have taken the challenged adverse action if he had not engaged in protected activity. *Barnett v. Lucent Technologies, Inc.*, 36 Fed. Appx. 835, 841 (6th Cir. 2002).

In his appeal brief, Plaintiff lists nine (9) discrete employment actions that he claims were causally connected to his protected activity. (Document: 20, Page: 47-50). Plaintiff cannot establish any causal connection for the first four (4) alleged adverse actions for the simple reason that these actions **preceded** the earliest protected activity on July 16, 2019 (alleged incidents in January 2019 (#1), on March 8, 2019 (#2), in June 2019 (#3), and on July 10, 2019 (#4)).

As for the alleged incident in August 2019 (alleged incident #5), the record indicates Ferraiuolo and McKelvey, not Donlin, made the decision to temporarily

---

mousetrap drawing related to his age. (Milczak, 159:17-160:11 [RE 40-3, PageID # 648-649]).

assign Plaintiff to the second shift, and there is no evidence that Ferraiuolo or McKelvey knew of Plaintiff's alleged complaint to Donlin on July 16, 2019 regarding Lazaroff's "old fucker" comment. Moreover, Plaintiff's temporary shift change was necessitated by GM's decision to terminate Chonjnowski's contract, which created an immediate need to fill the vacancy on the second shift in the Body Shop. There is no evidence to show knowledge of protected activity by the decision markers or the "but-for" causation in relation to Plaintiff's temporary shift change.

As to Plaintiff's three gripes against Guy Mitchell and Brent Cuthbert from February 2020 through December 2021 (alleged incidents #7 through 9), there is no evidence that either knew of Plaintiff's July 16, 2019 complaint to Donlin regarding Lazaroff's comment, his November 11, 2019 Charge, or his June 24, 2021 Complaint (which was filed *after* the alleged adverse actions in February 2020 and on February 16, 2021). Plaintiff, instead, speculates Mitchell somehow became aware of his lawsuit and is now attempting to force Plaintiff to quit so that Mitchell could improve his standing within GM. Mere speculation, conjecture, and fantasy do not satisfy Plaintiff's evidentiary burden, which dooms Plaintiff's claims against Mitchell and Cuthbert. *Arendale*, 519 F.3d at 601.

### B.  Plaintiff Cannot Establish Pretext to Maintain His Retaliation Claim. [24]

The record unequivocally indicates, and Plaintiff does not dispute, that Plaintiff displayed chronic absenteeism in summer 2019. Plaintiff also acknowledged that his stress headaches were unpredictable and he provided little to no advance notice to GM that he was not coming to work, resulting in excessive unexcused absences. (Milczak, 99:1-20 [RE 26-2, PageID # 165]; Tackett Decl. ¶12-15 [RE 26-8, PageID # 252-253]). GM issued him an Attendance Letter to File on August 8, 2019 because Plaintiff was indisputably not meeting GM's expectation that employees come to work on time and to provide advance notice of their absences so that alternate work arrangements could be made. (Tackett Decl. ¶12-13 [RE 26-8, pageID #262]). GM has met its burden to articulate a legitimate, non-retaliatory reason for its action.

Notwithstanding his failure to advance any pretext argument thereby effectively abandoning his ultimate evidentiary burden, Plaintiff cannot demonstrate

---

[24] While adverse action in the retaliation context is broader than in the discrimination context, a letter to file setting forth an attendance expectation is insufficient to constitute an adverse action in the retaliation context. *Pines v. Bd. of Regents of the Univ. of Michigan,* 2012 WL 380242, *8 (E.D. Mich. Feb. 6, 2012). GM, however, will proceed with the burden-shifting analysis with respect to Plaintiff's August 8, 2019 Letter to File in the event this Court finds it to be actionable. To the extent that Plaintiff relies on the same set of alleged adverse actions to support both his retaliation and discrimination claims, GM restates its argument above setting forth legitimate, non-discriminatory (and non-retaliatory) reasons for these actions and Plaintiff's failure to proffer any admissible evidence of pretext.

GM's legitimate, non-retaliatory reason for his Attendance Letter to File was a pretext for retaliation. The reason for issuing the Letter was based in fact, and there is no dispute that Plaintiff had serious attendance issues in summer 2019. There is no evidence to suggest that Plaintiff's unexcused absences were not the reason that GM issued the Letter to him, and an acknowledged lack of formal attendance policy for salaried employees does not suggest Plaintiff's undisputed attendance issues were insufficient to justify the Letter absent evidence of disparate treatment. *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)(the third category of pretext – that employer's proffered reasons were insufficient to justify the adverse action – "consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct" that triggered the plaintiff's discipline). Because Plaintiff cannot meet his ultimate burden on pretext, summary judgment should be affirmed.

## CONCLUSION

For all of the foregoing reasons, Defendant-Appellee GM respectfully requests that this Court affirm the District Court's April 27, 2023 Opinion and Order granting summary judgment to GM on all of Plaintiff's claims.

Respectfully submitted,

/s/ Donald C. Bulea
Donald C. Bulea (Mich. P84895)
Mami Kato (Mich. P74237)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, PLLC
*Attorneys for Defendant-Appellee*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
(248) 593-6400
donald.bulea@ogletree.com
mami.kato@ogletree.com

Dated: October 23, 2023

# CERTIFICATE OF COMPLIANCE

I certify that the text of this brief, as counted by Microsoft Word, consists of 12,707 words including footnotes (excluding the cover page, corporate disclosure statement, table of contents, table of authorities, statement in support of oral argument, this certificate of compliance, certificate of service, designation of the record, and the list of unpublished opinions) and complies with the requirements of Fed. R. App. P. 32(a)(7)(B)(i).

The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font in compliance with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and type-style requirements of Fed. R. App. P. 32(a)(6). As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

<div align="right">

Respectfully submitted,

/s/ Donald C. Bulea
Donald C. Bulea (Mich. P84895)
Mami Kato (Mich. P74237)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, PLLC
*Attorneys for Defendant-Appellee*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
(248) 593-6400
donald.bulea@ogletree.com
mami.kato@ogletree.com

</div>

Dated: October 23, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2023, I electronically filed the foregoing

paper with the Clerk of the Court for the United States Court of Appeals for the

Sixth, Circuit using the ECF system.

<div style="margin-left: 40%;">

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, PLLC

s/ Mami Kato
Mami Kato (Mich. P74237)
*Attorneys for Defendant-Appellee*
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
(248) 593-6400
mami.kato@ogletree.com

</div>

Dated: October 23, 2023

# ADDENDUM 1
## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to 6 Cir. R. 30(g)(1), Defendant-Appellee designates the following

as relevant district court documents referenced in its Appeal Brief:

| Document Description | Date | Record Entry | PageID. Range |
|---|---|---|---|
| Complaint and Jury Demand | 06/24/21 | RE 1 | 1-14 |
| Defendant General Motors LLC's Motion for Summary Judgment | 11/30/22 | RE 26 | 90-125 |
| Exhibit 1: Milczak Deposition Tr. | 11/30/22 | RE 26-2 | 128-203 |
| Exhibit 2: Lazaroff Deposition Tr. | 11/30/22 | RE 26-3 | 204-212 |
| Exhibit 3: Perez Deposition Tr. | 11/30/22 | RE 26-4 | 213-224 |
| Exhibit 4: Mousetrap Drawing | 11/30/22 | RE 26-5 | 225-226 |
| Exhibit 5: Firek Deposition Tr. | 11/30/22 | RE 26-6 | 227-240 |
| Exhibit 6: July 10, 2019 Email | 11/30/22 | RE 26-7 | 241-248 |
| Exhibit 7: Declaration of Sean Tackett (with attachments) | 11/30/22 | RE 26-8 | 249-312 |
| Exhibit 8: HR Investigation Report | 11/30/22 | RE 26-9 | 313-328 |
| Exhibit 9: Declaration of Damon Ferraiuolo (with attachment) | 11/30/22 | RE 26-10 | 329-333 |
| Exhibit 10: August 13, 2019 Email | 11/30/22 | RE 26-11 | 334-335 |
| Exhibit 11: Donlin Deposition Tr. | 11/30/22 | RE 26-12 | 336-342 |
| Exhibit 12: photographs of "old man" and Michael Jackson CD | 11/30/22 | RE 26-13 | 343-345 |
| Exhibit 13: Milczak Compensation Notices | 11/30/22 | RE 26-14 | 346-349 |

| Document Description | Date | Record Entry | PageID. Range |
|---|---|---|---|
| Exhibit 14: EEOC/MDCR Charge of Discrimination | 11/30/22 | RE 26-15 | 350-351 |
| Exhibit 15: August 8, 2019 Letter to File | 11/30/22 | RE 26-16 | 352-354 |
| Exhibit 16: Declaration of Michelle Antczak-Healey (with attachments) | 11/30/22 | RE 26-17 | 355-364 |
| Exhibit 17: GM Suggestion Plan Handbook | 11/30/22 | RE 26-18 | 365-375 |
| Exhibit 18: September 4, 2019 Email | 11/30/22 | RE 26-19 | 376-378 |
| Plaintiff Douglas Milczak's Response to Defendant General Motors LC's Motion for Summary Judgment | 03/03/23 | RE 40 | 533-561 |
| Exhibit A (1 of 2): Milczak Deposition Tr. (Excerpt 1 of 2) | 03/03/23 | RE 40-2 | 565-603 |
| Exhibit A (2 of 2): Milczak Deposition Tr. (Excerpt 2 of 2) | 03/03/23 | RE 40-3 | 604-652 |
| Exhibit B: November 7, 2018 Email Regarding Voluntary Severance Program Opportunity | 03/03/23 | RE 40-4 | 653-656 |
| Exhibit H: Photograph of "old man" | 03/03/23 | RE 40-10 | 729-730 |
| Reply Brief in Support of Defendant General Motors LLC's Motion for Summary Judgment | 03/17/23 | RE 41 | 741-749 |
| Opinion and Order Granting Defendant's Motion for Summary Judgment | 04/27/23 | RE 42 | 750-768 |
| Judgment | 04/27/23 | RE 43 | 769-770 |

**ADDENDUM 2**
**UNPUBLISHED OPINIONS CITED IN THE BRIEF**

Pursuant to Fed. R. App. P. 32.1(b) and 6 Cir. R. 32.1(a)(1), Defendant-Appellee files the following unpublished opinions cited in their principle brief and not available in a publicly accessible electronic database as an addendum to its brief:

*Beans v. City of Massillon*,
     2016 WL 7492503 (N.D. Ohio Dec. 30, 2016)

*Cosby v. Purdue University*,
     2010 WL 2838377 (N.D. Ind. Jul. 16, 2010)

*Pines v. Bd. of Regents of the University of Michigan*,
     2012 WL 380242 (E.D. Mich. Feb. 6, 2012)

2016 WL 7492503
Only the Westlaw citation is currently available.
United States District Court, N.D. Ohio, Eastern Division.

Cheryl BEANS, Individually and as Administratrix
of the Estate of Shane Allen Ryan, Plaintiff,
v.
CITY OF MASSILLON, et al., Defendants.

CASE NO. 5:15–cv–1475
|
Signed 12/30/2016

**Attorneys and Law Firms**

William E. Walker, Jr., Massillon, OH, for Plaintiff.

Gregory A. Beck, Melvin L. Lute, Jr., Baker, Dublikar, Beck, Wiley & Mathews, North Canton, OH, Kristen Bates Aylward, Kevin R. L'Hommedieu, City of Canton, Department of Law, Canton, OH, for Defendants.

MEMORANDUM OPINION

HONORABLE SARA LIOI, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are the following dispositive motions: (1) the motion of defendants City of Massillon ("Massillon"), Kathy Catazaro–Perry ("Catazaro–Perry"), William Peel ("Peel"), Paul Covert ("Covert"), Jason Greenfield ("Greenfield"), and David McConnell ("McConnell") (collectively "Massillon defendants") for summary judgment (Doc. No. 46 ["Massillon MSJ"]; (2) the motion of defendants City of Canton ("Canton"), William Healy II ("Healy"), Bruce Lawver ("Lawver"), David Davis ("Davis"), Lisa Broucker ("Broucker"), Charles Saler ("Saler"), Donald Miller ("Miller"), Travis Pellegrino ("Pellegrino"), and Brandon Shackle ("Shackle") (collectively "Canton defendants") for summary judgment (Doc. No. 48 ["Canton MSJ"]; and (3) the motion of plaintiff Cheryl Beans ("plaintiff" or "Beans") for summary judgment (Doc. No. 49 ["Plaintiff MSJ"]). The motions are fully briefed. (*See* Doc. No. 58 (Plaintiff's Opposition to Massillon Defendants' Summary Judgment Motion ["Massillon MSJ Opp'n"] ); Doc. No. 84 (Reply Brief in Support of Massillon Defendants' Summary Judgment Motion ["Massillon MSJ Reply"] ); Doc. No. 60 (Plaintiff's Opposition to Canton

Defendants' Summary Judgment Motion ["Canton MSJ Opp'n"] ); Doc. No. 83 (Reply Brief in Support of Canton Defendants' Summary Judgment Motion ["Canton MSJ Reply"] ); Doc. No. 55 (Massillon Defendants' Response to Plaintiff's Summary Judgment Motion ["Plaintiff MSJ Massillon Opp'n"] ); Doc. No. 67 (Canton Defendants' Response to Plaintiff's Summary Judgment Motion ["Plaintiff MSJ Canton Opp'n"] ); Doc. No. 85 (Reply Brief in support of Plaintiff's Motion for Summary Judgment as against Canton Defendants ["Plaintiff MSJ Reply–Canton"] ); Doc. No. 86 (Reply Brief in Support of Plaintiff's Motion for Summary Judgment as against Massillon Defendants ["Plaintiff MSJ Reply–Massillon"] )).

For the reasons to follow, the motions of Massillon defendants and Canton defendants for summary judgment are granted, and plaintiff's summary judgment motion is denied.

## I. BACKGROUND [1]

[1]
    For purposes of framing the issues raised in defendants' summary judgment motions, the Court takes the facts supported by competent evidence in a light most favorable to plaintiff. In doing so, the Court notes that many of the facts relied upon by plaintiff are either unsupported by the record or supported by incompetent evidence that the Court may not consider on summary judgment.

The tragic events that supply the foundation for the present civil rights action were set in motion with a walk. On July 28, 2013, Shane Ryan ("Ryan" or "deceased") called his ex-girlfriend [2], Taylor McLendon ("McLendon"). Unable to reach her by phone, Ryan decided to walk 10 miles to the Great Clips Hair Salon in Massillon, Ohio, where McLendon was employed. It is undisputed that, along the way, Ryan placed a called to the Crisis Intervention and Recovery Center ("Crisis Center"). Given the distressed nature of Ryan's call, a representative of the Crisis Center contacted the Stark County Sheriff's Office and reported the call. Using GPS tracking technology or triangulation, the Stark County Sherriff's Office was able to determine that Ryan was in Massillon. (Doc. No. 71 (Deposition of Jason Greenfield ["Greenfield Dep."] ) at 2050–52. [3] ) The sheriff's office contacted the Massillon Police Department and requested assistance in locating Ryan. (*Id.* at 2050–51.)

[2]
    It is unclear from the record whether McLendon and Ryan were currently in a romantic relationship

at the time of the shooting, or whether any such relationship had previously ended. For purposes of summary judgment, it is a distinction without a difference.

3      All references to page numbers are to the page identification numbers generated by the Court's electronic filing system.

**\*2**  While local law enforcement was looking for him, Ryan arrived at the salon only to discover that McLendon was not there. What happened next is disputed, but the parties agree that the customers present in the salon vacated the building and one of the salon's employees, Heather Patterson ("Patterson"), ended up with Ryan in a small room in the back of the salon. [4] Shortly after the customers left the store, some unidentified person placed a 911 call from the salon to the Massillon Police Department and hung up. Responding to the call, Massillon police were dispatched to the salon. (*Id.* at 2053.)

4      Plaintiff has suggested in briefing that Heather Patterson willingly went with Ryan to the utility room. All of the evidence in the record, however, demonstrates that Patterson was a hostage, held in the back room against her will by Ryan. For example, officers consistently testified in their depositions that Patterson could be heard, at various times, whimpering or crying. (Greenfield Dep. at 2138; *see* Doc. No. 69 (Deposition of David McConnell ["McConnell Dep."] ) at 1956.) Ryan also made repeated threats to kill Patterson, and even inquired about exchanging Patterson with McLendon. (Greenfield Dep. at 2079; Doc. No. 62 (Deposition of Charles Saler ["Saler Dep."] ) 1486.) All of this evidence is consistent with the fact that Patterson was a hostage. Plaintiff has pointed to no competent evidence that would suggest that Patterson agreed to accompany Ryan into the back room, or that she remained there of her own volition. Further, plaintiff has also failed to identify any evidence that would suggest that the officers believed that Patterson was Ryan's guest in the utility room. In addition to the threats by Ryan and the observed actions of Patterson crying, it is undisputed that the Sergeant Muntean immediately reported that there was a "hostage situation" developing at the salon. (Greenfield Dep. at 2063; McConnell Dep. at 1952.) Indeed, all of the information available to the officers at the scene

would have led any reasonable officer to conclude that Ryan had taken a hostage.

Sergeant Brian Muntean ("Muntean") was the first Massillon police officer to arrive at the scene. Once there, Muntean radioed dispatch and, with "a lot of stress in his voice," requested backup advising that a hostage situation had developed at the salon and that the suspect was possibly armed with a gun. (Greenfield Dep. at 2063; Doc. No. 69 (Deposition of David McConnell ["McConnell Dep."] ) at 1952.) Greenfield was the Massillon officer in charge of the shift that day, and he immediately left the station for the salon. (Greenfield Dep. at 2053.) Defendant McConnell, a detective with the Massillon Police Department, along with various other Massillon police officers, also responded to the call for assistance. (McConnell Dep. at 1952–53.)

When he arrived on the scene, McConnell was advised by Muntean that a suspect named Shane Ryan had barricaded himself in a small utility room at the rear of the salon with a hostage, later identified as Heather Patterson. (McConnell Dep. at 1953.) Ryan could be heard in the utility room yelling, and he appeared to be very upset. (*Id.*) Through the door that separated the utility room from the rest of the salon, Ryan demanded to speak with McLendon, and was heard to say "I'm going to die today. You [the police] will have to kill me. I'm going to force you guys to kill me." (Greenfield Dep. at 2064; *see* McConnell Dep. at 1954.) Patterson could also be heard through the door "whimpering[.]" (Greenfield Dep. at 2138.) Officers could tell that Patterson was also very upset. (McConnell Dep. at 1956.)

**\*3**  Within moments of his own arrival on the scene, Greenfield determined that the police were facing a "very serious situation[.]" (Greenfield Dep. at 2074.) Because Massillon did not have its own special weapons and tactics team ("SWAT"), Greenfield called dispatch to inquire as to the availability of other local SWAT teams. (*Id.*) He was advised that members of Canton's Regional SWAT could arrive within 40 minutes. (*Id.* at 2075.)

Defendant Saler, a Sergeant with Canton's Police Department and the leader of the Canton Regional SWAT, was contacted and apprised of the situation. (Doc. No. 62 (Deposition of Charles Saler ["Saler Dep."] ) at 1462–63.) Pursuant to established protocol, Saler contacted defendant Lawver, Chief of the Canton Police Department, for the purpose of establishing that permission had been granted for the Canton Regional SWAT to assist the Massillon police force in dealing with the stand-off. (*Id.* at 1464.) He was advised

that the appropriate officials from Massillon and Canton had communicated and determined that the Canton Regional SWAT would offer its services. (*Id.* at 1465–66.) Saler then used a telephone notification system to summon other SWAT members to report for an emergency hostage mission. (Doc. No. 48–7 (Affidavit of Charles Saler ["Saler Aff."] ) ¶ 2.) Defendants Shackle and Pellegrino, both Canton police officers and members of Canton Regional SWAT, reported to the Canton Police Station. Defendant Miller reported directly to the scene. (*Id.*)

While Greenfield, McConnell, and other Massillon police officers waited for Canton Regional SWAT members to arrive, McConnell initiated a conversation with Ryan through the closed door in an attempt to build a rapport with Ryan and calm him down. (McConnell Dep. at 1955–56.) During this conversation, Ryan indicated that he needed a cigarette. (*Id.* at 1958.) On the counter of the salon, McConnell found a plastic shopping bag with loose tobacco, materials for rolling cigarettes, and a lighter. (*Id.* at 1958–60; Greenfield Dep. at 2065.) Ryan agreed to exchange the materials in the bag for several weapons, including scissors and a folding pocket knife. (McConnell Dep. at 1957.) The exchange was made when Ryan cracked the door open. (*Id.* at 1960–61.)

Approximately 15 minutes after the exchange, McConnell placed a call to Ryan and asked to speak with Patterson. (McConnell Dep. at 1962–63.) Once she was on the line, McConnell asked Patterson if she was all right and inquired as to whether Ryan had any other weapons in the utility room. At first, Patterson said she was not sure, but she later stated that she did not see any other weapons. (*Id.* at 1964.)

When Canton Regional SWAT arrived on the scene, Greenfield met the team's members in the salon's parking lot and began to brief them on the situation. (Greenfield Dep. at 2080; Saler Dep. at 1475, 1484.) Saler and the other SWAT members were advised that Massillon police had been negotiating with Ryan for approximately one and one half hours, that he had a hostage, and that he had informed the officers that he would either kill a police officer or be killed by one. (Saler Aff. ¶ 3.) They were also informed that Massillon officers did not know if Ryan had any other weapons. (*Id.*)

Following the briefing, Greenfield escorted the SWAT members to the salon where they could hear Ryan yelling and screaming from the back room. It was clear to Greenfield that the situation had "turned really nasty really fast." (Greenfield Dep. at 2080; *see also id.* at 2138 ["the level of everything

had changed"]; Saler Dep. at 1486 [the situation had changed "drastically"].) Greenfield and the SWAT members were informed that a call had been arranged between Ryan and McLendon that had ended with Ryan yelling, "You caused this", and when McConnell rejected Ryan's suggestion that McLendon be traded for Patterson, the communications broke down entirely and Ryan terminated the call. (Greenfield Dep. at 2079.)

**\*4** Ryan's next comment through the door put everyone on high alert. Yelling, Ryan threatened the officers, stating "You've got [so many] minutes [5], and then I'm going to blow the place up." (McConnell Dep. at 1994.) Ryan informed the officers that he had opened up the natural gas lines, and he was going to kill the hostage and use his lighter to cause an explosion in the building. (Saler Dep. at 1486.) As Ryan was conveying this threat, Patterson, who had been whimpering, was "crying really loud." (Greenfield Dep. at 2138.) With these new threats from Ryan, the officers assembled agreed that the situation had significantly escalated to the point where it was necessary to breach the utility room. (Saler Dep. at 1490; McConnell Dep. at 1964–65; Doc. No. 72 (Deposition of Paul Covert ["Covert Dep."] ) at 2259–60.)

[5]     McConnell could not remember the exact time frame Ryan suggested, but it was a matter of minutes. (McConnell Dep. at 1994.)

Saler formulated the hostage rescue plan. Because of the new risk of a gas explosion, he had to rule out the use of distraction devices, such as the beanbag shotgun and or a taser. (Saler Dep. at 1504.) As he and his team were preparing to enter the utility room, Saler heard Ryan, again, screaming that he was going to blow up the building and kill the hostage. (*Id.* at 1502.) Saler gave the order to storm the room. (Doc. No 66 (Deposition of Donald Miller ["Miller Dep."] ) at 1862; *see* Saler Dep. at 1494.) Saler was first through the door, and, as he entered, he announced "Police, down now, let her go." (Saler Dep. at 1512; *see id.* at 1506.) Instead of heeding Saler's command, Ryan tried to ignite the lighter he had in his hand, which sparked but did not light. (*Id.* at 1505.) Ryan also moved behind Patterson, putting his arm around her neck. (*Id.* at 1507.)

Saler testified in his deposition that he attempted to use his ballistic shield to separate Patterson from Ryan. (*Id.* at 1512.) When that did not work, Saler shot Ryan once around his lower left rib cage. (*Id.* at 1515–16.) Ryan continued to hold onto Patterson and the lighter, and Saler shot Ryan again;

this time the bullet hit the left side of Ryan's head. (*Id.* at 1516–17.) The entire exchange took only a few seconds. (*Id.* at 1522, 1539, 1549.) After Ryan fell to the ground, officers attempted to administer first aid, but Ryan ultimately died from his injuries.

Shortly after the stand-off, an internal investigation was conducted by the Stark County Sheriff's Office during which individuals who were at the scene, including Patterson and various Canton and Massillon police officers, were interviewed. No charges were ever filed in connection with the death of Ryan, and there is no record of any disciplinary action taken against any of the participants.

On July 27, 2015, plaintiff, as the administratrix of Ryan's estate, brought suit in this Court against defendants. The complaint raises federal claims for violations of the Fourth and Fourteenth Amendments and the Due Process Clause, failure to train and supervise, excessive force, conspiracy, municipal liability, and failure to accommodate under Title II of the Americans with Disabilities Act ("ADA"). Plaintiff also raises state law claims for wrongful death, state law conspiracy, negligence and gross recklessness, gross negligence and deliberate indifference, intentional and negligent infliction of emotional distress, and survivorship. All individual defendants were sued in their individual and official capacities. (Doc. No. 1 (Complaint ["Compl."] ).)

On October 2, 2015, the Court conducted a case management conference. At the request of the parties, the Court agreed to bifurcate discovery in this matter, allowing for an initial period of discovery and motion practice limited to the question of whether the individual defendants were entitled to qualified immunity. (Minutes Oct. 2, 2015.) After the completion of this initial discovery period, each party joined in one of three summary judgment motions.

## II. STANDARD OF REVIEW

### A. Summary Judgment Standard

**\*5** When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record ...; or (B) showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the

materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also* 🚩 *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing 🚩 *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

The summary judgment standard does not change when a court is presented with cross-motions for summary judgment. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 312 (6th Cir. 2010) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "The fact that both parties have moved for summary judgment does not mean a court must grant judgment as a matter of law for one side or the other; rather, a 'court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " *Id.* (quoting *Taft*, 929 F.2d at 248); *see 60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (the threshold requirement for all parties who seek summary judgment under Rule 56 demands that the moving party come forward with competent evidence showing that there is no genuine issue of material fact and that the movant is entitled to judgment in her favor as a matter of law) (citation omitted).

### B. Defendants' Motions to Strike

**\*6** Plaintiff's opposition to defendants' summary judgment motions relies heavily upon the unsworn interviews of various individuals who were at the scene, and were later interviewed as part of the post-shooting investigation conducted by the Stark County Sheriff's Office. In particular, plaintiff places significant weight on the interview of Massillon Police Officer Kervin Brown, who was neither sued as a defendant, nor deposed during discovery. Both the Canton and the Massillon defendants move to strike the uncertified transcript of Officer Brown's interview, as well as the transcripts of other interviews conducted by Stark County. (Doc. No. 54 (Massillon Defendants' Motion to Strike ["Massillon Mot. Strike"] ); Doc. No. 56 (Canton Defendants' Motion to Strike ["Canton Mot. Strike"] ).) It is the position of both sets of defendants that the unsworn testimony of Brown and others is not acceptable evidence under Rule 56.

A party seeking or opposing summary judgment may rely on deposition transcripts, electronically stored documents, affidavits, declarations, and other materials. Fed. R. Civ. P. 56(c)(1)(A). Defendants argue that, because the interview of Officer Brown is not an affidavit, a sworn declaration,

a deposition, or a signed interrogatory answer under oath, it represents incompetent hearsay testimony that cannot be relied upon to defeat summary judgment. "It is well established that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 Fed.Appx. 513, 514 (6th Cir. 2012) (unsworn witness statements taken during police investigation were properly excluded from consideration on summary judgment) (citations omitted); *see 🚩 Dole v. Elliott Travel & Tours, Inc.*, 942 F. 2d 962, 968 (6th Cir. 1991) ("Affidavits composed of hearsay and opinion evidence do not satisfy [Rule 56] and must be disregarded.") (quotation marks and citation omitted); 🚩 *Purdy v. Newland*, No. 93–2110, 1994 WL 601341, at \*1 n.1 (6th Cir. Nov. 2, 1994) (transcript of private investigator's unsworn interviews could not be considered on summary judgment) (citations omitted); *see also* 🚩 *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010) (citation omitted).

Plaintiff suggests that the unsworn statement of Brown and others interviewed as a part of the internal police investigation may properly be considered because they were produced during discovery. She cites generally to case law that provides that evidence produced pursuant to Rule 26 can be relied upon to support or oppose summary judgment. The fact that the unsworn transcripts were produced during discovery does not cure the fact that they contain inadmissible hearsay. In *Pollino v. City of Phila.*, No. Civ. A. 03–6288, 2005 WL 372105 (E.D. Pa. Feb. 15, 2005), a civil rights plaintiff attempted to offer the unsworn statements of three witnesses who were interviewed as part of a police investigation into a shooting death to oppose summary judgment. The witnesses were never deposed in discovery, but the statements were produced during discovery as part of the police's internal files regarding the shooting. The court ruled that the unsworn statements could not be construed as "competent evidence" and could not be relied upon when reviewing summary judgment. *Id.* at \*7 (citation omitted).

Further, the court held that the fact that the statements were produced in discovery as a response to an interrogatory inquiring as to the identity of potential trial witnesses did not mean that the statements were incorporated into the evidence of the case. *Id.* ("The unsworn statements alleged to be incorporated by reference in the interrogatory answer are clearly nothing more than hearsay that would not be admitted at trial for substantive purposes" and "is not considered when reviewing summary judgment.") (citing 🚩 *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 159 & 159 n.19, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). While acknowledging that answers to interrogatories can be used as "competent evidence" to defeat summary judgment, the mere mention of a police report containing these unsworn witness statements did not elevate them to the status of an affidavit based on personal knowledge under Rule 56(e). To permit such an expansive interpretation of the word "affidavit", the court concluded, "would have an unsworn statement be treated as the equivalent of an affidavit without the speaker swearing to the accuracy of the statement or testifying under oath that he or she is competent to give such testimony." *Id.* at *7. The Court finds the reasoning in *Pollino* persuasive. Like the case in *Pollino*, the unsworn interview transcripts alleged to have been incorporated by reference in the interrogatory answer are "clearly nothing more than hearsay that would not be admitted at trial for substantive purposes." *Id.*

**\*7** Plaintiff offers the affidavit of Brian Arnold, a Major with the Stark County Sheriff's Office, in which Arnold avers that he is the custodian of the records associated with the investigation into the shooting death of Ryan, and that the transcripts of the unsworn interviews of Brown and others are true and accurate copies of the investigation records. (Doc. No. 59 (Affidavit and Certificate of Authentication of Brian Arnold) at 1284.) She suggests that this affidavit demonstrates that the transcripts are public records that are admissible under Fed. R. Evid. 803(8) as an exception to the hearsay rule. To be sure, Arnold's affidavit solves the problem originally identified by defendants that the transcript was unauthenticated. *See* 🔖 *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (unauthenticated documents do not meet the requirements of Fed. R. Civ. P. 56 and are inadmissible) (citations omitted). Arnold's affidavit establishes that the interviews of Brown and the other witnesses at the scene of the shooting took place as part of the Stark County Sheriff's investigation, and that the transcripts were produced as recordings of those interviews. This is not sufficient, however, to bring the statements contained in the transcripts within Rule 803(8)(A)(iii) [6] because the transcripts contain no fact findings. Rather, they are "simply a compilation of witness statements, all of which are hearsay." *Tranter*, 460 Fed.Appx. at 515 (witness statements contained in a police report were not public records under former Rule 803(8)(C)) (citing, among authority, 🔖 *United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) ("In line with the advisory committee note to Rule 803(8), decisions in this and other circuits squarely hold that hearsay statements by

third persons...are not admissible under this exception merely because they appear within public records)).

[6]   Rule 803(8)(A)(iii) and (B) excepts "A record or statement of a public office if: it sets out: in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."

Because the unsworn statements contained in the interview transcripts prepared as part of the internal investigation into the shooting were hearsay, and no exception to the hearsay rule would have permitted their admission,[7] the Court rules that it may not consider them in ruling on summary judgment. Defendants' motions, and supplemental motions, to strike are granted.

[7]   Likewise, the Court rejects plaintiff's unsupported argument that the unsworn statements qualify under Rule 801(d)(2)(D) as an admission by an agent of a party. *Compare Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 722 (6th Cir. 2006) (statement of deputy police chief on subject of police promotions constituted an admission by a party) with *Perry v. City of Pontiac*, 254 F.R.D. 309, 316 (E.D. Mich. 2008) (rank-and-file police officers' statements would not constitute admissions by the city under Rule 801(d)(2)).

### III. DISCUSSION

### A. Qualified Immunity and Defendants' Dispositive Motions

The Massillon and Canton defendants assert that qualified immunity protects the police officers and municipal officials from liability for all federal claims asserted against them in their individual capacities. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 🔖 *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quotation marks and citation omitted). "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'

" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, ——U.S.——, 134 S. Ct. 3, 5, 187 L. Ed. 2d 341 (2013)). Qualified immunity will apply " 'if officers of reasonable competence could disagree on the issue.' " *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. [8] *See Pearson*, 555 U.S. at 236.

[8] On some occasions, it may be necessary to employ a third step, which is whether the plaintiff " ' "offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.' " *Thacker v. Lawrence Cnty.*, 182 Fed.Appx. 464, 468 (6th Cir. 2006) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004)).

**\*8** It is axiomatic that a citizen has a constitutional right, secured by the Fourth Amendment, not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

Excessive force cases are analyzed under an "objective reasonableness" standard. *Id.* at 388. Whether or not a use of force is reasonable requires balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tenn. v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (quotation marks and citation omitted). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9). "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Withers v. City of Cleveland*, 640 Fed.Appx. 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citation omitted).

An officer's use of deadly force is reasonable only if " 'the officer has probable cause to believe that the suspect poses a threat of death or serious physical harm either to the officer or others.' " *Garner*, 471 U.S. at 11; *see Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious threat either to the police or members of the public.") (citations omitted). Ultimately, the plaintiff bears the burden of demonstrating that any force used was unjustified in order to establish a constitutional deprivation. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989) (citations omitted).

### Standing

As an initial matter, plaintiff advances the rather novel argument that the individual defendants lack standing to assert qualified immunity because the Massillon defendants "abdicated" their authority when they enlisted the services of the Canton Regional SWAT and permitted this group to take

control of the stand-off. (Massillon MSJ Opp'n at 1259.) In support, plaintiff cites Article XVII, Section III, of the Ohio Constitution. Known as the "Home Rule" Amendment, this section provides that "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Ohio Const. art. XVIII, § III. It is plaintiff's position that the Canton defendants usurped the constitutional authority given to Massillon to govern within its municipal boundaries when the Canton Regional SWAT took charge of the situation at the salon. Plaintiff believes that "[t]his usurpation of constitutional authority cannot be a legitimate police function[,]" and, therefore, the individual defendants from both municipalities were not performing legitimate, discretionary functions when deadly force was used against Ryan. (Canton MSJ Opp'n at 1434.)

Plaintiff's creative (albeit wholly frivolous) argument represents a fundamental misunderstanding of the Home Rule Amendment. The purpose of the amendment was to "distinguish between state and municipal lawmaking authority." *Am. Fin. Servs. Ass'n v. Cleveland*, 858 N.E.2d 776, 781 (Ohio 2006). It "gives municipalities the 'broadest possible powers of self-government in connection with all matters which are strictly local and do not imping upon matters which are of a state-wide nature or interest.' " *Mothers Against Drilling in Our Neighborhood v. State*, 60 N.E.3d 727, 731(Ohio Ct. App. 2016) (quoting *State ex rel. Hackley v. Edmonds*, 80 N.E.2d 769, 773 (Ohio 1948)). The only restriction on a municipality's authority to act within its boundaries, under the amendment, is the prohibition against passing laws that conflict with the Ohio Constitution or its laws. *See* Ohio Const. art. XVIII, § III.

**\*9** The amendment does not prohibit, as plaintiff suggests, local municipalities from enlisting the aid of other municipalities or law enforcement entities, nor do the statutory laws of the State of Ohio forbid it.[9] In fact, the Ohio Revised Code specifically sanctions it. Section 737.04 of the Ohio Revised Code provides that a municipality may "enter into contracts with one or more municipal corporations, township police districts, [or] joint police districts ... for services of police departments or the use of police equipment or for the interchange of services of police departments ... within the several territories of the contracting subdivision." Ohio Rev. Code § 737.04.[10] Further, section 737.041 permits a police department of any municipality to provide police

protection, upon approval, to any other municipality. Ohio Rev. Code § 737.041. *See State ex rel. Ohio Civil Serv. Employees Ass'n v. City of Coshocton*, 448 N.E.2d 834, 835 (Ohio Ct. App. 1982).

[9]    Even plaintiff's authority—a decision issued by the Supreme Court of Washington—does not support her position that the individual defendants lack standing to assert qualified immunity. In *Brown v. City of Cle Elum*, 261 P. 112, 113 (Washington 1927), the court, applying a similar "home rule" amendment, held that a municipality exceeded its authority when it passed an ordinance punishing certain proscribed acts committed on property six miles beyond the corporate limits of the municipality. Thus, the decision is clearly distinguishable from the situation before this Court where a municipality lawfully requested assistance within its own boundaries. Moreover, later Washington state court cases made clear that Washington's version of the "home rule" amendment did "not prohibit [a] municipality or county from entering into a legislatively authorized contract with another municipality or county, which is in whole or part outside its borders, to preform functions for the latter that the latter had authority to provide within its borders." *See Lakehaven Util. Dist. v. Pierce Cnty.*, No. 60007–9–1, 145 Wash. App. 1019, at \*3 (Wash Ct. App. June 23, 2008).

[10]    In fact, pursuant to this statutory section, Ohio courts have held that a municipal corporation is not even required to maintain its own police department and may contract for all of its police protection to be provided by another municipality or law enforcement entity. *See State ex rel. Ohio Civil Service Employees Ass'n v. City of Coshocton*, 448 N.E.2d 834, 835 (Ohio Ct. App. 1982).

Thus, the Massillon defendants were clearly exercising legitimate job-related police functions when they responded to a hostage situation within its boundaries, and then called for the assistance of the Canton Regional SWAT. Likewise, the Canton defendants did not usurp Massillon's authority when it agreed to assist. Because all members of law enforcement were engaged in job related police functions when they responded to the stand-off at the salon and encountered Ryan,

they were acting within their discretionary authority and may assert qualified immunity. [11]

[11]  Plaintiff has also suggested that defendants lack standing because it cannot be a legitimate police function to "provide an accelerant and ignition device to a suicidal man and then immediately kill him for possessing them[.]" (Canton MSJ Opp'n at 1435.) This misrepresents the nature of the Court's inquiry. "[T]o pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description." *See* *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004) (In determining "whether a police officer may assert qualified immunity against a Fourth Amendment claim, [the Court does] not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures in *general* is a part of his job-related powers and responsibilities.") (emphasis in original) (citation omitted).

### *Individual Inquiry*

**\*10** The Court now turns to the merits of defendants' dispositive motions. Because of the factually particularized nature of the qualified immunity analysis, " '[e]ach defendant's liability must be assessed individually based on his own actions.' " *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). " 'To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.' " *Id.* (quoting *Binay*, 601 F.3d at 650).

### *Officer Saler*

Because Saler led the team that breached the utility room and was most directly involved in the use of force against Ryan, the Court begins its individualized inquiry with him.

The first question the Court must answer as to this defendant is whether, under the totality of circumstances, it was objectively reasonable for Saler to use deadly force against Ryan. The Court finds it was. The undisputed competent evidence demonstrates that the police responded to a hostage situation, wherein the suspect had, at various times, been armed with a knife and scissors and had threatened to kill the hostage. He also had informed officers that he had opened a gas line and was planning to cause an explosion with a lighter. Moreover, when the officers breached the utility room, Ryan attempted to ignite the lighter and refused to release the hostage. Even after the first shot was fired, Ryan refused to release the hostage or the lighter.

According to these undisputed facts, each of the *Graham* factors weighs heavily in favor of applying qualified immunity as Saler, and the officers, faced a serious hostage situation, involving a suspect who—rather than give up— had informed the officers that they would have to kill him. Further, while the hostage did not see any other "weapons" in the utility room, various officers testified that they could not rule out the presence of other sharp instruments that could be used as weapons, and, in any event, they knew that Ryan was threatening to use the lighter as a weapon.

Judging Saler's conduct from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight, the Court finds that Saler's actions were objectively reasonable under the circumstances. Ryan's actions would have led any reasonable officer to believe that he posed an immediate and significant threat to the safety of the hostage and the officers in the building. *See* *Pollard*, 780 F.3d at 403 (qualified immunity available where officers mistakenly believed defendant had a gun, the defendant had made gestures toward the police suggesting he had a weapon, and he demonstrated that he was willing to do almost anything, including endangering his own life, to avoid arrest); *Bell v. Irwin*, 321 F.3d 637, 639–40 (7th Cir. 2003) (affirming qualified immunity for officers' use of force where suspect threatened to blow up his house using propane gas and had indicated to police that he would only come out "feet first"); *see, e.g., Wells v. City of Chattanooga, Tenn.*, No. 1:09–CV–219, 2011 WL 2749563, at \*4–6 (E.D. Tenn. July 14, 2011) (qualified immunity protected officers where officers used deadly force to neutralize a suspect who had advised officers that they would have to kill him and it was reasonably believed that he may have taken hostages).

It is worth underscoring the undisputed fact that the officers did not make the decision to even attempt a rescue of the hostage until "*after* a dramatic change in circumstance"; namely, Ryan threatening to kill the hostage and blow up the building. *See* Pollard, 780 F.3d at 403 (referring to the suspect making gestures indicating that he had a weapon) (emphasis in original). Further, the undisputed record demonstrates that only a few seconds expired between the time the officers entered the utility room and Saler shot Ryan twice. "While the evaluation of reasonableness must ... recognize that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation ..., the fact that a situation unfolds relatively quickly does not, by itself, permit officers to use deadly force." *Withers*, 640 Fed.Appx. at 419 (quotation marks and internal citations omitted). Still, the fact that a dangerous situation was "tense, uncertain and rapidly evolving" weighs in favor of finding qualified immunity. *See* Rush v. City of Lansing, 644 Fed.Appx. 415, 421 (6th Cir. 2016) ("Immediately before [the officer] fired the first shot, [the suspect] drew a knife and slashed at [the officer] from an arm's length away. Under those circumstances, it was not unreasonable for [the officer] to use deadly force by shooting at" him.) (quotation marks and citation omitted); Mullins, 805 F.3d at 767 (the officer "was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable"); *see also* Pollard, 780 F.3d at 403 ("It is [the facts related to the suspect's threatening gestures] immediately preceding the shooting which weigh most heavily in assessing the officers' split-second decision to shoot.") (citation omitted).

**\*11** In opposing summary judgment on qualified immunity, plaintiff relies on the unsworn statements of Brown and another officer, Jolina Boyer, who were interviewed during the investigation that followed the shooting to support her position that the hostage was safely out of the utility room before Officer Saler opened fire on Ryan. (*See, e.g.,* Massillon MSJ Opp'n at 1254–55.) It is plaintiff's belief that this evidence establishes a fact dispute as to whether there was still a risk of death or serious injury to the hostage when Saler used deadly force. The Court disagrees, as it has already ruled that plaintiff may not rely on this incompetent evidence to generate a genuine issue of material fact in the face of a properly supported summary judgment motion.

However, even if these unsworn interview transcripts were properly before the Court, they would not serve to create a fact dispute sufficient to defeat summary judgment. Neither officer was in the utility room when Saler and his team breached it, as both Massillon officers had been asked to retreat to allow Canton SWAT access to the room. Additionally, neither officer stated that the hostage was safely out of the building when the shots were fired. Officer Boyer indicated that, "As they [Canton SWAT members] made entry I heard two shots fired and saw the victim hysterical and screaming face down near the doorway, body probably half in half out." (Doc. No. 59–5 (Interview of Patrolman Jolina Boyer ["Boyer Int."] ) at 1335.) Similarly, Officer Brown ambiguously stated that he heard the shots as "we're taking [Patterson] out of the building." (Doc. No. 59–11 (Interview of Patrolman Kervin Brown ["Brown Int."] ) at 1351.) Even by their accounts, the hostage was in the process of being removed from the room and the building at the time, and was still in jeopardy of being injured by an explosion.

Of course, even if the hostage had been safely escorted out of the building, the officers were still at risk of being injured in the explosion Ryan was threatening to cause. An officer may factor in the risk of serious injury to himself and his fellow officers, in addition to the risk to members of the public, into the calculation of whether to employ deadly force against a suspect. *See* Garner, 471 U.S. at 11; Williams, 496 F.3d at 487. It is undisputed that Ryan had previously threatened to blow up the building, and that he was still holding the lighter when Canton SWAT entered the room. Given the fluid nature of the events that were rapidly unfolding, the Court cannot (and will not) second guess the decision to use deadly force. *See also* Plumhoff v. Rickard, ——U.S.——, 134 S. Ct. 2012, 2022, 188 L. Ed. 2d 1056 (2014) ("if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended").

Plaintiff also criticizes defendants because they did not take steps to cut off the gas supply to the utility room, "even though it could have been turned off by hand at the back door." (Canton MSJ Opp'n at 1427.) In support, she offers pictures depicting the gas meters at the back of the salon. (Doc. Nos. 59–7, 59–8, 59–9, 59–10.) There is no evidence in the record, however, that, if believed, would establish that the gas being supplied to the utility room could have been shut off using the gas meters shown in the photograph, or that it could have been done within the brief time frame imposed

by Ryan before he planned to blow up the building. Instead, defendant Miller testified that the procedure followed by the police would be to contact the gas provider and have the provider cut off the gas supply. (Miller Dep. at 1842–43.) Saler testified that this procedure can be "as quick as a half hour and as long as four hours." (Saler Dep. at 1541.) In other words, there is no evidence it could have been done quickly enough. More to the point, even if the failure to shut off the utilities represented a miscalculation on the part of defendants, the qualified immunity analysis clearly allows for good faith mistakes in judgment, and there is no evidence that any such miscalculation (if there was a miscalculation) was intentional. *See* Chappell, 585 F.3d at 907 (citing Pearson, 555 U.S. at 231).

 **\*12** Ultimately, the Court finds that Ryan posed an immediate serious threat to the hostage and the officers inside the building at the time Saler shot him.[12] Consequently, the use of lethal force was reasonable and Saler is entitled to summary judgment on the issue of qualified immunity. Further, because a reasonable fact-finder, viewing the facts in the light most favorable to plaintiff, could not find that Saler violated Ryan's constitutional rights through excessive use of force, it is unnecessary to consider whether any allegedly violated right was clearly established at the time of the incident.

[12] Plaintiff also relies on photographs of Ryan's body that were contained in the coroner's report, and suggests these photographs "contradict" Saler's account of the incident because they "show that Ryan's right arm had been at his side when Saler shot thorough the arm and into the chest." (Canton MSJ Opp'n at 1442, citing Doc. No. 59–20 and 59–21.) Plaintiff represents that "[t]his is significant because it shows that while Saler admitted he knew what was in Ryan's right hand he must have also known that nothing could be used in the left." (Canton MSJ Opp'n at 1442.) As Canton defendants have correctly observed, however, the photographs actually show Ryan's *left* arm, which was near his side and being used to hold the hostage close to him, which is consistent with Saler's testimony. (Saler Dep. at 1513.)

*Other Individual Defendants*

All other individual defendants from both Canton and Massillon are entitled to summary judgment on the issue of qualified immunity because plaintiff has failed to identify genuine issues of material fact as to whether Ryan's constitutional right to be free from excessive force was violated. Even if Ryan's constitutional rights had been violated, and those same rights were clearly established at the time of the shooting, Miller, Pellegrino, and Shackle would be entitled to qualified immunity because there is no evidence that they could have intervened to prevent the use of force by Saler. Though they were in the utility room at the time of the shooting, it is undisputed that the entire incident occurred in a matter of seconds. *See* Ontha v. Rutherford Cnty., Tenn., 222 Fed.Appx. 498, 506 (6th Cir. 2007) ("courts have been unwilling to impose a duty to intervene where, as here, an entire incident unfolds 'in a matter of seconds' ") (collecting cases). The same holds true for Officer McConnell, who was not even in the utility room at the time of the shooting, and had even less of an opportunity to intervene.

Plaintiff has attempted to assert liability for the use of force by Saler against the remainder of the individual Massillon defendants by alleging that they permitted what she has referred to as the "abdication of authority" that led to the Canton Regional SWAT being placed in a position to use force against Ryan. Similarly, plaintiff's primary theory of liability against the remaining individual Canton defendants is their alleged usurpation of Massillon's authority to exercise its police powers within its geographic district. As this Court has already determined, however, the Massillon defendants properly permitted the Canton Regional SWAT to participate in, and take control of, the stand-off. Thus, the remaining defendants are entitled to qualified immunity as against any allegations that polices they implemented, or supervision they provided, led to the cooperative effort by Massillon and Canton to address the hostage situation that led to Ryan's death.

### B. Remaining Claims in the Complaint and Plaintiff's Motion to Strike

 **\*13** Defendants also seek dismissal of the remaining claims in the complaint, including plaintiff's ADA and state law claims. Noting that the Court bifurcated this case and limited the initial period of discovery to the issue of excessive force and the availability of qualified immunity, plaintiff argues that defendants' summary judgment motions seek rulings that are outside the qualified immunity boundaries set by the Court's case management plan. Plaintiff moves to strike

defendants' summary judgment arguments that the remaining claims should be dismissed, or, in the alternative, to hold in abeyance these arguments until after the qualified immunity issue has been resolved. (Doc. No. 50 ["Plaintiff Mot. to Strike"].)

In support of her motion to strike, plaintiff suggests defendants' summary judgment motions "stray into areas in which discovery has not yet been permitted by this Court." (*Id.* at 1201.) Plaintiff has a point, and, to the extent that defendants' dispositive motions sought rulings on subject matters for which no discovery has taken place, the Court would agree that any ruling, without the opportunity for discovery, would be premature. However, as will be seen below, the discovery that has been conducted regarding the July 28, 2013 shooting incident, as well as the Court's ruling on the availability of qualified immunity, foreclose the possibility the remainder of the claims can be maintained.[13] Accordingly, plaintiff's motion to strike is denied.

[13]    Additionally, the Court notes that plaintiff fully briefed defendants' arguments that they were entitled to summary judgment on the remaining claims in the complaint. In doing so, plaintiff failed to identify any additional discovery that was required to fully respond to defendants' motions.

### *Monell Liability and Failure to Train*

Plaintiff seeks to hold Massillon and Canton liable under a theory that the policy and customs implemented by these municipalities resulted in a deprivation of Ryan's constitutional rights. *See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).* However, "the constitutional violation of a municipal official is a prerequisite to municipal liability." *Pollard, 780 F.3d at 404* (citing *Weeks v. Portage Cnty. Exec. Offices, 235 F.3d 275, 279 (6th Cir. 2000)*). Because the Court has determined that Ryan's constitutional rights were not violated by the use of force employed against him, defendants are entitled to summary judgment on plaintiff's claim of municipal liability. *See, e.g., Robertson v. Lucas, 753 F.3d 606, 622 (6th Cir. 2014); Pollard, 780 F.3d at 404; see also Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)* ("Neither *Monell* ... nor any other of our cases authorizes the award of damages against

a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").

### *Conspiracy under Federal Law (42 U.S.C. § 1983)*

The Court's ruling on qualified immunity also dooms plaintiff's federal conspiracy claim. "A civil conspiracy [under Federal law] is an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn, 658 F.3d 598, 602 (6th Cir. 2011)* (quotation marks and citation omitted). To prevail on a civil conspiracy claim under *42 U.S.C. § 1983*, a plaintiff must show: (1) a single plan existed; (2) the defendants shared in the general conspiratorial objective to deprive plaintiff of his constitutional or federal statutory rights; and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *Id.* at 602 (citation omitted).

The complaint alleges that the defendants conspired to injure Ryan [by shooting and killing him] by unlawful means. (Compl. ¶ 279.) Beyond this conclusory allegation, however, plaintiff has failed to allege any facts in support of her federal conspiracy claim, rendering the claim fatally deficient. *See Robertson, 753 F.3d at 622* (a plaintiff must plead the existence of a conspiracy with some degree of specificity); *Spadafore v. Gardner, 330 F.3d 849, 854 (6th Cir. 2003)* (same). In addition to the pleading deficiency, however, the claim fails because the Court has determined that Ryan's constitutional right to be free from excessive force was not violated. Because plaintiff's conspiracy claim was premised on defendants' use of force, the conspiracy claim ails, as well.[14] *See Umani v. Mich. Dep't of Corr., 432 Fed.Appx. 453, 463 (6th Cir. 2011)* (citing, among authority, *Wiley v. Oberlin Police Dep't, 330 Fed.Appx. 524, 530 (6th Cir. 2009)* (where plaintiff failed to show an underlying constitutional violation that injured her, plaintiff cannot prevail on her conspiracy claim).

[14]    Plaintiff's state law conspiracy claim is pled with even less specificity than the one brought under *§ 1983.* Indeed, the Thirteenth Claim for Relief provides simply that "Said acts (referring to all factual allegations in the complaint) constituted the

tort of civil conspiracy under Ohio law." (Compl. ¶ 277.) Under Ohio law, a claim for civil conspiracy requires " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (quoting *Le–Fort v. Century 21–Maitland Realty Co.* 512 N.E.2d 640, 645 (Ohio 1987)). The only facts plaintiff alleges that would support the existence of a conspiracy involve the decision by officials from Massillon and Canton to use Canton Regional SWAT, a decision that the Court has already determined was lawful. Additionally, without an underlying tort, this derivative claim must fail. *See* *Burgess v. Fischer*, 735 F.3d 462, 483 (6th Cir. 2013) (quotation marks and citation omitted).

### Substantive Due Process

**\*14** Plaintiff's substantive due process claim is based on allegations that Ryan's death was the result of a state created danger. Plaintiff argues that Saler and the other Canton Regional SWAT members manufactured the danger from a possible explosion by supplying a mentally unstable and suicidal man with a lighter. (Canton MSJ Opp'n at 1436 [While defendants "supplied the room with an unending stream of natural gas, [d]efendants handed Ryan a cigarette lighter."].) To establish a state created danger claim, a plaintiff must show: (1) an affirmative act by the state that created or increased the risk to the plaintiff; (2) a special danger to the victim as distinguished from the public at large; and (3) the requisite degree of state culpability. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 464 (6th Cir. 2006) (citation omitted). Under this theory of liability, the officers' acts must be made with "deliberate indifference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Sixth Circuit has "equated [deliberate indifference] with subjective recklessness." *Cutlip v. City of Toledo*, 488 Fed.Appx. 107, 117 (6th Cir. 2012) ("[The] plaintiff [must] show that the state 'official knows of and disregards an excessive risk to [the victim's] health or safety ... in a manner demonstrating 'reckless or callous indifference' toward the individual's rights.") (quoting *Ewolski*, 287 F.3d at 513) (further quotation marks and citation omitted).

And where the police are choosing from a number of risky options, " 'a plaintiff must show that the police 'knowingly and unreasonably' opted for a course of conduct that entailed a substantially greater total risk than the available alternatives.' " *Id.* (quoting *Ewolski*, 287 F.3d at 515). The Court's ruling on qualified immunity is fatal to plaintiff's substantive due process claim.

Although the officers traded Ryan's deadly weapons for cigarettes and a lighter, there is no evidence that the officers acted with deliberate indifference to a risk of injury to Ryan, or that they could have foreseen that the exchange would lead to an escalation of the situation. Rather, they reasonably convinced Ryan to exchange known dangerous weapons in his possession for cigarette rolling material and a lighter. It was Ryan who created the dangerous situation by turning a fairly innocuous cigarette lighter into a mechanism to trigger a dangerous explosion. *See, e.g., Camp v. Knox Cnty, Tenn.*, No. 3:14–CV–257–PLR–HBG, 2015 WL 461642, at *4 (E.D. Tenn. Feb. 3, 2015) (rejecting "state-created danger" theory of liability because the suspect created the danger by barricading himself in a bedroom with a weapon). Further, it is undisputed that Ryan did not threaten to use the cigarette lighter as a weapon until more than fifteen minutes after the trade when communications with his ex-girlfriend had broken down. There is no evidence that the officers could have anticipated this development, let alone deliberately opted for a course of conduct that was obviously going to result in a need to employ deadly force. Defendants are entitled to summary judgment on this claim.

### Title II of the ADA and Failure to Train

Plaintiff alleges that defendants violated the ADA by failing to reasonably accommodate Ryan's disability by neglecting to transport him to a mental health facility. (*See* Compl. ¶ 265.) Plaintiff also alleges that Canton and its supervisory employees failed to properly train its employees regarding interaction with mentally disabled individuals. While the pleading is not entirely clear, plaintiff's ADA claim appears to rest on allegations that various individual defendants failed to take steps to deescalate the situation, and, instead, supplied Ryan with a cigarette lighter and failed to cut off the supply of gas to the utility room. (*Id.* ¶¶ 267–270.) As part of her claim, she alleges that Ryan was not a threat to police officers once he was barricaded in the utility room until officers supplied him with a lighter and natural gas. (*Id.* ¶ 267.) *See Jones v.*

*Lacey*, 108 F. Supp. 3d 573, 588 n.1 (E.D. Mich. 2015) (citing *Everson v. Leis*, 412 Fed.Appx. 771, 774 (6th Cir. 2011) (" '[W]hether Title II applies to arrests is an open question in [the Sixth] Circuit....' ")). The Court assumes for the purposes of this analysis, however, that Title II ADA claims arising in the context of a police stand-off and attempted arrest are viable in this circuit.

Plaintiff complains that any ruling on her ADA claim would be premature as the parties have not yet conducted any discovery relative to Ryan's alleged mental impairments. However, even if the Court assumes Ryan was disabled for purposes of the ADA, its ruling that officers acted objectively reasonable in using deadly force in response to a dangerous and quickly evolving hostage situation precludes this claim.

**\*15** "Under the ADA, 'No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.' " *Thompson v. Williamson Cnty., Tenn.*, 219 F.3d 555, 557 (6th Cir. 2000) (quoting 42 U.S.C. § 12132). In the Sixth Circuit,

> To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) [ ]he has a disability; (2) [ ]he is otherwise qualified; and (3) [ ]he was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability.

*Anderson v. City of Blue Ash*, 798 F.3d 338, 357 & n.1 (6th Cir. 2015) (citing *Tucker v. Tenn.*, 539 F.3d 526, 532 (6th Cir. 2008) and *Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005), but eliminating the requirement that discrimination be "solely" because of plaintiff's disability, finding that in Title II claims, discrimination must be shown to have been "because of" the individual's disability.) A prima facie case requires a plaintiff to show that the discrimination

was *intentionally* directed toward him or her in particular." *Tucker*, 539 F.3d at 532 (emphasis in original).

In *Thompson*, a police officer responded to a 911 call from the decedent's brother, who indicated that the decedent was threatening family members with a machete. The responding officer was forced to shoot to kill when the decedent raised a machete as if to throw it at the officer. *Id.* at 556. The Sixth Circuit ruled that the ADA claim failed, as a matter of law, because the decedent was not denied access to a public service and, if he was, it was not because of disability. *Id.* at 557. The court reasoned that the officer's failure to disarm and transport the decedent to a hospital for treatment was not the result of inadequate training in dealing with mental disabled individuals, but was because the decedent "threatened him with a deadly weapon before he could subdue him. Thus, if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled." *Id.* at 558 (citation omitted). *See Wolfanger v. Laurel Cnty., Ky.*, 308 Fed.Appx. 866, 867–68 (6th Cir. 2009) (county and officers were entitled to summary judgment on plaintiff's Title II ADA and failure to train claims because it was objectively reasonable for officers to use deadly force against disabled man who pointed a gun at them); *Dillery*, 398 F.3d at 568 (plaintiff could not establish a prima facie case of discrimination where the record reflected that plaintiff was stopped by the police because her practice of operating her motorized wheelchair in the street was a safety hazard, not because of her disability); *see also Tucker*, 539 F.3d at 536 (concluding that when "officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns").

Similarly here, the Court's ruling that Saler acted in an objectively reasonable manner when he employed deadly force in response to Ryan's threatening behavior forecloses plaintiff's Title II ADA claim. The failure to disarm Ryan and transport him for treatment was not the result of inadequate training with dealing with mentally unstable individuals, but because Ryan threatened to kill his hostage and the officers before he could be subdued. Accordingly, he was not denied access to medical care because of any disability, but because of his own threatening and dangerous behavior. Moreover, in light of the volatile and rapidly evolving circumstances faced by the officers at the scene, it would have been unreasonable to require the officers to attempt to accommodate Ryan's disability before neutralizing the danger Ryan's conduct

created. Plaintiff's Title II ADA claim, therefore, is subject to dismissal. *See* *Tucker*, 539 F.3d at 536; *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 981 (E.D. Mich. 2010) ("if [plaintiff's] behavior was highly alarming, it would seem unreasonable to require the Officers to take the time to contact a mental health professional") (citation omitted).

*State Claims and Tort Immunity*

**\*16** Section 2744 of the Ohio Revised Code extends to municipalities immunity from tort liability for governmental and propriety functions. Ohio Rev. Code § 2744.02(A) (1); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). It is well settled that "government functions" include the operations of law enforcement. *See* § 2744.01(C)(2) (a); *Harris v. Sutton*, 918 N.E.2d 181, 185 (Ohio Ct. App. 2009). There are, however, certain exceptions to the general grant of immunity spelled out in the statute. Specifically, immunity is not available to a municipality where: (1) injury or damage is caused by a municipal employee's negligent operation of a motor vehicle [§ 2744.02(B) (1)]; (2) the losses are due to the negligent performance of employees with respect to proprietary functions of a political subdivision [§ 2744.02(B)(2)]; (3) damages are the result of a municipality's negligent failure to keep public roads in repair [§ 2744.02(B)(3)]; (4) damages are the result of a physical defect on the grounds of public buildings used for government functions [§ 2744.02(B)(4)]; and (5) civil liability is expressly imposed by another provision of the Ohio Revised Code § 2744.02(B)(5).

Based on the undisputed record facts regarding the incident leading to the shooting death of Ryan, there can be no doubt that Canton and Massillon qualify for immunity under Ohio Rev. Code § 2744.02(A)(1), as its employees were engaged in the governmental function of police activities while at the hair salon on July 28, 2013. Further, there are no exceptions that would apply to the circumstances as they are known following the period of discovery on qualified immunity. Thus, to the extent that the municipalities are sued under state law, they are entitled to immunity for plaintiff's state tort claims. *See generally Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 744 (N.D. Ohio 2008) ("Ohio courts have held that political subdivisions are entitled to immunity

under § 2744.02 for the intentional torts committed by their employees.") (collecting cases).

Ohio Rev. Code § 2744 also provides immunity for tort actions for employees of political subdivisions, provided their acts and omissions were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owned in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted). "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.*

Based on the same analysis presented above with respect to federal qualified immunity, the Court concludes that there are no genuine issues of material fact and that the individual defendants are entitled to immunity from liability in connection with plaintiff's state law claims. In the same way in which she failed to demonstrate that Saler's actions were objectively unreasonable, plaintiff has also failed to show that Saler and the other individual defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Chappell*, 585 F.3d at 916 n.3 (holding that failure to prove objective unreasonableness to avoid qualified immunity under 42 U.S.C. § 1983 also defeated claim for qualified immunity under Ohio law); *see Pollard*, 780 F.3d at 404 ("If the officers were objectively reasonable in shooting Bynum, it logically follows that they could not have been reckless in shooting Bynum"); *Mullins*, 805 F.3d at 769 ("Because we find that [the officer's] use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid

statutory immunity under Ohio law.") (quoting 📙 Ohio Rev. Code § 2744.03(A)(6)(b)).

## C. Plaintiff's Motion for Summary Judgment

**\*17** Plaintiff also seeks summary judgment on the issue of the availability of qualified immunity. Her motion is built on a dubious foundation of incompetent evidence and mischaracterizations of the competent record before the Court. For example, plaintiff framed her request for summary judgment around representations that Ryan went to the salon "in hopes of seeing his girlfriend" and "made a disturbance when he learned [she] was not there." Plaintiff further claimed that the police arrived, "treat[ing] the event" as a hostage situation, causing Ryan to "fle[e] into" the back room "accompanied" by one of the employees. Saler then entered the room and, after seeing "no weapons in Ryan's hands," and after seeing the "employee ... hurried ... out of the room," shot him twice. (Plaintiff MSJ at 1023–24) (capitalization omitted). She concludes that because Saler "had never seen Ryan holding or touching a weapon" he "knew that Ryan could not reach out to harm anyone." (*Id.* at 1030–31) (capitalization omitted).

These characterizations constitute gross misrepresentations of the record before the Court, the most egregious of these being the representation that Ryan was unarmed and a danger to no one when he was shot by police. Instead, the undisputed record demonstrates that Ryan was holding a lighter and, instead of giving up, he attempted to ignite it when the members of the Canton Regional SWAT entered the room. [15] When coupled with the threats that Ryan had previously made (and conveniently omitted from plaintiff's summary judgment motion)—that the officers would have to kill him and that he would kill the hostage and blow up the building—it is clear that the danger faced by the responding officers was very real. No amount of massaging the facts can escape this conclusion.

[15] Plaintiff simply cannot have it both ways. While she insists that Ryan was "unarmed," she also argues that defendant's erred by giving a "suicidal man" a "deadly weapon." (Canton MSJ Opp'n at 1437; *see also id.* ("Captain Covert agreed with McConnell that officers have no discretion to *arm* the suicidal.") The record clearly establishes that Ryan turned the cigarette lighter into a deadly weapon when he indicated that he was prepared to

use it to cause harm to himself, the hostage, and the officers.

Plaintiff concedes, as she must, that the use of deadly force is reasonable, and constitutional, if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." (*Id.* at 1028 (quoting 📙 *Chappell,* 585 F.3d at 908).) Yet, the undisputed facts demonstrate that the risk to the hostage and the officers at the scene was significant, and the officers had only seconds to respond. Given the evolving nature of this dangerous situation, plaintiff cannot establish that no reasonable fact-finder, viewing the facts in the light most favorable to defendants, would find that defendants' actions were objectively unreasonable.

Plaintiff also relies extensively on the transcribed interview of Officer Brown, and, in particular, Brown's representation that the hostage was in the process of being rescued from the utility room when Saler shot Ryan. (*Id.* at 1025.) The Court has already set forth in detail why this unsworn statement may not be considered on summary judgment. The Court has also discussed, in depth, the limitations of this evidence, and how it fails to demonstrate that the risk of injury or death to the hostage and the officers from a gas explosion had dissipated.

Accordingly, plaintiff is not entitled to summary judgment.

## IV. CONCLUSION

The shooting death of Shane Ryan was a tragedy. Yet, not all tragic events are the result of constitutional violations. The undisputed record compels the Court to conclude that, tragic as it was, the death of Ryan was not the result of a violation of his constitutional rights. Such a finding entitles the individual defendants to qualified immunity, and prevents plaintiff from continuing to prosecute the claims in her complaint.

**\*18** Accordingly, and for all of the foregoing reasons, plaintiff's motion for summary judgment is denied, and defendants' summary judgment motions are granted. This case is dismissed.

**IT IS SO ORDERED**.

## All Citations

Not Reported in Fed. Supp., 2016 WL 7492503

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2838377
Only the Westlaw citation is currently available.
United States District Court, N.D.
Indiana, Hammond Division.

Melissa A. COSBY, Plaintiff,

v.

PURDUE UNIVERSITY, and Purdue
University Police Department, Defendants.

No. 4:08–CV–88–PRC.
|
July 16, 2010.

**Attorneys and Law Firms**

Melissa A. Cosby, Thorntown, IN, pro se.

Tandra M. Stovall, Trenten D. Klingerman, Stuart & Branigin LLP, Lafayette, IN, for Defendants.

**OPINION AND ORDER**

PAUL R. CHERRY, United States Magistrate Judge.

 **\*1**  This matter is before the Court on (1) Defendants' Motion for Summary Judgment [DE 30], filed by Defendants on April 30, 2010, and (2) Defendants' Motion to Strike [DE 38], filed by Defendants on July 6, 2010. Plaintiff filed her response brief to the Motion for Summary Judgment on June 18, 2010, to which Defendants filed their reply brief on July 6, 2010.

**PROCEDURAL BACKGROUND**

On November 18, 2008, Plaintiff Melissa A. Cosby, *pro se,* filed an Employment Discrimination Complaint in this Court alleging sex discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"), and disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Defendants filed an Answer on December 17, 2008.

On January 15, 2009, the Court conducted a Rule 16 Preliminary Pretrial Conference [DE 13], during which the parties orally agreed to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and

to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

On April 30, 2010, Defendants filed their Motion for Summary Judgment, their brief in support, and Statement of Material Facts. Also on April 30, 2010, Defendants filed their "Notice in Compliance with *Lewis v. Faulkner* for Defendants' Motion for Summary Judgment." Plaintiff filed a response brief on June 18, 2010. Defendants filed a reply brief in support of their Motion for Summary Judgment, as well as a Motion to Strike on July 6, 2010.

**SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment is appropriate-in fact, is mandated-where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir.1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply " 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial,

the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id. at 323, 325; Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 n. 3 (7th Cir.1994); *Fitzpatrick v. Catholic Bishop of Chi.,* 916 F.2d 1254, 1256 (7th Cir.1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund,* 791 F.2d 548, 558 (7th Cir.1986); *Bowers v. DeVito,* 686 F.2d 616, 617 (7th Cir.1982).

**\*2** Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed.R.Civ.P. 56(e)(2); *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994). Rule 56(e) establishes that the opposing party's "response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson,* 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid–Am., Inc.,* 45 F.3d 231, 234 (7th Cir.1995); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson,* 477 U.S. at 249–50; *Doe,* 42 F.3d at 443.

**MATERIAL FACTS**

The following are the facts viewed in the light most favorable to the nonmoving party. [1] The Trustees of Purdue University ("Purdue") is a corporate body created by the Indiana legislature through Indiana Code § 21–23–2–2 *et seq.* The Trustees of Purdue University operate Purdue University and have the power to "dismiss, suspend, or otherwise punish any ... employee of the state educational institution who violates the institution's rules or standards of conduct." Ind.Code § 21–39–2–4(b). The Purdue University Police Department ("the Police Department") is a professional law enforcement department operated by Purdue University.

[1]   Local Rule 56.1(a) requires that a party opposing a motion for summary judgment submit a response that includes a "Statement of Genuine Issues" setting forth all material facts as to which a genuine issue exists and which may be litigated. Local Rule 56.1(a) further provides that the "Statement of Genuine Issues" and the facts stated therein shall set forth all material facts, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence. In the "Statement of Genuine Issues," the nonmoving party's response is not required "to respond to each and every fact, point by point, [but] it does require that the nonmoving party submit potentially determinative facts and identify factual disputes" that may preclude summary judgment. *Fox v. Lear Corp.,* 327 F.Supp.2d 946, 948 (S.D.Ind.2004). Failure to include such crucial facts may be detrimental to the non-movant's case because the Court assumes the facts as claimed and supported by admissible evidence submitted by the moving party, unless they are controverted with supporting evidence by the nonmoving party. *See* L.R. 56.1(b)L.R. 56.1(b). Plaintiff has not provided a Statement of Genuine Issues. The only evidence submitted by Plaintiff is in the form of exhibits attached to her response brief, which include numerous documents and deposition testimony. Accordingly, the Court relies on the admissible material facts in Defendants' Statement of Material Facts that are not contested by Plaintiff's exhibits.

Plaintiff was hired by Purdue in 2000 as a police dispatcher at the Police Department. She underwent training at the Law Enforcement Academy in 2001 and began working as a

uniformed patrol officer for the Police Department in early 2002.

Lieutenant Sarah Sheppard ("Lt.Sheppard") was Plaintiff's shift commander and supervisor at the Police Department and evaluated her performance as a patrol officer. Sergeant Ryan Needham ("Needham") was Plaintiff's shift sergeant during most of her time at the Police Department and was responsible for fulfilling the Lieutenant's role in his or her absence.

While Plaintiff was a patrol officer, if she was dissatisfied with a performance review or the issuance of a discipline, she could raise any concerns with her patrol Captain. If she did not agree with the Captain's decision, she could then grieve any employment decision to Purdue's Human Resources Representative, Sarah Smith.

 **\*3** Plaintiff previously worked with Needham at other law enforcement agencies and began a romantic relationship with him in 1998. While working at the Police Department, her relationship with Needham continued, even after he became a patrol officer with the Police Department in September 2002.

Needham was promoted to Sergeant in late 2003 or early 2004 and he was assigned to Plaintiff's shift. Plaintiff testified at her October 5, 2009 deposition that her relationship with Needham did not positively or negatively impact her job near the time that their relationship ended in late 2005. At the end of their relationship, Needham became romantically involved with another patrol officer, Kelly Colosino.

In August 2006, Needham disclosed his prior relationship with Plaintiff and his relationship with Colosino to then-Chief Gary Evans. Shortly afterwards, Plaintiff, Officer Colosino, and Needham met with Lt. Sheppard to discuss the relationships. At the meeting, Plaintiff reported to Lt. Sheppard that Needham harassed her at her home and that she wanted Needham to stop contacting her. Plaintiff also alleged that Needham harassed her through telephone calls, emails, and text messages. Lt. Sheppard indicated to Plaintiff that she would report the allegations to the Captain Tim Potts, despite Plaintiff's request that he not be notified of the allegations against Needham.

On August 21, 2006, Captain Potts and Lt. Sheppard met with Plaintiff and informed her that Purdue's human resources department would need to investigate her claims of harassment. Then–Captain John K. Cox conducted an investigation into Plaintiff's allegations and Sarah Smith

conducted a parallel investigation to determine whether the circumstances violated any of Purdue's policies. After her investigation, Ms. Smith concluded that, although Plaintiff claimed that much of the harassment occurred via email and text messaging, she was unable to present evidence supporting her allegations and her claims could not be substantiated as no witness observed Needham harassing her. Although Ms. Smith determined that there were no violations of Purdue's policy, she determined that the working relationship between Plaintiff and Needham was irreparably harmed and she recommended that Needham no longer serve as Plaintiff's supervisor and that he be disciplined for failing to maintain constructive relationships with his employees.

Captain Cox's investigation concluded that none of Plaintiff's allegations could be substantiated and that Plaintiff, Needham, and Officer Colosino all violated the Police Department's Standard Operating Procedure. Plaintiff admitted to inappropriately using her Mobile Data Terminal ("MDT") to send a message to Needham that violated the Standard Operating Procedure. [2] Accordingly, Plaintiff received a documented Verbal Warning and a letter of expectation on November 8, 2006, that prohibited her from working shifts with either Needham or Colosino without receiving prior approval from Captain Potts or Chief Evans.

[2]     Plaintiff testified at her October 5, 2009 deposition that she sent Needham a message through the MDT that he needed to "[f]uck his girlfriend off duty." Defs.' Mot. Summ J., Ex. B at 101:19.

 **\*4** Needham and Colosino also received letters of expectations as documentation of conduct that they engaged in and that it demonstrated poor judgment that affected the workplace and both were removed from Plaintiff's shift.

In February 2007, Plaintiff responded to a call of possible drug use at a Purdue University residence hall and, contrary to the Police Department's policy, she failed to complete a report on this incident. According to the Police Department's policy, when property or drug paraphernalia is confiscated, officers are required to make a report. Plaintiff contended at her October 5, 2009 deposition that it was debatable as to whether she seized drug paraphernalia from the suspect, in the form of a smoking pipe, and she did not file a report. Plaintiff apparently destroyed the pipe without first having filled out a report. Captain Potts issued a written reprimand to Plaintiff for failure to properly document and report the case

and indicated that her conduct failed to meet the standards of performance required of Police Department employees.

In March 2007, Plaintiff and other officers refused to attend a mandatory training session at the Police Department because there was a question as to whether other police officers who were not certified trainers could properly conduct the training. Lt. Sheppard later attempted to question Plaintiff about the incident, but Plaintiff refused to answer her questions because she would not show Plaintiff a copy of the complaint filed against her for failure to attend the training session, instead requesting to speak to her attorney. As a result, Plaintiff was suspended from active duty for three days for failing to answer questions in connection with the internal investigation of the incident.

On March 22, 2007, Plaintiff filed an internal complaint of harassment with Purdue's Affirmative Action/Equal Opportunity Office, alleging that she was the subject of harassment, discrimination, and retaliation. Plaintiff alleged that Needham harassed her by threatening her with termination if she reported Needham's relationship with Plaintiff and Colosino and that the Police Department's discipline of her constituted retaliation and sexual harassment.

Monica S. Bloom, the Assistant Director of Conflict Resolution, conducted the investigation of this matter and, upon completion of her investigation, concluded that Plaintiff's allegations of discrimination, harassment, and retaliation were not substantiated. Purdue's Vice President of Human Relations, Alysa Rollock, also determined that there was insufficient evidence supporting Plaintiff's allegations that she was sexually harassed, discriminated against, or retaliated against. In particular, Ms. Rollock found that Plaintiff failed or allegedly refused [3] to provide emails, recordings, or other documents that she asserted would support her allegations. Ms. Rollock recommended that Plaintiff be issued a Letter of Reprimand for knowingly filing false or malicious charges against Captain Cox, Needham, and Colosino.

[3]    At her October 5, 2009 deposition, Plaintiff contended that her attorney at the time tried to contact Ms. Rollock, but she would not return the attorney's calls. Further, Plaintiff alleged that she was not asked for emails as part of Purdue's investigation.

**\*5**    Nonetheless, Ms. Rollock recommended that Needham attend a workshop on sexual relationships and harassment in the workplace and that Chief Evans prepare a Police Department policy addressing sexual and romantic relationships among members of the Police Department. Ms. Rollock also recommended that Lt. Sheppard be provided professional development opportunities in the area of supervision and that she and Plaintiff be encouraged to develop their conflict resolution skills.

On June 5, 2007, Plaintiff filed a Charge of Discrimination with the Indiana Civil Rights Commission and the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of sex and retaliation. In particular, Plaintiff alleged that she was sexually harassed by Needham and was retaliated against for complaining about the harassment.

On September 4, 2007, Plaintiff received a "Letter to File" reprimanding her for two prior incidents in which she failed to report to work on time. Further, on October 25, 2007, Plaintiff was issued a Final Warning in connection with an internal investigation into MDT usage. In the Final Warning, the Department documented several instances of Plaintiff's inappropriate use of the MDT equipment by sending messages to another officer, including messages such "I just got humped by 3 fireman at once". Defs.' Mot. Summ. J ., Ex. B at Exhibit H. The Final Warning reminded Plaintiff of her prior disciplinary warnings and warned that further violation of the Police Department's policies would result in her termination. At her October 5, 2009 deposition, Plaintiff did not deny sending the messages or that this conduct violated the Police Department's policy, instead providing that a majority of the Police Department engaged in similar behavior. *Id.* at 127:21–23.

On November 21, 2007, Plaintiff failed to report to work, prompting her shift sergeant to contact her to determine why she did not report to work. Plaintiff provided that she thought she was scheduled off for the Thanksgiving holiday. Following her failure to report to work, Plaintiff was terminated on December 5, 2007 for failing to meet the Police Department's performance expectations, despite having been given prior opportunities to improve her performance.

On March 18, 2008, Plaintiff filed a second Charge of Discrimination with the Indiana Civil Rights Commission and the EEOC, alleging sex discrimination and retaliation. In

particular, Plaintiff alleged disparate treatment and retaliation following her June 5, 2007 Charge of Discrimination.

The EEOC issued a Determination to Plaintiff on June 18, 2008, related to her June 5, 2007 Charge. The EEOC informed Plaintiff that it concluded that evidence obtained in its investigation of Plaintiff's Charge indicated that Purdue retaliated against her when she complained of sex discrimination and there was reasonable cause to believe that Purdue violated Title VII. The EEOC provided that it would continue to pursue Plaintiff's retaliation claim through its conciliation process. However, the EEOC informed Plaintiff of her right to sue as to her sex discrimination claims and that she had ninety days from the date of the letter to file a lawsuit for sex discrimination.

**\*6** On August 21, 2008, the EEOC sent Plaintiff a Notice of Right to Sue letter related to her retaliation claim.

On October 7, 2008, the EEOC issued to Plaintiff a Notice of Right to Sue related to her March 18, 2008 Charge.

### ANALYSIS

In support of their Motion for Summary Judgment, Defendants contend that Plaintiff's disability discrimination claim is untimely, her Title VII disparate treatment claim is untimely and, in any event, she cannot prove a prima facie case of discrimination, retaliation, or harassment. The Court evaluates each in turn.

### A. Plaintiff's ADA Claim

In her Employment Discrimination Complaint, Plaintiff alleges a violation of the ADA. In particular, Plaintiff alleges in her Complaint that the "EEOC found cause to believe that the 1964 Civil Rights Act, as amended/and or (sic) the Americans with Disabilities Act (ADA) was violated." Pl.'s Compl. at 2. However, the EEOC did not make any finding as to an ADA claim. Defendants argue that Plaintiff's ADA claim is not properly before the Court because she failed to include it in either of her EEOC charges.

In her response brief to the Defendants' Motion for Summary Judgment, Plaintiff fails to address this argument. Because Plaintiff fails to address this issue in her response brief,

her ADA claim is waived. *See Palmer v. Marion County,* 327 F.3d 588, 597 (7th Cir.2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned); *Laborers Int'l Union of N. Amer. v. Caruso,* 197 F.3d 1195, 1197 (7th Cir.1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived).

Nonetheless, since the Plaintiff is proceeding *pro se* in this matter, in the interests of justice, the Court will evaluate the merits of whether her ADA claim is properly before this Court.

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. Western & Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir.1994); *see Denson v. Village of Bridgeview,* 19 F.Supp.2d 829, 833 (N.D.Ill.1998) (providing that "[t]o bring a claim under the ADA, a plaintiff must first file a charge alleging the unlawful employment practice with the EEOC and receive notice of right to sue ."). The purpose of this requirement is to promote the resolution of the dispute by settlement or conciliation and to ensure that the sued employers receive adequate notice of the charges against them. *Id.* at 500.

An ADA "plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Teal v. Potter,* 559 F.3d 687, 691 (7th Cir.2009). Further, ADA plaintiffs can litigate claims not explicitly included in the EEOC charge if the allegations fall within the scope of the plaintiff's allegations contained in the EEOC charge. *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 202 (7th Cir.1996). In determining whether the allegations in the complaint fall within the scope of the EEOC charge, the Court considers whether they are "like or reasonably related to" those contained in the EEOC charge. *Id.* This is a liberal standard that is satisfied if there is a reasonable relationship between the allegations in the charge and those in the complaint, and the claims in the complaint could reasonably be expected to be discovered in the course of the EEOC's investigation. *Teal,* 559 F.3d at 692.

**\*7** Plaintiff's June 5, 2007 Charge of Discrimination alleges sex discrimination[4] and retaliation. Plaintiff's March 18, 2008 Charge of Discrimination alleges sex discrimination and retaliation. In neither of her Charges does Plaintiff make

any allegation that she had a disability or that she was discriminated against on the basis of a disability. Accordingly, Plaintiff's allegation that Defendants violated the ADA is not like or reasonably related to her discrimination or retaliation allegations contained in her Charges of Discrimination.

4    Although Plaintiff alleges in the Charge that she has been "sexually harassed", her allegations focus on retaliation and discrimination. For example, Plaintiff alleges that she was suspended for insubordination for failure to attend baton training, while another officer who did not attend was not disciplined. Further, in its June 18, 2008 Determination, the EEOC characterized Plaintiff's claims as sex discrimination and retaliation.

Further, none of the Right to Sue letters that the EEOC sent to Plaintiff mention a claim for disability discrimination in this matter. Therefore, there is no reasonable relationship between the allegations in the Plaintiff's Charges and those in her Complaint, and the ADA claim cannot be reasonably expected to have been discovered in the course of the EEOC's investigation. *Teal,* 559 F.3d at 692.

Accordingly, the Court concludes that Plaintiff's ADA claim is improperly before this Court as it was not included in Plaintiff's EEOC Charges. Therefore, summary judgment must be granted in Defendants' favor on Plaintiff's ADA claim.

**B. Plaintiff's Claims under Title VII**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In her Complaint, Plaintiff alleges sex discrimination, retaliation, and hostile work environment. The Court evaluates each in turn.

*1. Plaintiff's Sex Discrimination Claim*

As a preliminary matter, Defendants argue that the discrimination claims that were, or could have been, brought in Plaintiff's June 5, 2007 Charge are untimely. "A civil action alleging a Title VII violation must be filed within 90 days of receiving a right-to-sue notice from the EEOC."

*Threadgill v. Moore U.S.A., Inc.,* 269 F.3d 848, 849–50 (7th Cir.2001). Compliance with the 90–day limit is not a jurisdictional prerequisite, but rather, is a condition precedent to relief that begins to run when the plaintiff receives actual notice from the EEOC of the right to sue. *Id.* Here, the EEOC Determination is dated June 18, 2008. In the Determination, the EEOC informed Plaintiff that she had ninety days within which to file a suit as to her sex discrimination allegations or her right to sue would be lost. Plaintiff filed the instant suit on November 18, 2008, more than ninety days after receiving the June 18, 2008 Determination. "The time limit is not flexible, even for pro se litigants, and a one-day delay is fatal." *Davis v. Browner,* 113 F.Supp.2d 1223, 1226 (N.D.Ill.2000). Therefore, her sex discrimination claims related to the allegations in her June 5, 2007 Charge are untimely. Nonetheless, in the interests of justice the Court will consider the merits of Plaintiff's claims as if they were timely filed.

**\*8** A plaintiff may meet her burden of proof for a discrimination claim under Title VII by offering direct evidence of the defendant's discriminatory intent or by proving disparate treatment through the indirect method. *Contreras v. Suncast Corp.,* 237 F.3d 756, 759 (7th Cir.2001). Under the direct method, the plaintiff must show either through direct or circumstantial evidence that the employer's decision to take the adverse employment action was motivated by an impermissible animus, such as the plaintiff's sex. *Adams v. Wal–Mart Stores, Inc.,* 324 F.3d 935, 938–39 (7th Cir.2003). Where a plaintiff fails to establish discrimination under the direct method, the plaintiff may still meet her burden through showing discriminatory treatment under the indirect, burden-shifting method. *Contreras,* 237 F.3d at 759. Under the burden-shifting method, established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff has the initial burden of establishing a prima facie case of sex-based discrimination. *Farrell v. Butler Univ.,* 421 F.3d 609, 613 (7th Cir.2005).

To establish a prima facie case under *McDonnell Douglas,* a plaintiff must show that (1) she is a member of a protected class; (2) she was performing her job according to the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated more favorably by the employer. *Atanus v. Perry,* 520 F.3d 662,

672–73 (7th Cir.2008). If the plaintiff establishes her prima facie case, then the defendant must state a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. If the defendant offers a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to come forward with evidence showing that the stated reason is pretextual. *Id.* at 804.

Plaintiff's Employment Discrimination Complaint reveals that Plaintiff has failed to allege any facts showing direct evidence of discrimination. Therefore, Plaintiff must proceed under the indirect, burden-shifting method.

Defendants concede that, as a woman, Plaintiff is a member of a protected class and that she suffered an adverse employment action by being terminated on December 5, 2007. However, Defendants contend that Plaintiff is unable to show that she was meeting Defendants' legitimate job expectations or that they treated similarly situated individuals outside of the protected class more favorably.

First, when evaluating whether a plaintiff was performing her job according to the employer's legitimate expectations, the Court evaluates the plaintiff's performance "through the eyes of her supervisors at the time of her ... termination." *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 689 (7th Cir.2008). Here, the evidence of record supports that Plaintiff was disciplined for several infractions. On November 8, 2006, Plaintiff received a documented verbal warning for improper use of the MDT equipment and, at her October 5, 2009 deposition, Plaintiff admitted engaging in that conduct and that it violated the Police Department's policy. Plaintiff also received a letter of expectation. Further, on February 9, 2007, Plaintiff received a written warning for failing to meet the standards of performance and behavior required of Police Department employees related to her failure to complete a police report on a call of possible drug use in a residence hall. Plaintiff did not disagree that she failed to fill out a report, but instead, at her October 5, 2009 deposition testified that it is debatable as to whether she needed to fill out a report.

**\*9** Next, Plaintiff was suspended for three days in March 2007 for failing to comply with the Police Department's policies when she failed to answer Lt. Sheppard's questions during an investigation as to Plaintiff's failure to attend baton training. On September 4, 2007, Plaintiff was issued a letter to file because she failed to report to work on

time and failed to advise the Police Department that she would be absent or late. Further, on October 25, 2007, Plaintiff received a Final Warning for continuing to violate Purdue's policies and procedures regarding the inappropriate MDT usage and Defendants informed her that any additional violations would result in termination. Plaintiff did not deny engaging in this conduct at her October 5, 2009 deposition, instead arguing that a majority of the Police Department engaged in similar behavior. Finally, Plaintiff failed to report to work on November 21, 2007, and she was terminated on December 5, 2007 for repeated violations of Purdue's policies and procedures and failed to meet performance expectations. Based on these circumstances, the evidence of record does not support that Plaintiff was meeting Defendants' legitimate job expectations at the time that she was terminated. *See Waggoner v. Olin Corp.,* 169 F.3d 481, 483 (7th Cir.1999) (providing that "[i]t should not require saying that generally attendance is a requirement of a job."); *Coppage v. Illinois Bell Telephone Co.,* No. 08–1143, 2009 WL 3460457, at *3 (C.D.Ill. Oct.22, 2009) (finding that a plaintiff failed to show that he met his employer's legitimate performance expectations due to attendance issues).

In her response brief, Plaintiff does not argue that she was meeting the Defendants' legitimate expectations. Rather, Plaintiff instead directs the Court to different documents and deposition transcripts that she filed along with her response brief that supposedly support her claims. However, Plaintiff fails to explain which of the numerous documents contain information showing, or how they show, that she met the Defendants' legitimate expectations. "A lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts *nor district courts* are 'obliged in our adversary system to scour the record looking for factual disputes ....' " *Greer v. Board of Educ. of City of Chicago, Ill.,* 267 F.3d 723, 727 (7th Cir.2001) (quoting *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1993)) (emphasis added). Failing to address this issue in her response brief or direct the Court to evidence indicating that she met Defendants' legitimate expectations, Plaintiff has failed to raise a genuine issue of material fact as to whether she met the Defendants' legitimate expectations. [5]

5        Plaintiff attached as exhibits to her response brief copies of some of her performance evaluations. After reviewing the evaluations, the Court

concludes that they do not create a genuine issue of material fact. First, the performance evaluations from the rating periods of July 2002 through June 2003, July 2004 through June 2005, and January 2006 through March 2006, although favorable to the Plaintiff, predate the conduct for which she received discipline. Next, although the performance evaluation from the rating period of November 27, 2006 through December 31, 2006, indicates that Plaintiff received a favorable review, her performance evaluation from July 2006 through June 2007 noted that she needed improvement in acceptance of feedback and in relationships with other department members, as well as noting her failure to file a report as required by the Police Department and allegedly filing false charges against other members of the department.

Next, even if Plaintiff was able to show that she was meeting Defendants' legitimate expectations, she still must show that similarly situated employees outside of the protected class were treated more favorably. A plaintiff may demonstrate that another employee is similarly situated by showing that the other employee is directly comparable to the plaintiff in all material respects. *Bottoms v. Ill. Dep't of Human Servs., 281 F. App'x 561, 564 (7th Cir.2008).* In this context, a similarly situated employee is one who shared the same supervisor, performance standards, and engaged in similar conduct to plaintiff without such differentiating or mitigating circumstances that would "distinguish their conduct or the employer's treatment of them." 🔖 *Peirick v. Indiana Univ.-Purdue Univ., 510 F.3d 681, 688 (7th Cir.2007).*

 **\*10** At her October 5, 2009 deposition, Plaintiff alleged that she was treated differently than other employees who also failed to attend the mandatory training, after which she was suspended when she failed to answer Lt. Sheppard's questions during the subsequent investigation. However, she admitted that she did not know if anyone else failed, or refused, to answer questions in the ensuing investigation.

Further, although Plaintiff alleged that she was treated differently regarding her use of the MDT equipment after sending inappropriate messages, she testified that she did not know who else was disciplined and thought that it was "probably" just her. *See* Defs.' Mot. Summ. J., Ex. B 102:18. Plaintiff also alleged that in being disciplined for failing to make a report when she responded to a call of possible drug use and recovered a smoking pipe, she was treated

differently than other officers who made similar arrests. In particular, Plaintiff claims that Officer Mike Boesch, Jr. was involved in a similar situation in that he seized a marijuana pipe from a suspect and Lt. Sheppard told him to destroy it and he did not make an arrest. There is no indication from the record, however as to whether, like Plaintiff, he failed to file a report. Plaintiff also claims that Officer John Goetz was involved in similar circumstances but did not have information regarding the incident. Therefore, the Court cannot conclude that Officer Goetz is similarly situated to Plaintiff.

Plaintiff also testified at her October 5, 2009 deposition that she was denied opportunities to participate in field training officer assignments, while male officers were given such opportunities. However, Plaintiff testified that she did not know if other officers were given assignments when they were in progressive discipline. Plaintiff also alleged that the individuals investigating her allegations of harassment failed to properly investigate her claims. In particular, Plaintiff alleges that Ms. Rollock treated her differently than male complainants during the investigation in that she would not let Plaintiff speak and would not take her complaints. However, Plaintiff provided that she was guessing that Ms. Rollock allowed Chief Evans and Needham to speak because of their rank over her and gender.

Plaintiff also alleged at her deposition that she was treated differently in being disciplined for failure to report to work on time while two other officers, Gabe Argerbright and Nick,[6] were also repeatedly late. Plaintiff provided that she did not know whether Officer Argerbright was issued a letter for being late and was unaware whether Nick was disciplined. Nonetheless, Plaintiff provided that Officer Argerbright "laughed it off and said nothing ever happened to him, [and] they just told him not to do it again" and that she was told, regarding Nick, that Defendants "didn't think it was that big of a deal." Defs.' Mot. Summ. J., Ex. B 174:17–19, 22–23. However, Plaintiff has not provided any evidence as to their disciplinary history.[7]

[6]     Plaintiff testified that she did not know Nick's last name.

[7]     Further, to the extent that Plaintiff claimed at her deposition that she requested Officer Argerbright's personnel file and did not receive it, Plaintiff did not notify the Court and has not filed a motion to compel.

To the extent that Plaintiff alleges that she was treated differently when she was required to take additional taser training while other male officers who also used tasers were not, she has failed to identify any other officer, other than Lt. Sheppard, involved in a similar situation. However, Lt. Sheppard is not similarly situated to Plaintiff as she is in a different position. *See Hoffman–Dombrowski v. Arlington Intern. Racecourse, Inc.,* 254 F.3d 644, 651 (7th Cir.2001) (deciding that a comparator was not similarly situated to the plaintiff where they did not hold the same or equivalent positions). Also, while Plaintiff argues that she had to respond to more calls than her male counterparts, she failed to identify any of the male counterparts and the Court cannot determine if they are similarly situated to Plaintiff.

**\*11** In her response brief, Plaintiff contends that the attached deposition transcripts to her brief will show that other officers were late numerous times and were not reprimanded at all, or to the extent that Plaintiff was. However, Plaintiff fails to direct the Court to any specific portion of the deposition transcripts supporting her allegations and the Court is not required to scour the record to search for this evidence. *See Greer,* 267 F.3d at 727. "A court need not make the [plaintiff's] case." *Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995); *see Oest v. Illinois Dept. of Corrections,* 240 F.3d 605, 615 (7th Cir.2001) (providing that a plaintiff must offer specific evidence and not just conclusory assertions that other employees are similarly situated).

Plaintiff alleges that Captain Potts testified during his February 15, 2010 deposition that she was the only officer who was subjected to a psychological evaluation. However, Captain Potts specifically testified that one other officer was also required to do so. Plaintiff alleges that Officer Michael Boesch testified at his February 8, 2010 deposition that Plaintiff was discriminated against or treated differently than male officers. While he testified that he believed that Lt. Sheppard retaliated against Plaintiff, he also provided that he did not know Plaintiff's disciplinary history and that he was not involved in meetings regarding punishment for inappropriate use of the MDT equipment.

Plaintiff also contends that Officer Goetz testified during his February 8, 2010 deposition that he was involved in a domestic dispute with his wife while he was on duty and was not disciplined. According to his deposition testimony, and Officer Boesch's, Officer Goetz and his wife had an argument and things got blown out of proportion after a third party called the police. Officer Goetz took the rest of the day off and met with Captain Potts to discuss what was going on. Plaintiff has failed to show how this is similar to any of the conduct that she engaged in so that the Court could conclude that Officer Goetz is similarly situated to her.

Next, Plaintiff contends that Needham admitted at his deposition to being romantically involved with numerous subordinates and was disciplined for similar incidents at his *previous* employer. However, she fails to explain how this is relevant to showing that they engaged in similar conduct and are similarly situated. Plaintiff also argues that Officer Argerbright admitted during his February 15, 2010 deposition that he reported to work late at least five times and was not disciplined. However, Plaintiff's characterization of Officer Argerbright's testimony is incorrect as he testified to being late five times and he received a written reprimand in the form of a letter.

Therefore, Plaintiff has failed to show that these individuals are similarly situated. *See Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 350 n. 3 (7th Cir.1997) (providing that parties are not similarly situated where they do not engage in all of the same misconduct); *Taffe v. Illinois Dept. of Employment Sec.,* 229 F.Supp.2d 858, 869 (N.D.Ill.2002) (finding that employees were not similarly situated where they held different positions and were disciplined for different types of conduct). Accordingly, Plaintiff has failed to establish a genuine issue of material fact as to whether similarly situated employees outside of the protected class were treated more favorably than her. Therefore, summary judgment must be granted in Defendants' favor.

**\*12** Even assuming that Plaintiff is able to show a prima facie case of gender discrimination, she would still have to show that Defendants' legitimate reasons for terminating her were a pretext for discrimination. Pretext means a lie or phony excuse. *O'Neal v. City of New Albany,* 293 F.3d 998, 1005 (7th Cir.2002). A plaintiff can establish pretext with evidence that the employer's explanation is not credible. *Atanus,* 520 F.3d at 674. The focus of this inquiry is whether the employer's stated reason was honest, not whether it was accurate or wise. *Lochard v. Provena St. Joseph Med. Ctr.,* 367 F.Supp.2d 1214, 1224 (N.D.Ill.2005).

Based on the record, Plaintiff cannot show that Defendants' reasons for terminating her, based on her numerous violations of their policies and procedures and failure to improve her performance, were pretext for discrimination. [8]

[8] While Plaintiff generally directs the Court to her "Timeline (sic) of Events" that she has attached as an exhibit to her response brief, the "Timeline" is her recitation of the events that occurred leading up to, and after, her termination. "[I]n opposing a motion for summary judgment under Rule 56, Plaintiffs may rely upon sworn affidavits ... [but] *[t]hey may not rely upon their own unsworn statements." Loch v. Board of Educ. of Edwardsville Community School Dist. No. 7,* No. 06–CV–0017–MJR, 2008 WL 2414864, at *1 (S.D.Ill. June 12, 2008) (emphasis added). As the Timeline is not a sworn statement, Plaintiff may not rely on it to attempt to create a genuine issue of material fact in this matter. *See Tye v. Chertoff,* No. 03 C 5931, 2006 WL 2861980, at *4 (N.D.Ill. Sept.29, 2006) (providing that a party may not rely on an unsworn statement).

Therefore, based on the foregoing, Plaintiff fails to create a genuine issue of material fact regarding her prima facie case of sex discrimination and summary judgment must be granted in Defendants' favor as to her Title VII sex discrimination claim.

### 2. Plaintiff's Retaliation Claim

Next, Plaintiff alleges that Defendants retaliated against her after she filed complaints for sex discrimination, harassment, and hostile work environment. Under Title VII, it is unlawful for an employer to "discriminate against" an employee "because [s]he has opposed any practice made an unlawful employment practice" by the statute or "because [s]he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a). An employee can establish a prima facie case of retaliation by proceeding under either the direct or indirect method. *Roney v. Illinois Dept. of Transp.,* 474 F.3d 455, 459 (7th Cir.2007).

Plaintiff fails to argue that she has direct evidence of retaliation and, having reviewed the evidence of record, the Court does not find admissible evidence supporting that she may proceed under the direct method. [9]

[9] The only argument that Plaintiff makes in her response brief concerning retaliation is by directing the Court to the June 18, 2008 Determination letter in which the EEOC indicated that it found reasonable cause to believe that Defendants retaliated against her. However, the EEOC did not provide any factual basis for its finding. Further, Plaintiff fails to cite any case law supporting that an EEOC finding is dispositive of whether an employer has violated Title VII, nor is the Court able to find any law in support. Therefore, Plaintiff's reliance on the EEOC Determination in support of her retaliation claim is misplaced.

Under the indirect method, the plaintiff must show that (1) she engaged in a statutorily protected activity, (2) she met her employer's legitimate expectations, (3) despite her satisfactory performance, she suffered a materially adverse employment action, and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Benitez v. American Standard Circuits, Inc.,* 678 F.Supp.2d 745, 761 (N.D.Ill.2010). A plaintiff's failure to satisfy any one element of the prima facie case is fatal to her retaliation claim. *Roney,* 474 F.3d at 459.

If the plaintiff establishes a prima facie case of retaliation, then the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. If the defendant meets this burden, then the plaintiff must show that the proffered reason is pretextual.

Under the indirect method, as discussed in relation to Plaintiff's sex discrimination claim, because Plaintiff has failed to show that she met the Defendants' legitimate expectations and is unable to show similarly situated employees who were treated more favorably, her prima facie case fails. Therefore, Plaintiff has failed to raise a genuine issue of material fact regarding her retaliation claim and summary judgment must be granted in the Defendants' favor.

### 3. Plaintiff's Hostile Work Environment Claim

**\*13** "A hostile environment claim falls under the general rubric of harassment at the workplace, which can amount to prohibited discrimination in terms and conditions of

employment." *Cerros v. Steel Technologies, Inc.,* 288 F.3d 1040, 1045 (7th Cir.2002). To survive summary judgment on a hostile work environment sexual harassment claim, a plaintiff must establish that "(1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on her sex; (3) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability." *Moser v. Indiana Dept. of Corrections,* 406 F.3d 895, 902 (7th Cir.2005). "Federal civil rights laws do not exist to ensure that employees enjoy workplaces that are free from profanity or incivility; to be actionable, the conduct must either have a discriminatory character or purpose." *Mokry v. Partylite Worldwide, Inc.,* No. 07 C 0972, 2009 WL 2588888, at *16 (N.D.Ill. Aug.20, 2009) (Slip Copy). "Title VII protects a worker against conduct which is sufficiently severe or pervasive that a reasonable person would find it hostile and which the victim [her]self subjectively sees as abusive." *Andonissamy v. Hewlett–Packard Co.,* 547 F.3d 841, 847 (7th Cir.2008).

Courts examine a variety of factors when evaluating whether a workplace is hostile, including the frequency of the supposed discriminatory conduct; its severity; whether the conduct is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's job performance. *Id.*

At her October 5, 2009 deposition, Plaintiff alleged that Captain Potts created a hostile work environment by failing to take her side in disputes with Lt. Sheppard and, in particular, yelling at her when Lt. Sheppard was around and screaming at her over her failure to attend baton training. Further, Plaintiff alleged that he talked to her about complaints that she made, attempting to intimidate her prior to her attending meetings related to Purdue's investigation of her claims. Plaintiff fails to indicate the frequency of Captain Potts yelling at her. "[I]solated and innocuous incidents will not support a hostile environment claim." *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 480 (7th Cir.1996). Further, Plaintiff has failed to show that this conduct is objectively hostile. *Racicot v. Wal–Mart Stores, Inc.,* 414 F.3d 675, 678 (7th Cir.2005) (providing that where the plaintiff alleged that co-workers used vulgar language in her presence, occasionally cursed at her and yelled at her, she failed to show an objectively offensive work environment).

Plaintiff also alleged that Chief Evans harassed her by forcing her to go on light duty and making her take a fitness for duty exam, which caused her to suffer embarrassment as her co-workers wanted to know why and started rumors. However, Plaintiff has failed to provide evidence as to what the rumors were, that Chief Evans started the rumors, and has failed to offer evidence in the way of establishing that her work environment could objectively be perceived as hostile because of this. *Roney,* 474 F.3d at 463. Plaintiff also contends that Captain Cox created a hostile work environment for her because he conducted both of the investigations relative to her claims instead of the Police Department conducting one investigation while Purdue conducted a separate investigation. Nonetheless, Plaintiff fails to explain how this was subjectively or objectively hostile.

**\*14** Plaintiff also alleges that Sergeant John Moore failed to appear to conduct the baton training session which caused her a hostile work environment. But, Plaintiff testified that she was not saying that he did so to purposely cause her a hostile work environment. Nonetheless, her allegations are based on speculation. "[M]ere speculation or conjecture" will not defeat summary judgment. *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir.2003). Plaintiff also claims that Sergeant Moore subjected her to a hostile work environment when he allegedly distributed to other officers copies of emails that she printed relating to her complaints. Plaintiff testified that she was aware that Sergeant Moore distributed the emails because Officer Boesch told her that Officer Argerbright told him that Sergeant Moore distributed the emails. However, Plaintiff has failed to offer evidence indicating the content of the emails or that the information that the emails contained was humiliating or personal information or that his distribution of the emails interfered with her job performance. Therefore, the allegations related to Sergeant Moore's conduct do not support her hostile work environment claim.

Next, Plaintiff alleges that Officer Kelly Colosino subjected her to a hostile work environment by failing to assist Plaintiff on a call and by sending her harassing emails. Plaintiff has failed to indicate whether Colosino's refusal to assist her on a call affected Plaintiff's job performance, what the content was of the allegedly harassing emails, or the frequency of the emails. Accordingly, Plaintiff has failed to provide the Court with information from which it can determine that the alleged conduct was subjectively and objectively hostile.

Finally, Plaintiff alleges that Needham created a hostile work environment by threatening her and screaming at her on different occasions. Particularly, Plaintiff testified at her deposition that if Needham was upset, he would take her to a location that was not close to campus so that he could yell at her. But Plaintiff has failed to indicate the frequency of this alleged conduct, the content of the threats [10] so that the Court can evaluate whether the alleged threats were physically threatening or a mere offensive utterance. "[R]elatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment." 🚩 *Filipovic v. K & R Exp. Systems, Inc.,* 176 F.3d 390, 398 (7th Cir.1999).

[10] While Plaintiff has alleged in her Employment Discrimination Complaint that Needham physically entered her residence and threatened her, in the transcripts of her deposition before this Court she did not identify this conduct when discussing how Needham created a hostile work environment. Therefore, the Court finds that she has failed to provide evidence supporting that this contributed to a hostile work environment.

Although the evidence reveals that other officers' conduct was unprofessional (such as Needham's conduct in maintaining romantic relationships with subordinates), and at times constituted childish and boorish behavior, [11] Title VII does not set forth a general civility code for the workplace and "does not protect an employee from trivial harms, petty slights, nor minor annoyances." 🚩 *Stephens v. Erickson,* 569 F.3d 779, 790 (7th Cir.2009). Plaintiff has failed to show that any alleged harassment was because of her sex, *See* 🚩⚠ *Haugerud v. Amery School Dist.,* 259 F.3d 678, 692 (7th Cir.2001) (providing that "[o]ur inquiry turns on whether the alleged harassment occurred *because of the sex of the complainant"* ) (emphasis added); *E.E.O.C. v. International Profit Associates, Inc.,* No. 01 C 4427, 2008 WL 4876860, at *8 (N.D.Ill. July 14, 2008) (finding that a plaintiff's hostile work environment claim failed where she could not demonstrate that the alleged severe and pervasive conduct resulted from any actions directed against her because of her sex); 🚩⚠ *Van Jelgerhuis v. Mercury Finance Co.,* 940 F.Supp. 1344, 1358 (S.D.Ind.1996) (providing that "in order for harassment to be actionable under Title VII, *it must have occurred because of a plaintiff's sex"* ) (emphasis added), and has failed to provide evidence [12] indicating that the alleged

harassment was objectively hostile or that it was severe or pervasive enough to interfere with her work performance. *See Andonissamy,* 547 F.3d at 847.

[11] For example, during his February 8, 2010 deposition, Officer Boesch testified that Needham would fart on Lt. Sheppard and she would chase him around the department to try to burp on him.

[12] Plaintiff has submitted a medical document from her doctor indicating that she developed general anxiety disorder in response to harassment by another employee. However, the doctor failed to provide any basis for this conclusion and Plaintiff "cannot defeat summary judgment by relying on unsubstantiated assertions." 🚩 *Greer,* 267 F.3d at 729.

**\*15** Accordingly, Plaintiff has failed to raise a genuine issue of material fact regarding her hostile work environment claim and summary judgment must be granted in Defendants' favor.

### C. Defendants' Motion to Strike

Given that the Court grants Defendants' Motion for Summary Judgment, the Court hereby denies as moot the Motion to Strike.

### CONCLUSION

Accordingly, based on the foregoing reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment [DE 30]. Summary judgment is hereby **ORDERED** in favor of Defendants Purdue University and Purdue University Police Department. Plaintiff shall take nothing by her Complaint in this case against the Defendants.

The Court **DENIES as moot** the Defendants' Motion to Strike [DE 38].

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2838377

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 380242
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Donald E. PINES, Plaintiff,

v.

BOARD OF REGENTS OF the
UNIVERSITY OF MICHIGAN, Defendant.

No. 10–15106.
|
Feb. 6, 2012.

**Attorneys and Law Firms**

Richard A. Meier, Farmington Hills, MI, for Plaintiff.

Richard W. Warren Megan P. Norris, Joseph W. Uhl, Miller, Canfield, Detroit, MI, for Defendant.

**MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 14) AND DISMISSING CASE** [1]

[1] Although originally scheduled for hearing, the Court deems this matter appropriate for decision without oral argument. *See* Fed.R.Civ.P. 78(b); E.D. Mich. LR 7.1(f)(2).

AVERN COHN, District Judge.

### I. Introduction

**\*1** This is an employment case. Plaintiff Donald E. Pines (Pines) is suing defendant the Board of regents of the University of Michigan (the University) claiming he was terminated in retaliation for complaining about a female co-worker, in violation of Title VII of the Civil Rights Act of 1964. [2]

[2] Pines stipulated to dismiss his claims under the Americans with Disabilities Act, Persons with Disabilities Civil Rights Act, and Elliot–Larsen Civil Rights Act. *See* Doc. 11.

Before the Court is the University's motion for summary judgment, arguing that Pines has failed to establish a prima facie case because (1) some of the alleged actions do not constitute adverse employment actions and (2) Pines cannot establish a causal connection between the protected activity and his termination. The University also argues that summary judgment is appropriate because he has failed to show that the University's reason for terminating him was a pretext for retaliation. For the reasons that follow, the motion will be granted.

### II. Background

The material facts as gleaned from the parties' papers follow. [3]

[3] The University complied with the Court's motion practice guidelines for a motion for summary judgment. The University prepared a statement of relevant facts in separately numbered paragraphs, (Doc. 13). Pines did not respond or prepare a counter-statement. Under the Court's guidelines, the University's factual statements, which are supported by record citations, are deemed admitted. As such, they form the basis for the majority of the factual background section of this memorandum.

### A. Pines' Employment Generally

Pines began working for the on January 8, 2007 as a part-time employee at the University's Department of Psychiatry. Ten months later, on November 26, 2007, the University offered Pines a regular full-time position as Senior Billing Clerk/Patient Account Representative (Senior Account Representative). As a Senior Account Representative, Pines had four primary duties: (1) answer phones; (2) call insurance companies to enquire about the benefits of particular patients; (3) track deposits; and (4) perform batch entries. Pines began his Senior Account Representative position on a six-month probation period, which ended on May 27, 2008.

On July 7, 2008, just over a month after his probation period ended, Pines informed the University's Director of Operations, Annmarie Lucas (Lucas), in an email that he was unhappy with his job, stating in part: "I want to bid on the job downstairs with Intake. To be honest, I am not that happy

up here and there is no chance that is going to change" Lucas forwarded Pines' email to his immediate supervisor, Tammy LaPrell (LaPrell), who responded in an email to Lucas which stated in part: "we've had no inclination that [Pines] was dissatisfied until now"

LaPrell then spoke with Pines to find out why he wanted to leave the department and reported back to Lucas in an email, stating in part:

> I ... spoke with [Pines] and he said that the Patient Rep position is just not a good fit for him. Nothing else. He is very stressed and would like to move on. At that point I spoke to him about the Nueropscyh. position and he actually sounded very interested. I gave him the posting number and he said he would pop on it. I also told him that the three of us would be talking no later than Wednesday and would get back to him. He seemed somewhat releaved [sic].

### B. Pines' Harassment Complaint

That same day, July 7, 2008, Pines met with Lucas. During the meeting, he explained that Hilary McGraw (McGraw), a co-worker, was stalking him. In particular, Pines reported the following incidents of "harassment:" (1) when his wife (who also worked at the University) was in his office, McGraw banged things so he could hear and that he felt he was being sexually harassed; (2) McGraw followed him around; (3) McGraw made him feel uncomfortable; and (4) on one occasion McGraw had given him a Valentine's Day card and candy.

**\*2** While Pines testified at deposition that he was not sure he gave all of the details to Lucas, he now alleges that (1) McGraw made him uncomfortable because she asked for his phone number, although he admits that he does not know why she wanted it and that he never actually received a call that he knows came from McGraw; (2) he threw the Valentine's Day card away without reading it, so he has no idea whether it said anything other than McGraw's name or was sexual

in any way; and (3) McGraw did not say anything sexually suggestive to him regarding the card. Pines also explained in his deposition that the allegation that McGraw "followed" him is based on the fact that he frequently encountered her as he went about his business in the office and that McGraw accompanied Pines when he delivered money to another department—as she was required to do. Pines also now alleges that McGraw ate a sucker "suggestively," wore low-cut tops, and said that if they had a baby, they could name it Destiny. Pines also admitted at deposition that any alleged sexual harassment had ended by July 8, 2008, the day after he first made his complaint.

After making his complaints to Lucas, Pines requested to be moved to a different position, suggesting that he would like to bid on a position in Intake. Lucas told Pines she would investigate his complaints

To that end, on July 16, 2008, Human Resources Consultant Patricia Whitfield (Whitfield) outlined the investigation process Human Resources would conduct with the assistance of David Betts (Betts) of the University's Office of Institutional Equity (OIE). As part of the investigation, Betts interviewed Pines, McGraw, and other coworkers. During his deposition, Pines stated that he may not have provided all of the details regarding his current allegations when he met with Betts, which took place on July 17, 2008.

During McGraw's interview with Betts, McGraw denied Pines' allegations and made a counter-complaint, indicating that Pines (1) told her he liked her breasts; (2) would stare at her breasts;(3) would stand unnecessarily close to her; (4) attempted to engage in sexual conversation, asking, among other things, for her to explain her online dating and sexual experiences; (5) would play the Marvin Gaye song "Let's Get It On" while dancing in a sexually suggestive manner; and (6) would simulate sexual intercourse with McGraw's chair, the office wall and a toy frog McGraw kept in her office. However, McGraw did not provide specific dates or times of such incidents. She also reported that sometimes Pines comments led her to tell him he was giving "too much information," she did not tells Betts that Pines' conduct was unwanted or unwelcome. McGraw also told Betts that on occasion her conversations with Pines became sexual in nature, and that she had willingly participated in the conversations.

Betts also interviewed other witnesses who corroborated some of McGraw's complaints but did not corroborate Pines'

allegations against McGraw. In his affidavit, Betts states that within a few weeks of beginning his investigation, he concluded that McGraw did not sexually harass Pines, but that both McGraw and Pines acted unprofessionally on several occasions. However, due to the fact that McGraw had made a counter-complaint, Betts delayed issuing a final report because he wanted to speak with Pines. As will be explained below, however, Betts was unable to do so because Pines went on medical leave a few weeks after he reported the alleged harassment.

**\*3** On September 15, 2008, LaPrell gave Pines a written warning for inappropriate and unacceptable behavior based on "information indicating a pattern that you occasionally initiated conversations that were inappropriate and should not have occurred in the work setting" Because witnesses did not corroborate Pines' allegations against McGraw, LaPrell issued her a verbal warning. LaPrell states in her affidavit that the discipline decisions were made based on Betts' statements to her regarding his initial findings.

On January 26, 2009, Betts issued his final report, [4] finding neither Pines nor McGraw had violated the University's sexual harassment policy, but that both had acted unprofessionally.

[4]  In the background section of the report, Betts notes that the report was delayed due to both Pines and McGraw "being unavailable for extended periods of time."

#### B. Pines' Medical Leave and Performance Issues

Meanwhile, on July 28, 2008, a few weeks after he made his complaint about McGraw, Pines went out on medical leave. Pines provided a note from Dr. Murtaza Syed which stated Pines was under his psychiatric care and would be unable to work from July 28, 2008 through August 11, 2008. Dr. Syed extended Pines medical leave several times, during which Pines applied for and was granted leave under the Family and Medical Leave Act. Dr. Syed ultimately released Pines to return to work on September 15, 2008, with the restrictions that Pines would need a "gradual return to his workplace for adjusting to workplace," could only work part-time during the gradual return, and would be seen again by Dr. Syed in two weeks.

The University agreed to the doctor's requested accommodations and allowed Pines to return to work on a part-time basis "at 4 hours a day starting September 15, 2008." As noted above, the day Pines returned to work he received the written warning based on Betts' investigation.

Because Pines' work hours were reduced, the University also reduced his workload to three tasks—(1) taking patient representative phone calls; (2) processing requests in the patient representative email inbox and (3) staying current with the batch entries—in order to help Pines complete the most essential components of his job during his limited time in the office. Finally, the University changed Pines' office location to separate him from McGraw.

Although he returned to work in mid-September, Pines was absent several times shortly thereafter. He called in sick nine times between September 15 and November 3, 2008, sometimes without a doctor's note.

On October 3, 2008, LaPrell documented her concerns regarding Pines' attendance and the fact that he had not provided any documentation regarding the need for continued restrictions beyond the two week revisit date noted in Dr. Syed's initial return-to-work release. LaPrell wrote to Pines: [5]

[5]  At deposition, Pines denies receiving several notices regarding his performance. However, he admits that his telephone was disconnected and he used his wife's e-mail to conduct business.

On Monday, September 29, I expected that your schedule would return to full-time per Work Connections. On September 29, you left at Noon without informing me, called in sick September 30 and left at Noon on October 1, and on October 2 and again without informing me that you were leaving for the day.

**\*4** As of October 3, Work Connections has not received any updated documentation from your medical provider that your part-time work restriction would continue beyond September 29, 2008. The absences this week will be unexcused without pay.

Your continued absence is causing a negative impact on your productivity as well as the productivity of other staff with the Business Office. It is causing a hardship on me and my staff in meeting the demands of patient billing.

If additional documentation from Work Connection is not received by October 6, 2008, it may jeopardize continuation of your current position with the Department of Psychiatry.

On October 11, 2008, Dr. Syed continued Pines' restrictions until the end of 2008.

In addition to the attendance issues, Pines had problems completing his reduced tasks. On October 29, 2008, LaPrell documented these problems in a memorandum to Pines entitled "1st Corrective Action–Work Performance" which states in part:

> My review of your work shows that you have not been meeting minimal obligations. For example, today was your assigned day to monitor voice mail and you left without doing it. The completed folder in the shared inbox shows that no messages were processed by you since your return to work on September 15. In addition, we continued to fall further behind in batch entry in M–Strides.

In mid-November 2008, LaPrell went through Pines' work and found a number of tasks that were months overdue. As a result, the University placed Pines on an unpaid medical leave, effective November 11, 2008. LaPrell documented the reasons in a November 10, 2008 memorandum to Pines, entitled "Failure to Meet Work Obligation ." The memorandum states in part:

> During September 2008, we agreed to support your return to work by temporarily providing you with an accommodated work schedule. As a result, you were permitted to alter your normal 40 hour per week schedule in exchange for a 20–hr. work week where you were scheduled to work 4 hrs per day, 5 days per week.
>
> ... Since your return to work on September 15, 2008, you have failed to demonstrate that you are able to sustain yourself on a 20 hour per week work schedule. Since your return 9 weeks ago, with the exception of two weeks, you have been unable to meet a work obligation of 20 hours per week. Although we have attempted to accommodate

your reduced work schedule, your inability to regularly contribute 20 hours of work per week, has been disruptive to our operational work flow. Your typical work pattern has included either 1 or 2 days of no pay for each of the weeks that you have failed to work 20 hours. At this time, we are no longer able to offer continued reduced work hours.

> Effective November 11, 2008, we are releasing you from reporting to work and placing you on an unpaid medically approved leave. If future health changes enable you to increase your work hours, please alert me and provide this updated health information to Work Connections.

**\*5** On November 13, 2008, Pines provided a medical statement from his doctor. The statement is of poor quality and difficult to read. However, it appears that his doctor stated: "[Pines] feels harassed at work. As long as he is exposed to what he feels are caustic co-workers he will have difficulty performing any work." The doctor states Pines will be evaluated weekly and appears to give a return to work date of February 13, 2009. Thus, Pines' doctor's note essentially confirms he was unable to work.

On December 3, 2008, the University advised Pines of the return-to-work process, [6] stating in part:

[6]
> At the time Pines was on unpaid medical leave of absence, the University's leave of absence policy stated in part:
> I. Policy
> Leaves of absence are without compensation by the University except as provided by the University Disability Plans ... Staff members returning from initial ... medical ... leaves of absence will be assigned to their former classifications or classification or like status and pay for which they are qualified; unless their circumstances or the circumstances of the University have changed, making this unreasonable.
> * * *
> I.J. Failing To Return From A Leave
> Failure to report for work at the conclusion of a leave without requesting and receiving an extension of the leave will be cause for termination of the staff member's employment with the University.
> * * *

III. B. 1. Procedures–Returning From Leave–Staff Member

Two weeks before the date that the leave expires, [staff members] must notify the appropriate Personnel Service Center Employment Office of [their] intent to work. If returning from a medical leave, provide a medical leave release from a physician.

III. B. 2. Procedures–Returning From Leave–Personnel Service Center Employment Office

If a returning staff member's former position is not available, and there are vacant position of like status and compensation for which the returning staff member is qualified, discuss option a, b, or c with the staff member as they apply:

(a) Return the staff member to a vacant position in the department from which the leave was taken.

(b) Return the staff member to a vacant position in the organizational group from which the leave was taken;

(c) Return the staff member to a vacant position any place in the University

You have been granted an unpaid personal leave of absence not covered2 under the FMLA. The leave began on November 11, 2009 and will end on May 11, 2009.

...

This will be your only notice regarding your leave of absence. It will be your responsibility to contact your department at least 14 days prior to your return to work. If you do not contact your department to make arrangements to return, your reemployment with the University of Michigan may be terminated.

On December 6, 2008, Pines' new doctor, Ravi Kirbat, M.D., released him to return to work, without restrictions, effective December 17, 2008.

Pines, however, did not contact anyone at the University regarding his return to work and did not appear for work on December 17, 2008. Rather, it was not until three months later, in March 2009, that he contacted the University about returning to work.

C. Pines' Position at the University

While Pines was on his medical leave, but after his physician released him to return to work as of December 17, 2008, the University decided that it did not need a Senior Account Representative position and eliminated the position. After deciding that it could effectively operate with a lower position, the University created a new, reduced position that included some, but not all, of Pines job functions, which it filled in December 2008.

On March 16, 2009, more than three months after he was released to return to work by his physician, Pines emailed Whitfield in Human Resources, stating,

> It has come to my attention that my previous position has been filled. I was placed on medical leave under the assumption that I would be returning to this position. I have been working with my doctor to return to work from medical leave. I have also supplied documentation from my health care provider stating that all health care restrictions have been lifted as well. The reason I have contacted you is that I am hoping that you could provide some assistance in securing a new position at the University of Michigan.

Whitfield responded in an email dated March 20, 2009, stating in part:

Staff members returning from medical leaves are typically considered for placement in vacant positions in their former department for which they are qualified, if any vacancies exist. I've checked and have not identified a vacancy in your former area and I will therefore be monitoring other areas of Psychiatry to determine if other suitable openings occur.

**\*6** Once you have obtained a release to return to work from your treating sources, you should feel free to begin bidding on positions online through eMploy....

I am open to meeting with you if you would like to discuss your planned job search. You also have the option of forwarding your resume/cover letter and I could review it and provide feedback

Whitfield again explained the process to Pines in an another email on April 2, 2009. After Pines expressed some dissatisfaction with the University's response to his request to return to work, Whitfield advised him, in an email dated April 6, 2009:

> In one of your previous e-mails you appeared to have concerns regarding how your previous position was handled. If that is correct, you can always file a grievance and note which actions you would like to have reviewed. If you have an interest in doing that, let me know and I will mail you a grievance packet along with instruction.
>
> If you would like to speak with my Services Director that would be Jan Mulcrone and you can request her through our front desk.

In April, 2009, Pines submitted a Non–Bargained For Grievance, contending that the University violated "(1) Michigan's Sexual Harassment law; (2) The Michigan Civil Rights Initiative; (3) the Americans With Disabilities Act; (4) Title VII of the Civil Rights Act of 1964; (5) the Whistleblowers Protection Act; (6) Marital Discrimination; and (6) University of Michigan Standard Practice Guide 201.3 Section N, line # 1"

Pines was allowed to choose one of the members to sit on the grievance panel. The third step grievance hearing was held on May 18, 2009. At his hearing, Pines explained that he "certainly [didn't] want to go back [to his former] position, but I needed the money now. I'm desperate. That's what I told them at the grievance. When you're desperate, that's all there is, I would have taken it. I wouldn't have liked it, and I still would have hoped for a transfer. I would have encouraged it."

The University Review Committee found that Pines was not subjected to any unlawful actions. The Committee, however, agreed to extend Pines' leave until August 11, 2009, so that he would have additional time to find a new position within the University.

Although Pines subsequently applied for positions, he was not selected for any positions for which he applied. The University says he was not selected because he was not the most qualified candidate. At deposition, Pines admitted that he has no idea who was ultimately selected for any of these positions or the qualifications of the successful candidates.

Because Pines did not find an alternate position during the extended time period, LaPrell sent him a letter stating he was terminated effective August 1, 2009. [7]

[7]    As noted above, the Committee extended Pines' leave until August 11, 2009. Thus, his termination should have been effective as of that date, not August 1, 2009. Be that as it may, there is no evidence in the record that Pines would have obtained a new position after August 1, 2009. Moreover, it is possible that the August 1, 2009 date in the letter was a typographical error.

### III. Summary Judgment

Summary judgment should be granted when the moving party establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick,* 355 F.3d at 451–52 (citing *Anderson,* 477 U.S. at 248). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury,* 344 F.3d 603, 613 (6th Cir.2003); *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir.2003).

**\*7** "The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick,* 355 F.3d at 451 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.,* 477 U.S. at 325. "Once the moving party satisfies its burden, 'the burden shifts to the

nonmoving party to set forth specific facts showing a triable issue.' " *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir.2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); Fed.R.Civ.P. 56(e). The nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. *Anderson,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202. Thus, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. *See Moore v. Philip Morris Co.,* 8 F.3d 335, 340 (6th Cir.1993); *see also Anderson,* 477 U.S. at 249–50.

## IV. Analysis

### A. Prima Facie Case

Title VII prohibits an employer from discriminating against an employee who opposes any practice made an unlawful employment action under Title VII. 42 U.S.C. § 2000e–3(a). "In the absence of direct evidence, we review [Pines'] retaliation claim under the *McDonnell Douglas* framework." *Vaughn v. Louisville Water Co.,* 302 Fed.Appx. 337, 348 (6th Cir.2008) (citation omitted).

In order to establish a prima facie case of retaliation, Pines must show that: (1) he engaged in a protected activity under Title VII; (2) the University knew he engaged in that protected activity; (3) the University took an adverse, retaliatory employment action against him thereafter, or he was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between his protected activity and the adverse employment action or harassment. *See Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 736 (6th Cir.2006); *Arendale v. City of Memphis,* 519 F.3d 587, 606 (6th Cir.2008) (citation omitted).

The University says that Pines has failed to make out a prima facie case because (1) some of Pines' alleged discriminatory employment actions do not constitute adverse employment actions and (2) Pines cannot show a causal connection between the protected activity and his termination. Each argument is addressed in turn.

**\*8** In *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court defined an adverse employment action in the context of a Title VII retaliation claim as one that "a reasonable employee would have found ... materially adverse, which in this context means [that the action would] dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." The Supreme Court cautioned that "it is important to separate significant from trivial harms." *Id.* "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Here, the University concedes that Pines' termination was an adverse employment action. While that would seem to end the matter insofar as to this element of a prima facie case, the University goes on to argue that Pines' alleged instances of adverse employment actions, including (1) having his office location changed, (2) never feeling part of the group, (3) never being handed his disciplines, and (4) his supervisor allowing him to perform only a portion of his duties after initially returning from medical leave, are not actionable. The Court agrees. None of these alleged action would dissuade a reasonable person from filing a sexual harassment complaint.

Pines, however, argues in his response that his four instances of discipline constitute adverse employment actions. Pines is mistaken. First, while the September 15, 2008 written warning is disciplinary, it informs Pines that his behavior was inappropriate and unacceptable and does not impose significant corrective action. Second, the October 3, 2008 letter is not disciplinary at all. Rather, it informs Pines as to the effect of absences without documentation. Third, the October 29, 2008 memorandum advises Pines that there are concerns with his performance but does not impose any discipline on him as a result. Finally, the November 10, 2008 memorandum is not disciplinary. In that letter, the University informs Pines that because he has been unable to meet his work schedule obligations, he will be returned to medical leave. As noted above, Pines responded to that memorandum with a doctor's note indicating that he could not work at all.

Based on the record, consisting of one written warning, a written counseling regarding performance improvement, a letter advising Pines of a need for medical documentation, and being placed on medical leave (which his doctor confirmed his inability to work at that time), reasonable minds could not differ that these events are insufficient to dissuade a reasonable employee from making a charge of discrimination. Thus, they do not constitute adverse employment actions.

The University also argues that Pines has failed to make out a prima facie case because he cannot show a causal connection. The University notes that Pines filed his complaint on July 8, 2008 and was not terminated until at least August 1, 2009–more than a year later. "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir.2008); see also *Randolph, 453 F.3d at 737* ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."); *Little v. BP Exploration & Oil Co.,* 265 F.3d 357, 363–64 (6th Cir.2001) ("While it is true that temporal proximity alone is insufficient to establish a causal connection for a retaliation claim, there are circumstances where temporal proximity considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection." (internal citations omitted)).

 *9 Here, Pines has offered no evidence as to causal connection, i.e. that any of his alleged "disciplines" (assuming they were adverse employment actions) or his termination were the result of his sexual harassment complaint. Instead, Pines argues that the complaint and his termination are not over a year apart, but rather only 91 days apart because he only worked that many days between the two events. Pines offers no authority for the proposition that actual days worked, as opposed to the number of days which elapsed between the relevant events, is controlling. Moreover, the Sixth Circuit appears to have rejected this type of argument.

See *Martin v. General Electric Co.,* 187 Fed. Appx. 553, 561 (6th Cir.2006) (counting total elapsed days between the filing of plaintiff's EEOC charge and adverse employment action, and not days plaintiff worked). Moreover, 91 days by itself does not establish a causal connection. *Hafford*

*v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999) (affirming dismissal of claim where disciplinary action occurred two to five months after alleged protected activity).

Even if Pines could establish temporal proximity, he has not pointed to any other indicia of retaliatory conduct. *See, e.g., Randolph, supra,* at 737. Instead, he says that "after going on a medical leave ... plaintiff was never allowed to return [to work]. The plaintiff was offered a settlement on June 16, 2009." (Doc. 16, Pines' Response brief at p. 8). However, Pines does not dispute that his doctor released him to return to work as of December 17, 2008 and he failed to show or make arrangements for his return until three months later. [8] Finally, the offer of a separation agreement does not establish retaliation. *See EEOC v. SunDance Rehabilitation Corp.,* 466 F.3d 490 (6th Cir.2006).

[8]     Pines does not dispute that he failed to return to work after his doctor cleared him to do so, nor does he explain why he waited three more months before contacting the University about returning to work.

Overall, Pines has failed to establish a prima facie case of retaliation.

### B. Pretext

Assuming Pines established a prima facie case of retaliation, the burden of production then shifts to the University to proffer a non-discriminatory reason for the adverse employment action. *Ladd v. Grand Trunk Western R.R., Inc.,* 552 F.3d 495, 502 (6th Cir.2009) (citation omitted). Once the University does so, "the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was mere pretext." *Id.* The burden of persuasion, however, remains at all times with the Pines. *Id.*

Here, because the University has stated a non-discriminatory reason for Pines' termination-his position was no longer available when he attempted to return to work from a medical leave of absence within the initial, and extended, period of time the University allowed him to seek an available position. Pines must now show this reason was pretextual. In order to prove pretext, Pines must show that the University's reason(s) "(1) had no basis in fact, (2) did not actually motivate its conduct, or (3) were insufficient to warrant the challenged

conduct." 🚩 *Browning v. Department of the Army,* 436 F.3d 692, 695 (6th Cir.2006).

**\*10** Pines argues that pretext is established because (1) LaPrell did not want him back in her department; (2) the University has never indicated why Pines' position was no longer available; and (3) the University failed to allow him to bump another employee from his/her position. These allegations, none of which are supported by any evidence, are sufficient to show pretext. Pines' allegation concerning LaPrell does not show pretext because he offers no facts to show that LaPrell wanted him out of her department. Speculation does not establish pretext. Pines' allegation regarding the availability of his position also fails to show pretext. Pines has no evidence to rebut the University's contention that it could operate effectively with a lower position. Pines' allegation regarding bumping to another position also misses the mark. When Pines finally sought to return in March 2009, three months after his physician released him to do so, the University says that he was no longer entitled to the protections of the University's Standard Practice Guide (SPG) which apparently allows for bumping. [9] Pines offers nothing to contradict this assertion. Overall, Pines has not shown that the University's actions with respect to him, up to and including his termination, were a pretext for retaliation.

[9] The University argues that even if Pines had been entitled to the SPG's protections—as they existed in the July 2009 version of the leave of absence SPG—an individual under that version of the SPG was only entitled to bump another employee "in the same classification ... provided the employee [can] do the work and has more service than the staff member with the most recent date of hire." Pines has not identified any existing employee in his classification with less seniority than him or shown that he had the ability to do that unidentified person's work.

### V. Conclusion

For the reasons stated above, the University's motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 380242

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.